Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NORTH DAKOTA

3                   EASTERN DIVISION

4    _____

5    Matthew G. Friederichs, M.D.,

6             Plaintiff,

7                        Case No. 3:22-cv-00008-PDW-ARS

8        vs.

9

10   Sanford Health,

11            Defendant.

12   _____

13

14        REMOTE VIDEOTAPED DEPOSITION OF

15             Brittany Sachdeva

16           Taken February 20, 2023

17           Commencing at 1:34 p.m.

18

19

20

21

22

23   REPORTED BY:  CHRISTA A. REESER, RPR, CRR, CRC

24

25

Page 2

1    Remote videotaped deposition of Brittany
2  Sachdeva taken on Monday, February 20, 2023, commencing
3  at 1:34 p.m., before Christa A. Reeser, Registered
4  Professional Reporter, Certified Realtime Reporter,
5  Certified Realtime Captioner, and Notary Public of and
6  for the State of Minnesota.
7
8            **********
9
10           APPEARANCES
11
12  ON BEHALF OF THE PLAINTIFF:
13    Brandon J. Wheeler, Esq. (via Zoom)
14    FELHABER LARSON
15    220 South Sixth Street, Suite 2200
16    Minneapolis, Minnesota 55402-4504
17    612-339-6321
18    bwheeler@felhaber.com
19
20
21
22  (APPEARANCES continued on next page)
23
24
25

Page 4

1              I N D E X
2
3  WITNESS:  Brittany Sachdeva          PAGE
4      Examination by Mr. Wheeler.............. 6
5
6
7
8  EXHIBITS MARKED                     PAGE
9      Exhibit 49 - 1/21/2022 - 1/23/2022     58
10         E-mail Exchange Between
11         Darren Huber, James Volk,
12         Brittany Sachdeva, Michael
13         Erickson
14      Exhibit 50 - 2/18/2022 E-mail From     60
15         Emily Mangin
16      Exhibit 51 - 4/14/2022 E-mail From     63
17         Darla Dobberstein w/
18         forwarded e-mail from
19         Matthew Friederichs
20
21
22
23
24
25

Page 3

1         APPEARANCES (continued)
2
3  ON BEHALF OF THE DEFENDANT:
4      Shawn M. Raiter, Esq. (via Zoom)
5      LARSON KING, LLP
6      2800 Wells Fargo Place
7      30 East Seventh Street
8      St. Paul, Minnesota 55101
9      651-312-6500
10      sraiter@larsonking.com
11
12
13
14
15
16  ALSO PRESENT:  Kraig Hildahl, Videographer
17
18
19
20
21
22
23
24
25

Page 5

1
2         THE VIDEOGRAPHER:  We are going on the
3  record at 1:34 p.m. Central Time on February 20, 2023.
4  This is media unit number one of the video recorded
5  deposition of Brittany Sachdev -- Sachdeva taken in the
6  matter of Matthew G. Friederichs, M.D. v. Sanford
7  Health filed in the U.S. District Court for the
8  District of North Dakota, Eastern Division, Case Number
9  3:22-CV-00008-PDW-ARS.
10         This deposition is being conducted remotely
11  using virtual technology.  My name is Kraig Hildahl,
12  and I'm with Veritext Legal Solutions, and I'm the
13  videographer.  The court reporter today is Christa
14  Reeser, also with Veritext.
15         Will counsel please identify themselves for the
16  record?
17         MR. WHEELER:  Good afternoon.  Brandon
18  Wheeler on behalf of plaintiff.
19         MR. RAITER:  Shawn Raiter from Larson King
20  on behalf of Sanford Health and the witness.
21         THE VIDEOGRAPHER:  Will the court reporter
22  please swear in the witness and then we can proceed?
23
24         BRITTANY SACHDEVA,
25  duly sworn, was examined and testifies as follows:

2 (Pages 2 - 5)

Page 6

1
2                    EXAMINATION
3 BY MR. WHEELER:
4    Q.  Good afternoon.  Could you please state your
5 name for the record?
6    A.  Brittany Sachdeva.
7    Q.  Sachdeva.  I'm going to do my best to pronounce
8 that correctly, but if I get it wrong, don't be shy and
9 let me know and I'll do my best to -- to correct it.
10       Ms. Sachdeva, have you ever had your deposition
11 taken before?
12    A.  Yes.
13    Q.  And how many times have you had your deposition
14 taken?
15    A.  I believe this is my fourth time.
16    Q.  When, going back in time, was the most recent
17 one you had?
18    A.  I think around five -- five to six years ago.
19    Q.  And then what about then going back further in
20 time from that to the, I guess, the second one?
21    A.  Oh, I don't have the specific dates, but
22 it's -- I mean, it's been all within my 20-year career,
23 most recent being five to six years ago.
24    Q.  Okay.  And I'll -- I'll ask just a few more
25 questions about that in a moment.  But it's been long

Page 7

1 enough, I assume you didn't do any of your depositions
2 via Zoom because I'm not sure Zoom was a thing five to
3 six years ago.  So I'll just kind of give you a couple
4 instructions here at the beginning to try and make this
5 go as smoothly as possible.
6       As you may recall from your prior depositions,
7 everything that I'm saying right now, the questions I'm
8 going to be asking you, the objections, if any, by
9 Mr. Raiter, and then your answers to my questions are
10 all being recorded by the court reporter, which means
11 it's very important that multiple people not speak at
12 the same time.  So I will do my absolute best to not
13 start a new question if you're still in the middle of
14 answering my question.  And likewise, I would ask that
15 you wait until I finish giving my question before you
16 start answering.  Does that make sense?
17    A.  Yep.
18    Q.  All right.  And answers do need to be audible
19 answers.  Shaking your head up and down, side to side
20 doesn't really work, nor does the uh-huhs and the
21 uh-uhs.  It would need to be "yes," "no," something
22 along those lines.  Does that make sense?
23    A.  Yes.
24    Q.  All right.  And those are particularly
25 important with Zoom because there's always a

Page 8

1 possibility of a slight lag or delay.  And relating to
2 that, if for any reason some technical issues come up,
3 you know, just let us know.  We can go off the record,
4 we can figure it out.  Does that make sense?
5    A.  Yes.
6    Q.  Perfect.
7       So I want to return back to what we were
8 talking about a moment ago about prior depositions.
9 And five to six years ago, did that lawsuit have
10 something to do with your employment at Sanford Health
11 or something else?
12    A.  No.
13    Q.  So not Sanford?  Sorry.
14    A.  Not Sanford.
15    Q.  Okay.  All right.
16       Was it a business-related matter?  A family,
17 personal thing?  What -- what's the general nature of
18 it?
19    A.  Business.
20    Q.  Okay.  And then what about going back further
21 in time to the earlier two depositions, were those with
22 Sanford or something else?
23    A.  No.  Something else.
24    Q.  And for the something else, in any of those,
25 are those -- any of those three relating to a job you

Page 9

1 had or, again, something else?
2    A.  Work.
3    Q.  So -- all right.  We'll -- we'll try and figure
4 this out as we go through it because you've been a
5 professional for a while.  So let's just start at the
6 very beginning.  Where did you go to college?
7    A.  I went to the University of South Dakota as
8 well as Walden University in Minneapolis.
9    Q.  Did you graduate from the University of South
10 Dakota?
11    A.  I did.
12    Q.  What year was that?
13    A.  Oh, man.  2008.
14    Q.  And was that a bachelor's degree you received?
15    A.  That was an associates.
16    Q.  Associates.  And what was your degree in?
17    A.  Nursing.
18    Q.  And were you a registered nurse or something
19 else?
20    A.  I was a registered nurse.
21    Q.  And then did you go back and obtain a
22 bachelor's degree at any point?
23    A.  Yes.
24    Q.  When was that?
25    A.  I received a master's degree in nursing in 2011

3 (Pages 6 - 9)

1 or '12. '12 probably. 2012.
2    Q. And I won't pretend to know the answers to many
3 of these questions, so I'll ask what might sound like
4 dumb questions from time to time. And I should also
5 say if you don't understand any question that I ask
6 you, just please let me know and I'll ask a better
7 question.
8       You -- you don't need a bachelor's degree to
9 get a master's degree in nursing?
10   A. You get your bachelors as you go.
11   Q. Got it.
12   A. So I did a bridge program.
13   Q. Understood. Okay.
14      And were you -- after you got your associate's
15 degree, were you working or were you going to school
16 first time -- or full time, rather?
17   A. I was going to school full time and working
18 full time.
19   Q. Where were you working at that point in time?
20   A. Initially, I was working at the VA Medical
21 Center in Sioux Falls.
22   Q. And was your masters in nursing also from the
23 University of South Dakota?
24   A. No, from Walden University in Minneapolis.
25   Q. Okay. And were you attending in -- online, in

1 person, or a hybrid?
2    A. Hybrid.
3    Q. Okay. And how long did you work at the VA
4 Medical Center for?
5    A. I believe that I worked at the VA for about
6 three years. My tenure at the VA preceded me getting
7 my RN degree because I was an LPN first.
8    Q. Where did you work after the VA?
9    A. I worked in Kansas City at Truman Medical
10 Center.
11   Q. I'm sorry, was that Truman?
12   A. Correct.
13   Q. Okay. All right. At some point you joined
14 some Sanford Health organization, right?
15   A. Correct.
16   Q. And what year was -- what year did you join
17 Sanford?
18   A. I joined Sanford in 2009.
19   Q. All right. And so then you were going to
20 school for your bridge slash masters while you were
21 working at Sanford?
22   A. Correct.
23   Q. Okay. What was your first position at Sanford?
24   A. I was a staff RN in the emergency room in Sioux
25 Falls.

1    Q. Is that just -- is there just one big hospital
2 complex there in Sioux Falls, or is there multiple
3 hospitals?
4    A. There's just one inpatient Sanford facility in
5 Sioux Falls.
6    Q. Okay. And that's the one you were working in?
7    A. Correct.
8    Q. All right. And how long were you a staff RN at
9 the ER?
10   A. Boy, I did -- I should have gotten my resume
11 out. These are -- these are soft dates. I --
12   Q. No, that's okay.
13   A. So to the best of my ability, I -- about 2011,
14 I transitioned from my staff role into a quality
15 position at Sanford.
16   Q. You said quality position?
17   A. Yeah.
18   Q. What does that mean?
19   A. I was an accreditation and quality specialist,
20 which required an RN degree but did not have patient
21 care.
22   Q. And can you just describe for me a little bit
23 what those sorts of job duties were in that role?
24   A. In that role, I was responsible for getting the
25 clinics in the Sioux Falls market accredited by Joint

1 Commission, next or no regulating -- you know,
2 regulatory body.
3    Q. So it sounds like at that point you weren't
4 really doing any direct patient care anymore?
5    A. Correct.
6    Q. Okay. And I'll get into some of your other
7 positions that you had subsequent to that, but did you
8 at any point ever return to a patient care sort of
9 role?
10   A. No, I did not.
11   Q. Okay. And is it -- you know, you -- you tell
12 me if words I'm using are not the best words and
13 there's better words to use, but is it just safe to
14 describe what you were doing then as more the
15 administrative side of things, or is there a better
16 word?
17   A. Correct.
18   Q. Administrative?
19   A. Administrative.
20   Q. Okay. So at some point, you moved up to Fargo,
21 right?
22   A. Yes.
23   Q. When was that?
24   A. October of 2017.
25   Q. All right. So there was probably some other

4 (Pages 10 - 13)

Page 14

1 positions then that we haven't talked about in Sanford.
2 And before you moved to Fargo, what was, I guess, the
3 -- the last position you held down in Sioux Falls?
4      A.  I was the senior executive director of
5 ambulatory nursing for the system.
6      Q.  And when you say "the system," that is more
7 than just Sioux Falls?
8      A.  Correct.  It was a corporate position.  It was
9 for all ambulatory locations in the four markets.
10     Q.  And I'm sure that I am missing some positions
11 in between your accreditation and quality specialist at
12 the time that you became senior executive director.
13 Can you just very briefly tell me what those titles
14 were?  I don't need specific timelines or anything like
15 that.
16     A.  Director of accreditation for the system, and
17 then executive director for regulatory services.
18     Q.  And then what was your first position in Fargo?
19     A.  VP of nursing, chief nursing officer, Fargo
20 market.
21     Q.  Again, never wanting to assume that I know the
22 answer to anything, was that a promotion from senior
23 executive director of ambulatory nursing?
24     A.  Yes.
25     Q.  All right.  And how long were you the VP of

Page 15

1 nursing slash chief nursing officer?
2      A.  Until 2019, October.
3      Q.  All right.  And what was your next position?
4      A.  Vice president of operations, chief operating
5 officer, Fargo market.
6      Q.  And was that the last position that you held,
7 or is there another one?
8      A.  That's the last.
9      Q.  Okay.  And I'll probably be bouncing around a
10 decent amount today.  So, again, if for some reason
11 you're not following where I'm going with something,
12 just let me know.
13         When you say VP of operations or COO of the
14 Fargo market, that was still an administrative
15 position, right?
16     A.  Correct.
17     Q.  And obviously Sanford is a very large and
18 complex organization, but did you have someone that you
19 reported directly to?
20     A.  Yes.  The chief -- CEO and president of the
21 Fargo market.
22     Q.  And who was that?
23     A.  During what time frame?
24     Q.  Well, let's just start at the -- the first one,
25 I guess, that you reported to in October of 2019.

Page 16

1      A.  Bryan Nermoe.
2      Q.  All right.  Then there was the second one, I
3 take it?
4      A.  Then it was Tiffany Lawrence.
5      Q.  And anybody else?
6      A.  Not during that time frame.
7      Q.  Okay.  All right.  So -- and did you have any
8 sort of, I guess, peer positions within Fargo, or were
9 you by yourself with respect to the Fargo market in the
10 seniority of -- of where you were at?  That's probably
11 a bad question.  Let me ask a better question.
12     A.  Yep.
13     Q.  So let's -- let's go this direction instead.
14         You just tell me a little bit about what it is
15 you did as VP operations slash COO of the Fargo market?
16     A.  I worked closely with the other members of the
17 senior leadership team in the Fargo market to ensure
18 that we had tight, tight, safe, quality based operations.
19     Q.  And who are the other members of the senior
20 leadership team?
21     A.  Would you like their names or their positions?
22     Q.  Well, how many are we talking about, I guess?
23 Let's start with that.
24     A.  There's a handful.  So I would say that there
25 were five people that I worked with closest.

Page 17

1      Q.  Okay.  Let's start with those five then.
2      A.  So that would be Tiffany Lawrence as the
3 president and CEO, most recent; Theresa Larson, the
4 chief nursing officer; Kristin Herman, the chief
5 financial officer; Jim Volk, the vice president of the
6 clinic; and Doug Griffin, the chief medical officer.
7      Q.  And, sorry, I'll be taking various notes here.
8 So if there's a pause, that's primarily what I'm doing.
9         All right.  So am I correct that of these five,
10 two are physicians, one is a nurse, and then two are
11 neither physician nor a nurse?
12     A.  Correct.
13     Q.  Okay.  Is there any kind of -- well, let's --
14 trying to go back to the bad question I asked earlier.
15 Were you then, I guess, at the -- if I'm trying to
16 think of a hierarchy here, right, were you within the
17 senior leadership team or were you essentially
18 reporting to the senior leadership team?
19     A.  No, I was part of the senior leadership team.
20     Q.  Okay.
21     A.  So the chief medical officer, the chief
22 financial officer, the chief nursing officer, the vice
23 president of clinic, and the chief operating officer in
24 the Sanford system are equivalent with direct reporting
25 to the president and CEO.

5 (Pages 14 - 17)

1 Q. Got it. Okay. That's -- that's very helpful.
2 So then I assume you didn't have any sort of
3 direct report in Sioux Falls or anything like that?
4 A. Re -- restate that. Did -- did I --
5 Q. Yeah, what --
6 A. -- have people that reported to me --
7 Q. Sorry, yeah --
8 A. -- or did I --
9 Q. Sorry. The other -- the other direction.
10 I mean, were you -- did you -- were you
11 supervised at any level by anyone out at Sioux Falls
12 while you were in this last position?
13 A. Not directly.
14 Q. Okay. And then going the other direction, but
15 I -- well, I guess, let me ask first. I assume that
16 there's a number of people that reported directly to
17 you, right?
18 A. Correct.
19 Q. And was that Fargo, Sioux Falls or multiple
20 locations?
21 A. They were all Fargo based.
22 Q. And again, assuming that it's a manageable
23 number, but if you tell me it's not, we can figure out
24 a different way. If you just me the names and titles
25 of those folks I guess at the end?

1 A. The -- their titles were all executive
2 director. And it was Mike Erickson, Paul Burud, Darla
3 Dobberstein, Kathryn Norby, Ashley Erickson, Sherm
4 Syverson.
5 Q. And were these folks executives directors of,
6 you know, particular departments or clinics or how did
7 you define what they were executive directors of?
8 A. They were executive directors of service lines.
9 Q. Service lines. Okay.
10 And then between the -- I think it was six of
11 them I counted, is that all of the service lines in
12 Fargo?
13 A. Yes.
14 Q. Okay. And obviously you know that we're here
15 because of Dr. Friederichs' lawsuit, and
16 Dr. Friederichs was in orthopedics. Mike Erickson was
17 executive director over orthopedics and sports
18 medicine, right?
19 A. Correct.
20 Q. During your time as the VP of ops slash COO,
21 was there anyone else in his position?
22 A. No.
23 Q. All right. So then I understand, but certainly
24 correct me if I'm wrong, that probably around the time
25 that you got this VP of operations role, there was some

1 sort of reshuffling or reorganization; is that right?
2 A. Correct.
3 Q. Can you tell me just a little bit about what
4 that reorganization or reshuffling was?
5 A. We went from prior -- prior, we had eight
6 executive directors. With some departures and
7 retirements, we restructured and we went down to six.
8 So as -- in an effort to try and, you know, create
9 equity amongst the executive director leadership team,
10 we tried to get closer to a more true service line
11 based portfolio for each of them. And that was at --
12 and at that point is when Mike Erickson assumed
13 orthopedics.
14 Q. And I know it might not be -- given this
15 reorganization or reshuffling, whatever we want to call
16 it, it might not be a very clear move, but was moving
17 from the VP of nursing slash chief nursing officer to
18 VP of ops, COO a promotion or was that more of a
19 lateral move, or was it something else?
20 A. I would say that in the organizational
21 structure, they are equivalent in terms of your seat at
22 the table. It's a -- the chief operating officer
23 position is a broader responsibility.
24 Q. So I could probably assume from the title, but
25 why don't you just tell me a little bit about when you

1 were the chief nursing officer, VP of nursing, what
2 those roles were?
3 A. As the chief nursing officer, I was responsible
4 for standardization, quality and safety amongst the
5 clinical workforce. So nursing and clinical support
6 staff. My job largely came down to policies, protocols
7 and oversight of how care was provided.
8 Q. All right. And so is it okay if I -- and I --
9 I can list it out fully, if you'd like, every time I
10 ask the questions -- the question, but can I just say
11 "VP of ops" and you'll understand I'm also talking
12 about the COO, because you held that position at the
13 same time, right?
14 A. Correct.
15 Q. Okay. So if that's fine with you, I'm just
16 going to shorten that to say "VP of ops," okay?
17 A. Yes.
18 Q. Okay. So when you were VP of ops, did you have
19 an equivalent or a counterpart in other markets?
20 A. Yes.
21 Q. And what were those other markets that you had
22 a counterpoint -- or a counterperson in? Counterpart
23 --
24 A. Sioux Falls --
25 Q. -- sorry.

6 (Pages 18 - 21)

Page 22

1    A. Sioux Falls, South Dakota; Bismarck, North
2 Dakota; Bemidji, Minnesota.
3    Q. And did that group of people, the four VP of
4 ops, or whatever the exact titles were, did you all
5 collaborate and work together on a frequent basis?
6    A. We did.
7    Q. Okay. Like, did you have standing weekly or
8 monthly meetings or -- or how did that work?
9    A. We had a standing weekly meeting that was
10 operations. Enter -- enterprise operations is what it
11 was called. And that was the -- all of the VP of ops,
12 but also the VP of clinic, the VP of nursing. And then
13 the VP of ops, we met every other week for an hour.
14    Q. All right. During your time in Fargo, did you
15 ever really get to know Dr. Friederichs?
16    A. I -- I knew Dr. Friederichs.
17    Q. And did you work directly with him?
18    A. Very little.
19    Q. How did you get to know him?
20    A. I -- I attended the strategic planning sessions
21 on an annual basis with all of the service lines and
22 then largely relied on my executive directors and
23 directors to communicate the -- needs of our
24 physician group.
25    Q. So if I were -- forgive my math. Let's see.

Page 23

1 And actually, maybe I didn't ask you specifically. Or
2 no, I did, I apologize. So October 2019, then for the
3 next three years, I mean, give me a ballpark of how
4 many times you think that you met Dr. Friederichs in
5 person.
6    A. I don't -- I don't recall. If it's a ballpark,
7 two.
8    Q. Okay.
9    A. Two to three potentially.
10    If you're asking if I had -- I had zero
11 one-to-one discussions with Dr. Friederichson [sic.]
12 where it was just him and I.
13    Q. And is that standard for your working
14 relationship with other physicians, or is it low or
15 high for level of interaction?
16    A. I would say that that's pretty -- pretty
17 standard.
18    Q. And again, I don't want to assume anything. If
19 there were an issue with a physician and we take the
20 six different people that are in the senior leadership
21 team, would it be one of the physicians that would --
22 those physicians being Volk and Griffin, would it be
23 one of them that would deal with the physician issue,
24 or does it just depend on what the issue is?
25    A. So from a standard standpoint, if it was

Page 24

1 strictly a physician issue, they -- Dr. Volk or
2 Dr. Griffin would take point on it.
3    Q. Okay. And, like I said, I'm going to be
4 jumping around here a little bit.
5    You do not currently work at Sanford, right?
6    A. Correct.
7    Q. When was your last day?
8    A. October 25th of last year.
9    Q. All right. And -- oh, sorry, I didn't hear
10 what you said at the end there.
11    A. Oh, I just said 2022.
12    Q. Okay. All right. And I believe that -- well,
13 you received a subpoena in this case, right?
14    A. I did.
15    Q. And that's, of course, why you're sitting here
16 talking to me right now, right?
17    A. Correct.
18    Q. And I believe that was served in Fargo; is that
19 right?
20    A. Yes.
21    Q. Okay. But you're now in San Antonio; is that
22 what you said earlier?
23    A. I am in San Antonio --
24    Q. Okay.
25    A. -- correct, yes.

Page 25

1    Q. Have you moved or are you in the process of
2 moving, or what's -- where -- go ahead.
3    A. I -- no, so I'm here for work right now.
4    Q. Okay. Where do you currently work?
5    A. I'm working on a part-time basis with Newpoint
6 Consulting.
7    Q. Sorry, was that Newpoint?
8    A. Yes.
9    Q. Okay. And that's some sort of health care or
10 hospital consulting?
11    A. Correct.
12    Q. Okay. And where is that based out of?
13    A. Phoenix.
14    Q. All right. So you get the opportunity in
15 February to get out of Fargo and get down to Phoenix
16 and San Antonio.
17    A. Yes.
18    Q. That's too bad.
19    So when did you start that role?
20    A. In January of '23.
21    Q. All right. And did you leave Sanford for that
22 role?
23    A. I left -- I did not leave Sanford specifically
24 for this role.
25    Q. And I apologize in advance of this, I obviously

7 (Pages 22 - 25)

1 don't know much about anything, but obviously ends of
2 jobs can always be a sensitive topic, so I do want to
3 apologize in advance.  But did you leave Sanford on
4 your own decision or was it someone else's decision for
5 you to leave?
6     A.  It was my decision.
7     Q.  Okay.  All right.  Returning to Dr. Friederichs
8 more specifically, are you aware of when he put in his
9 notice of resignation?
10    A.  Are you asking me do I know the date in which
11 he put it in?
12    Q.  Yeah.  Just trying to set the time frame.
13    A.  I honestly do not have a firm remembrance of
14 the specific dates.  I know that it was around November
15 of 2021.
16    Q.  Okay.  And would you typically get notice of
17 doctor resignations?
18    A.  Yes.
19    Q.  And was there anything in particular that you
20 were tasked with doing, I guess, in response to
21 physician -- or doctor resignations?
22    A.  Not me specifically, no.
23    Q.  What about anybody in your team?  And by team I
24 mean the executive directors.  Were you overseeing
25 people doing anything in response?

1     A.  Yes.
2     Q.  And what sorts of things is -- were those?
3     A.  The director who reports to the executive
4 director and the executive director reporting to me in
5 my role.  The director initiates the process of the
6 physician off -- offboarding, which essentially make
7 sure that all loose ends are tied up before they leave.
8 That's a set -- set standard process.  Vast majority of
9 that is done by the director with consult of the
10 executive director.  So unless there is -- was
11 something, you know, extremely nuanced or unusual, I
12 would not be involved in any of the specifics of that.
13    Q.  Do you know who the director was that would
14 have been involved with Dr. Friederichs' offboarding?
15    A.  Yes.  Emily Mangin.
16    Q.  I'm sorry.  I cut you off.  What -- what was
17 her name?
18    A.  Emily Mangin.
19    Q.  And I know that there's a level -- well,
20 primarily Mike Erickson between you and Ms. Mangin,
21 right?
22    A.  Correct.
23    Q.  And did you really work directly with her, or
24 did you just really work directly with Mr. Erickson?
25    A.  Typically, just directly with Mike Erickson.

1     Q.  And I just want to talk a little bit about -- I
2 think you said the phrase "offboarding process."  Is
3 that what you said?
4     A.  Correct.
5     Q.  Can you just tell me a little bit about what's
6 involved in offboarding?
7     A.  Making sure that patients are notified that
8 their provider is leaving, making sure that the
9 physician knows the impact to their benefits, making
10 sure that their schedule is appropriately cleared,
11 other administrative functions related to their
12 departure.
13    Q.  And, again, you typically wouldn't be directly
14 involved in any of that offboarding, right?
15    A.  I would not.
16    Q.  Okay.  And with Dr. Friederichs, were you
17 directly involved with any of that offboarding?
18    A.  I was not.
19    Q.  Did you -- and I just to set the -- the time
20 frame a little bit, I mean, you're right, it's
21 November.  I can show you the document, but end of
22 November of 2021, Dr. Friederichs puts in his notice,
23 and then he has roughly three months to go.  So through
24 near the end of February of 2022.  Sorry, now I got to
25 make sure I got the dates right.

1     So with that time frame in mind, do you
2 remember any discussions with whether it was
3 Mr. Erickson or Ms. Mangin, or however you pronounce
4 her name, in -- in -- in December regarding the
5 scheduling of appointments and Dr. Friederichs?
6     A.  I recall that there was discussion occurring
7 about when his last day to see patients in the clinic
8 would be.  I was not involved in the decision making or
9 the specifics of that.
10    Q.  So if someone made the decision as to when the
11 last day would be to see patients, you didn't make that
12 decision?
13    A.  Correct.
14    Q.  Okay.  But you -- were you -- trying to figure
15 out a little bit more precisely here.  Were you just
16 aware that these decisions were happening, or were you
17 more actively consulting in the decision making?
18    A.  I -- I was not consulted in the decision
19 making.  I did support the decision that was made once
20 it was made.
21    Q.  Can you recall what that decision was?
22    A.  There was a ramp-down period, which is very
23 typical, that was decided amongst the physician
24 leadership of the orthopedic department in consult with
25 Mike and, I believe, Dr. Volk.  And I can't -- I don't

Page 30

1  remember the specifics about how long prior to his
2  departure that he would quit seeing new patients.
3      Q.  And was this just at -- at meetings that you
4  were discussing this, or how -- how are you aware of
5  the -- these discussions going on?
6      A.  Well, Mike kept me apprised during our
7  one-on-one meetings, and then I'm -- I'm confident that
8  I was likely cc'd on different e-mail correspondence.
9      Q.  Okay.  And are you aware of whether there's
10  any -- well, let me back up a second.
11      If I just describe -- is it the Fargo system or
12  the Fargo clinic, or what's the best way to describe
13  all of the -- the area that was reporting up to you?
14      A.  Fargo market.
15      Q.  The Fargo market.  Thank you.  You said that
16  earlier.
17      So do you know whether there's any policy
18  within the Fargo market or within particular clinics or
19  departments as to what that ramp-down period is?
20      A.  Each department has some independence in how
21  that is decided because the clinical practices are so
22  nuanced.
23      Q.  All right.  One of the other things that you
24  mentioned with respect to offboarding was making sure
25  that patients are notified that the physician is -- is

Page 31

1  leaving.  I don't know if that's exactly what you said,
2  but that's -- that's the gist of it, right?
3      A.  Correct.
4      Q.  Okay.  And is that sort of offboarding -- from
5  when you were in your position of VP of ops, was that,
6  again, something that was uniform throughout the Fargo
7  market, or was that something that was clinic or
8  department specific?
9      A.  You know, I didn't -- I didn't get involved in
10  that specific process directly.  I relied on the
11  executive directors to do that.  So it would be
12  difficult for me to say that there was a single
13  standard.
14      Q.  Okay.  And some of my questions are, of course,
15  kind of in the abstract, which doesn't always make it
16  the easiest to understand.  So I will start to show you
17  some -- some documents here to -- to get into a little
18  bit more specifics.
19      So you can bear with me for a moment.  Like I
20  said, I'm going to be some screen sharing here.  And
21  then for each of these documents, if you could just
22  take a look at it and then let me know when you're
23  ready for me to start asking you questions.
24      A.  Okay.
25      Q.  So just a moment.

Page 32

1      All right.  I am showing you -- or going to be
2  showing you what was previously marked as Deposition
3  Exhibit Number 6.  If you could let me know when you're
4  ready.
5      A.  I'm ready.
6      Q.  Okay.  I guess with this specific document, it
7  -- it's the Dr. Friederichs' letter, right?
8      Sorry, I didn't hear you.
9      A.  Correct.
10      Q.  Okay.  So I want to ask just, I guess, more
11  specifically about the letter, as it looks here, which
12  has Dr. Friederichs' name on the bottom.  Have you,
13  prior to the litigation, seen this letter?
14      A.  Yes.
15      Q.  Okay.  And what was the context in which you
16  saw the letter?
17      A.  Mike Erickson showed it to me.
18      Q.  And he showed it to you before it went out?
19      A.  No, after.
20      Q.  Okay.  And do you recall -- well, we can see on
21  here, Exhibit 6 says that it was January 5th of 2022.
22      Do you see that?
23      A.  Yes.
24      Q.  Do you recall approximately when it was he
25  showed it to you?

Page 33

1      A.  I have no idea the specific day.  It would have
2  been very close after that date.
3      Q.  Do you recall whether there was something that
4  specifically prompted him to show it to you?
5      A.  Dr. Friederichson [sic.] reaching out to say he
6  was upset about the letter being sent.
7      Q.  Okay.  So you recall that Dr. Friederichs was
8  upset, but this was still you think before any sort of
9  lawsuit had been started; is that right?
10      A.  Correct.
11      Q.  Okay.  And I know you don't recall exactly when
12  it happened, but just -- let's talk a little bit about
13  that conversation.  Did Mr. Erickson go to -- first
14  approach you, or did you first approach him?
15      A.  He approached me.
16      Q.  Okay.  And what did he tell you?
17      A.  He texted me and asked me to call him because
18  there was an issue with Dr. Friederichs as well as
19  another physician that left concurrent and this
20  specific letter that got sent to patients.
21      Q.  Okay.  And did you then have a conversation
22  about it?
23      A.  I did.
24      Q.  Was that in person or not in person?
25      A.  It was on the telephone.

9 (Pages 30 - 33)

1   Q.  Okay.  So then how did you, I guess, see the
2   letter if you were on the phone?
3   A.  The -- the initial -- it was an evening --
4   again I don't know the date -- that Mike ended up
5   asking me to call to talk about it.  And then at our
6   next in-person meeting, which would have been the
7   following day, he showed it to me.
8   Q.  Okay.
9   A.  He read it to me on the phone and then showed
10  it to me the next day.
11  Q.  All right.  So then just on the phone call then
12  for a moment, he -- it sounds like that he described at
13  least generally what the issue was and that he read you
14  what the letter said; is that right?
15  A.  Correct.
16  Q.  Anything else do you recall him saying about
17  the letter or the situation?
18  A.  I remember him saying that Freddy would like
19  the list of people that it was sent to.  And at that --
20  Q.  And do you recall -- oh, go ahead.
21  A.  And at that point, I said I think that we need
22  to get legal and we need to get compliance involved to
23  figure out next steps.
24  Q.  So at least at that point in time,
25  Dr. Friederichs was not going to be -- was not allowed

1   to see a copy of it, right?  And I say "it," sorry, the
2   list of the patients.
3   A.  Correct.
4   Q.  Okay.  And --
5   A.  And just to clarify --
6   Q.  Yep.
7   A.  -- not -- it wasn't that he wasn't allowed, it
8   was pending, you know, hospital standards for how we
9   release that type of information.
10  Q.  Sure.  And then anything else about -- that you
11  recall being discussed in that phone call?
12  A.  Not that I recall.
13  Q.  Okay.  And so you said -- you recall then
14  meeting with Mr. Erickson the next day; is that right?
15  A.  I believe it was the next day.  With --
16  Q.  And it --
17  A.  -- with --
18  Q.  Oh, go ahead.
19  A.  Within a short period of time following that
20  phone call.  I can't say with a hundred percent
21  certainty, but we typically -- I saw all of the
22  executive directors in passing usually on a daily to
23  every-other-day basis.
24  Q.  Okay.  So then in this meeting, I think you
25  said he showed you a copy of this letter?

1   A.  Correct.
2   Q.  Okay.  And then do you recall anything being
3   discussed at that meeting?
4   A.  Nothing outside of consult with internal legal
5   and what -- let's get guidance on how to move forward.
6   Q.  And just to make sure that we're on the same
7   page and talking about the same dates, I'm going to
8   show you a different document.
9       All right.  I'm showing you what was previously
10  marked as Dep -- Deposition Exhibit Number 31.  Are you
11  able to see that or is it a little too small?
12  A.  Well, I can pull -- I can -- I think it's okay.
13  Q.  All right.  Well, I can zoom in a little bit,
14  too.
15  A.  Oh, there, that's much better.
16  Q.  Okay.  So I'll just represent to you that these
17  are text messages that were produced from
18  Mr. Erickson's phone.  And if we just go down a bit on
19  the page, I believe it's the third page, doesn't look
20  like it's Bates stamped.  On the third page, I see a
21  text message right here dated January 11, 2022, 10:42
22  p.m.  Do you see the text message I'm talking about?
23  A.  I do.
24  Q.  And the 605 number, is that you?
25  A.  That's me.

1   Q.  Okay.  That's your personal cell phone?
2   A.  Yes.
3   Q.  Okay.  And then the message of this text says
4   "Call me later . . . I F'd up with Freddy's and
5   Erpelding's patient letters and they are pissed.  Can't
6   un-ring the bell."
7       Do you see that?
8   A.  I do.
9   Q.  Is that the text message that you were talking
10  about a moment ago?
11  A.  It is.
12  Q.  Okay.  So that would have been January 11th of
13  2022, which, if it's at all helpful, I'm looking at a
14  calendar and it says that was a Tuesday.  So I don't
15  know if that changes your -- or helps refresh your
16  recollection at all about when it was you would have
17  then actually met with Mr. Erickson.
18  A.  I don't have access to any of my e-mails or my
19  professional calendar for that time, otherwise I would
20  be able to go back and give you a specific date likely.
21  Q.  Sure.  But you still recall it was pretty
22  quickly thereafter?
23  A.  Correct.
24  Q.  Okay.  All right.
25      And speaking of just documents, I understand of

Page 38

1  course that you don't have access to Sanford e-mails or
2  anything like that.  Did -- did you check for text
3  messages on your phone in response to the subpoena?
4      A.  I'm sorry?  Restate.
5      Q.  Yes.  So in the subpoena, it requested
6  messages -- text messages as well that you may have had
7  regarding Dr. Friederichs.  Did you search your cell
8  phone for any text messages?
9      A.  I did.
10     Q.  Okay.  Did you find any?
11     A.  The one that Mike Erickson sent me.
12     Q.  Okay.  Did you find anything else?
13     A.  I did not.
14     Q.  And you have a -- an iPhone or something else?
15     A.  iPhone.
16     Q.  Okay.  And you just use the little search bar
17 and type in "Freddy" and "Friederichs" or what did you
18 do?
19     A.  "Freddy."
20     Q.  Okay.  All right.
21        Any other text messages that you saw with
22 anybody other -- beyond Mr. Erickson?
23     A.  No.
24     Q.  All right.
25     A.  I should restate.  There is a -- there is one

Page 39

1  reference to Freddy from internal counsel about
2  attending a meeting regarding Freddy, so unable to
3  connect with me, would need to follow up later.  Those
4  are the only two in the searches.
5      Q.  All right.  So that was a -- a text with an
6  attorney?
7      A.  Correct.
8      Q.  Okay.  All right.
9        So --
10     A.  And not specific to the case, but had his name
11 in it.
12     Q.  Sure.  So I'm going to put Exhibit 6 back up.
13 I'm sure you are familiar with it, but it's just
14 easiest to make sure that we're on the same page.
15        So you should see Exhibit 6 again.  Do you see
16 it?
17     A.  I do.
18     Q.  Okay.  So at the time -- or before you saw the
19 version of this letter with Dr. Friederichs' name on
20 it, had you ever seen any other letter like this?
21     A.  Yes.
22     Q.  And what was -- what other letters do you
23 recall seeing that are like this?
24     A.  Well, I -- I've seen the standard boilerplate
25 letters that we send out when physicians depart the

Page 40

1  organization.  Not specific to a physician or a
2  location, but more from an operations standpoint, this
3  is, you know, an example of a letter that would be
4  sent.
5      Q.  And do you -- do you recall who would have been
6  the person showing you those other letters?
7      A.  Well, throughout my career at Sanford, we had
8  several presentations by the physician recruitment team
9  as well as the physician compensation team about, you
10 know, the standard process for physicians departing.
11 So it would be a stock letter.
12     Q.  Understood.  And I'll show you a different
13 document here.
14        All right.  I'm showing you what was previously
15 marked as Deposition Exhibit 16.  It's nine pages, but
16 let's just talk about the first page.  If you could let
17 me know when you're ready.
18     A.  I'm ready.
19     Q.  Okay.  Have you ever seen this document before?
20     A.  I have.
21     Q.  Okay.  And do you recall you would have been
22 seeing this in connection with the other letters or in
23 connection with something else?
24     A.  I've seen this in connection with the physician
25 resignation process.

Page 41

1      Q.  Okay.  And is that different than the physician
2  recruitment and physician -- physician compensation
3  meetings that you were referring to?
4      A.  No.
5      Q.  Okay.  And within this, we can see, you know,
6  there's a letter number 1 highlighted on page 278; the
7  next page a letter 2.  Is this what you meant by when
8  you're talking about the boilerplate language?
9      A.  Correct.  Correct.
10     Q.  Okay.  So setting aside this policy, do you
11 recall seeing -- I'll just call them physician
12 letters -- physician letters with actual physician
13 names on them?
14     A.  I don't recall.
15     Q.  Let me ask it a little bit better way.  Do you
16 recall ever seeing a letter in connection with a
17 specific departing physician?
18     A.  I could not give you a name of a specific
19 physician.
20     Q.  Okay.  With Dr. Friederichs, it sounds like
21 prior to the letter going out, you didn't see the
22 letter, right?
23     A.  I did not.
24     Q.  Do you recall -- and I don't need a name quite
25 yet, but is there -- do you recall any other time that

1 you did see a letter before it went out?

2   A. No.

3   Q. Okay. So let's talk about then these physician

4 comp and physician recruitment meetings. Are those two

5 separate meetings, by the way?

6   A. It -- it -- it would be under Luis Garcia as

7 the president of the clinics and overarching umbrella

8 about how we onboard, recruit, and then, you know,

9 support retiring or departing physicians.

10   Q. Okay. And for the discussions about the policy

11 and the letter, was that more of an FYI educational

12 sort of thing, or was it a looking into revising,

13 changing, supplementing, whatever the practice?

14   A. So that -- that would largely have been in our

15 enterprise operations groups throughout, you know, many

16 years that I have seen, you know, changes or revisions

17 to that practice. And it's more on awareness. And my

18 role is to support getting it in front of the

19 appropriate parties that would execute the process,

20 i.e., the Mike Ericksons.

21   Q. And you say, sorry, getting it in front of the

22 appropriate parties like Mike Erickson. Are you

23 talking about getting the letter or the policy or

24 something else?

25   A. The policy.

1   Q. Okay. And so was there a period of time in

2 which the policy was not being given to the directors

3 or executive directors?

4   A. Not to my knowledge.

5   Q. Okay. I -- I'm just frankly not following a

6 hundred percent what it was you said. So when you --

7 when you said that you supported getting it in front of

8 the appropriate parties, can you just explain to me

9 what you meant by that?

10   A. In my role as the chief operating officer, the

11 VP of ops, is to -- there's system-wide procedures or

12 policy that we're going to all follow. That

13 information typically got communicated to the senior

14 leadership first. From there, in each of the markets,

15 the VP of ops was responsible for facilitating and

16 coordinating those presentations to happen with the

17 people who would execute them, which would be the Mike

18 Ericksons, and then Mike would be responsible for

19 getting Emily notified.

20   Q. Okay. And then with respect to -- just a

21 couple more questions and then we'll take a break.

22       With respect to more of, like, the -- the

23 marketing folks, is there a separate marketing

24 department at Sanford?

25   A. There is.

1   Q. And is that something for each market, or is

2 that all based out of Sioux Falls?

3   A. There are -- the department as a whole is a

4 central service or is a -- a corporate function. There

5 are local folks in each market, but it's managed

6 centrally. So we have people physically on site. The

7 operations and marketing are managed centrally out of

8 Sioux Falls.

9       MR. WHEELER: We've been going about an

10 hour here, so I think it makes sense to -- to take a

11 break. And we can go off the record now.

12       THE VIDEOGRAPHER: We're going off the

13 record at 2:32 p.m.

14       (A break was taken at 2:32 p.m.)

15       THE VIDEOGRAPHER: This is media number

16 two in the deposition of Britt -- Brittany Sachdeva.

17 Today is February 20, 2023. We're going back on the

18 record at 2:46 p.m.

19 BY MR. WHEELER:

20   Q. All right. Before the break, we were taking a

21 look at Exhibit 16, which I guess -- I don't know if

22 you use these phrases or not, but I -- I called it, I

23 guess, a marketing policy. And I'll just show it to

24 you again. I guess I don't know if you have -- how

25 you -- what you would describe this document to be.

1   A. I would call this document a procedure or a

2 guideline.

3   Q. Okay. And it looks like for physician, maybe

4 just departures is the best shorthand I can come up

5 with. So we have a procedure for departing physicians;

6 is that fair?

7   A. Yes.

8   Q. Okay. All right.

9       And did you have any involvement in drafting

10 this?

11   A. No.

12   Q. And when -- which one of your positions do you

13 recall would have been the first time you would have

14 started seeing this policy? Or, I'm sorry, procedure?

15   A. I've had knowledge of this pro -- procedure for

16 many years.

17   Q. So going back to your time in Sioux Falls, were

18 you aware of the procedure?

19   A. Yes.

20   Q. Okay. And are you aware -- we've talked a

21 couple different times about differences between

22 different markets, whether it's the Fargo market or the

23 Sioux Falls market. Are you aware of whether the Sioux

24 Falls market and Fargo market are different or the same

25 with respect to this procedure?

12 (Pages 42 - 45)

1    A. I -- I can't speak to that. The --
2    Q. Okay. Oh, go ahead.
3    A. -- gen -- general guideline is standard.
4    Q. And what do you understand that -- that general
5 guideline to be?
6    A. This -- this procedure, or -- and I would call
7 it a procedure or a guideline, is -- is standard. How
8 it's executed in each market may have nuances.
9    Q. All right. And so, again -- what I'm going to
10 try and do is differentiate between after the situation
11 with Dr. Friederichs gets to obviously where we are
12 now, before the Dr. Friederichs letter situation.
13 Okay?
14       Before the Dr. Friederichs letter situation, do
15 you recall there being any physician complaints about
16 this guideline or procedure?
17    A. I do not.
18    Q. Were you involved or otherwise aware of any
19 issues raised by a Dr. John Norberg relating to the
20 practice of letters?
21    A. Not prior to this.
22    Q. Okay. And, again, before the Dr. Friederichs
23 letter situation, do you recall -- I think you
24 described it as the execution on this. Do you recall
25 the execution in Fargo, whether generally physicians

1 were signing off on these letters or not?
2    A. If the letter had the physician's signature, I
3 would have expected they would have reviewed it.
4    Q. And why is that?
5    A. Because it's signed by them -- by them as
6 individuals.
7    Q. And when you say their signature, are you
8 referring to the actual, like, handwritten signature,
9 or are you just referring to their name in a signature
10 block?
11    A. Either.
12    Q. Okay. So you would expect that if their name
13 was at the bottom of the letter that they would have
14 signed off on it; is that right?
15    A. That is correct.
16    Q. Okay. And do you know -- we can just look at
17 some of the examples in here. Letter one, it's written
18 in the first person from a departing physician.
19       Do you see that?
20    A. I do.
21    Q. All right. And letter option number 2 -- and
22 this is Exhibit 16, again, we're looking at. In here,
23 you can see it's written in the first person with the
24 patient -- or the physician's name on the bottom?
25    A. Yep.

1    Q. Okay. And that's the same for -- well, no,
2 sorry. Then we're into letter three in which it's sent
3 on behalf of the executive director.
4       Do you see that?
5    A. Yes.
6    Q. Okay. So in this case, it's not on be -- on
7 behalf of the departing physician, it's -- well, if it
8 was orthopedics, it would be the Mike Ericksons of the
9 world, right?
10    A. Correct.
11    Q. Okay. And then number 4, we're back into the
12 first person with the physician's name on the bottom,
13 right?
14    A. Correct.
15    Q. Letter option number 5, same thing, in the
16 first person, physician name on the bottom.
17       Do you see that?
18    A. Yes.
19    Q. And then letter 6, which apparently deals with
20 residents and that situation, it's not the first
21 person -- well, it is the first person, but it's not on
22 behalf of the residents, it looks like it's from a
23 medical director.
24       Do you see that?
25    A. Yes.

1    Q. Okay. All right.
2       So at any point prior to the Dr. Friederichs
3 letter situation, were you aware of there being a
4 practice -- any kind of practice about sending
5 departing physician letters with that departing
6 physician's name at -- in the signature block without
7 that departing physician signing off on it?
8    A. No.
9    Q. Are you aware of -- other than what your
10 expectations would be, I mean, did somebody tell you,
11 whatever executive director or director it might have
12 been, that they were actually running these sorts of
13 letters past the departing physicians?
14    A. No.
15    Q. Okay. It was just your expectation, based on
16 how it was worded in this guideline, right?
17    A. Yes.
18    Q. Okay. All right.
19       All right. I want to return to Exhibit 31 -- I
20 can show you again here in a second -- which is the
21 text messages. I'm looking at the third page of
22 Exhibit 31, and again this is a text message from
23 Mr. Erickson saying "I F'd up with Freddy's and
24 Erpelding's patient letters and they are pissed."
25       Do you see that?

13 (Pages 46 - 49)

Page 50

1    A. I do.
2    Q. Okay.  As part of whether it was the immediate
3  conversation that followed this text message or whether
4  it was in person in the next couple of days, do you
5  recall what Mr. Erickson told you about why it was an F
6  up, I guess, to use his language?
7    A. Yeah, I called Mike after receiving that text,
8  I know that.  And he explained the situation and said,
9  you know, the -- the template that was used that he
10  approved appeared as though it was written by Freddy
11  and it was sent out without him and Erpelding seeing it
12  first.
13    Q. Did -- in this conversation, did Mr. Erickson
14  explain to you any earlier issue with Dr. Norberg and
15  Dr. Norberg's letter?
16    A. Not that I recall.
17    Q. Okay.  Put that exhibit back away again.
18       And going back then to what I think you called
19  as, like, the physician comp or physician recruitment
20  meetings -- and, again, I -- I guess it wasn't
21  abundantly clear, were those two different kinds of
22  meetings or was that just more, like, physician --
23    A. Services.
24    Q. -- related -- okay.  Physician services
25  meetings, maybe we can call it that.

Page 51

1       And I think you said Luis Garcia was -- I don't
2  want to necessarily say leading the charge.  What was
3  Luis Garcia's role on that?
4    A. Luis Garcia's, president of the clinic, is the
5  seat that he -- he's held the last several years.
6    Q. And --
7    A. And so --
8    Q. Oh, go ahead.
9    A. His office and physician services handles those
10  types of guidelines.
11    Q. And do you remember -- actually, strike that.
12  Let me ask you something differently.
13       So after meeting with Mr. Erickson went to --
14  something went to legal and compliance, and I don't
15  want to know about that.  Other than legal and
16  compliance, did you have discussions with anybody else
17  about the Dr. Friederichs letter situation, whether
18  senior leadership or anybody else?
19    A. Yes.
20    Q. And who did you have discussions with?
21    A. With the senior leadership team.
22    Q. And what were those -- was that a single
23  discussion or multiple discussions?
24    A. It was more than one discussion, it was ongoing
25  updates.  But, again, that was at the point that --

Page 52

1  that our internal legal counsel was involved.
2    Q. I see.  I want to not talk about any meetings
3  in which there was, you know, the lawyer present
4  talking about whatever.  But beyond that, you know, any
5  conversations, say, between you and Mr. Volk about the
6  Dr. Friederichs letter?
7       MR. RAITER:  Just caution you if the
8  conversations involved discussions or information
9  provided to you or conveyed to you by legal, I would
10  ask you not to disclose that part of the conversation.
11  I think counsel's asking you for things that were not
12  coming from legal or at the direction of legal.
13       THE WITNESS:  No.  There were no
14  discussions that were not legal informed.
15  BY MR. WHEELER:
16    Q. All right.  And then I understand that there
17  may have been some changes in the practice or the
18  execution of how departing physician's letters are
19  sent; is that right?
20    A. That is correct.
21    Q. And were you involved in -- in that process?
22  Making those changes?
23    A. I was not.
24    Q. Okay.  So I -- I want to talk a little bit more
25  about the physician services meetings, I guess.  And I

Page 53

1  just want to focus on your time in Fargo.  I don't know
2  if you would have been attending any of those sorts of
3  things beyond Fargo, but let's just focus on your time
4  in Fargo.  How frequently were you attending these
5  sorts of meetings?
6    A. The physician services was a presenting group
7  on a ad hoc basis for enterprise ops, which was held
8  every Wednesday.
9    Q. And so, you know, in a given year, what does
10  that mean for how many times they would present on an
11  ad hoc basis?
12    A. I couldn't estimate.
13    Q. Was it, like, more or less than once a year?
14    A. At least once a year to review survey data at a
15  minimum.
16    Q. And are these surveys of physicians, patients,
17  or both?
18    A. Physician compensation.
19    Q. Okay.  Did you have different sorts of meetings
20  regarding patient acquisition, retention, patient
21  happiness -- there's a better phrase I'm sure, but do
22  you know -- do you know what I'm talking about, the
23  sorts of things I'm talking about?
24    A. Patient satisfaction.
25    Q. Satisfaction.  Thank you.  That's the word I

14 (Pages 50 - 53)

1 was looking for.

2     Was there different sorts of presenting groups
3 on that sort of issue?

4   A. Yes.

5   Q. Okay. And do you recall this letter ever being
6 discussed in -- in that sort of context?

7   A. I do not.

8   Q. Okay. So best as you recall, it was more on
9 the physician services sides of things?

10   A. Correct.

11   Q. Okay. And I think the two things that you
12 describe are physician compensation and physician
13 recruitment, right? And --

14   A. Correct.

15   Q. -- was -- was there anything -- any other
16 categories beyond those two that would fall into
17 physician services?

18   A. Physician experience is kind of the third -- I
19 would say the third stool of that group.

20   Q. Is that kind of similar to satisfaction, just
21 how happy providers are?

22   A. Yeah. Provider satisfaction, and retention is
23 the other thing you could call it.

24   Q. Okay. So sitting here now -- well, after your
25 conversations with Mr. Erickson back in January of

1 2022, certainly at that point you were aware, right,
2 that some of these letters were being sent out on
3 behalf of a departing physician without that
4 physician's sign-off, I guess; is that right?

5   A. I was aware that it occurred with Freddy and
6 Erpelding.

7   Q. Right. Okay.

8     So are you aware of that happening with any
9 other physicians?

10   A. Prior to that time, no.

11   Q. And -- and just to be clear, I -- even
12 expanding it beyond, like, the orthopedic sports
13 medicine group, are you aware of that happening in any
14 other groups?

15   A. Not that I can recall.

16   Q. And in your discussions with Mr. Erickson, did
17 you ever get an understanding of the -- the origin of
18 the issue, I guess, of when that practice may have
19 started with orthopedics?

20   A. So --

21     MR. RAITER: Objection; form.

22     Go ahead and answer.

23     THE WITNESS: I would say that it was --
24 and as stated in -- in Mike's -- Mike Erickson's text
25 message to me, it was an error specific to the -- those

1 two physicians' resignation. It was a process error.

2 BY MR. WHEELER:

3   Q. So let me -- let me ask a -- a more specific
4 question. In any of your conversations with
5 Mr. Erickson, did he tell you that the same sort of
6 process error had occurred prior to Dr. Friederichs and
7 Dr. Erpelding?

8   A. No.

9   Q. Okay. All right. I'm going to show you a few
10 more exhibits here. I'm showing you what was
11 previously marked as Deposition Exhibit 37. If you
12 could let me know when you're ready.

13   A. I'm ready.

14   Q. Okay. So you're not on the very top e-mail,
15 but you are on the bottom e-mail, which is an e-mail
16 from Darren Huber maybe to a number of other folks with
17 a link to an article about this lawsuit, right?

18   A. Yes.

19   Q. And that's January 21st of 2022.

20     Do you see that?

21   A. I do.

22   Q. And who is Darren -- and I apologize if I'm
23 mispronouncing his last name -- Huber?

24   A. He's the executive director of marketing for
25 the Fargo market.

1   Q. And so is he one of those executive directors
2 like Mr. Erickson? Like, are they peers?

3   A. They would be peers in title. Darren reports
4 into a -- a corporate service.

5   Q. Oh, so he doesn't report to you?

6   A. He did not.

7   Q. Okay. Did that change?

8   A. No.

9   Q. Okay. Just wanted to make sure from your
10 phrasing there.

11     Okay. So did you still though work relatively
12 frequently with Mr. Huber?

13   A. Yes.

14   Q. And do you know who he reported to?

15   A. He reported to -- to somebody in Sioux Falls.

16   Q. Okay.

17   A. Kristy Griffin.

18   Q. All right. So just looking then at his e-mail,
19 we've already talked about Mr. Erickson, the next
20 person is you, and then we have a Neil Roesler or
21 Roesler. Who is that?

22   A. He's our attorney. Internal --

23   Q. Okay.

24   A. -- counsel.

25   Q. All right. And then we have Emily Mangin, who

15 (Pages 54 - 57)

1 I think we've already discussed. And then we have a
2 Scott Seiler or Seiler or something like that. Who is
3 that?
4     A. He's a marketing specialist on Darren's team.
5     Q. And do you work with Mr. Seiler or Seiler very
6 frequently?
7     A. Not near as frequent as Darren, but I worked
8 with Scott on a regular basis for external media
9 stories.
10     Q. Sure. And so I want to set aside, again, any
11 conversations protected by attorney-client privilege,
12 you know, with whether it's Mr. Roesler or somebody
13 else. But do you recall whether this e-mail prompted
14 you to have any other sorts of conversations with
15 anybody else whether on this e-mail chain or off this
16 e-mail chain?
17     A. Not to my knowledge.
18     Q. Okay. And I apologize, this is a little
19 clunkier remotely than it would be in real life, so
20 you'll have to --
21     A. That's okay.
22     Q. -- bear with the awkward pauses.
23       All right. Next I'm going to show you what
24 I've titled Exhibit 49, which is Bates stamped
25 SAN00001092. If you could let me know when you're

1 ready on that.
2     A. I see it.
3     Q. Okay. And there's two e-mails here, the one on
4 the bottom of course is the earlier e-mail. This is an
5 e-mail from Mr. Huber to you and a couple other folks
6 about a draft media response for Dr. Friederichs'
7 lawsuit.
8       Do you see that?
9     A. I do.
10     Q. And then there's a response from one of those
11 folks, who is Mr. Volk, who I think we've talked about
12 prior, right?
13     A. Correct.
14     Q. Okay. And the only name on here that I think
15 is new is a Nathan Aamodt -- Aamodt. I'm terrible with
16 names. Do you -- who is that?
17     A. He is a marketing communications specialist.
18     Q. Okay. So on Mr. Huber's team?
19     A. Correct.
20     Q. Okay. Do you recall, outside of these two
21 e-mails that we're looking at here, having any
22 conversations with any of the folks on the e-mail chain
23 about, you know, media responses to the lawsuit?
24     A. I do not recall.
25     Q. Do you recall any conversation with Mr. Volk

1 about that?
2     A. I -- no specific recollection. This is a -- a
3 very standard e-mail for me to get throughout the day
4 about any sort of external media coverage. I always
5 had awareness of what would be released in print. And
6 then if it was something -- you know, a specific quote
7 of mine or otherwise, then I would make my revisions
8 and amendments. So this is a very standard e-mail to
9 receive.
10     Q. Okay. Let me show you another one. So now I'm
11 going to show you what I've titled Exhibit 50, which is
12 stamped Bates label SAN00000346. And if you can let me
13 know when you're ready.
14     A. I'm ready.
15     Q. All right. So, again, two e-mails. We'll
16 start with the bottom e-mail. It's an e-mail from Pat
17 Lewis on behalf of Mr. Erickson to a whole bunch of
18 different folks, again, about Dr. Friederichs' lawsuit.
19       Do you see that?
20     A. I do.
21     Q. And this is in February 18th of 2022. So
22 certainly a couple weeks after the e-mail we were just
23 looking at, right?
24     A. Yes.
25     Q. Okay. And I'm not going to ask you about every

1 single person on this e-mail chain. But glancing at
2 the names, it seems like this includes the entirety of
3 the senior leadership team that you've been -- that you
4 referred to earlier, right?
5     A. Correct.
6     Q. Because I see Tiffany Lawrence, James Volk,
7 Doug Griffin, Darla Dobberstein and then Paul Burud,
8 was that -- how -- I'm terrible with names. Is that
9 the other one that you mentioned?
10     A. Yes.
11     Q. Okay. All right.
12       Do you -- are you aware of what prompted
13 Mr. Erickson to send this e-mail?
14     A. I do not recall. In the date, February 18th, I
15 was on maternity leave at that point.
16     Q. Okay. And hopefully you weren't re --
17 reviewing e-mails, or at least not reviewing them very
18 frequently. So -- but I'll ask. I mean, do you
19 remember having any conversations then with anybody
20 about the -- issue raised in this e-mail?
21     A. I do not.
22     Q. All right. And I guess before I put this away,
23 I mean, did you have any conversations with
24 Dr. Friederichs, I guess, ever after his -- after the
25 letter went out?

1    A. I did not.
2    Q. Okay. And I certainly can assume, but I'll
3  ask. Have you had any conversations with him in --
4  well, I -- I -- never mind. I just asked that
5  question.
6        All right. So after this whole letter
7  situation, I'll call it, Dr. Friederichs eventually
8  leaves Sanford, right?
9    A. Correct.
10    Q. And do you recall approximately when that was?
11    A. I don't recall the date. I would assume it
12  would be some point in February, based on a 90-day
13  notice.
14    Q. Sure. And your assumption is -- is right.
15        Do you recall dealing with any issues with
16  Dr. Friederichs after he gave his notice, not relating
17  to the letter but relating about anything else?
18    A. I did not deal directly with any additional
19  issues. I do have awareness of a block time concern
20  that he had.
21    Q. Okay. And what do you recall about the block
22  time issue?
23    A. He did not want to have a Friday block time,
24  concerns about -- he had raised concerns about safety,
25  I believe.

1    Q. And do you know whether, while he was an
2  employee at Sanford, he had Friday block time?
3    A. I -- I can't confirm.
4    Q. Okay.
5    A. I don't have the schedules of physicians
6  memorized.
7    Q. Sure. And so it sounds like then your
8  awareness or involvement of the issue was -- is it
9  relatively limited?
10    A. Extremely. And again, I was on maternity leave
11  at this point. So I know I received ongoing updates
12  via e-mail on what was happening, but I did not
13  participate in decision making.
14    Q. When did you return from maternity leave?
15    A. That's the hardest question you've asked me so
16  far.
17    Q. When were you supposed to officially return?
18    A. I -- May. I started coming back in -- early
19  March.
20    Q. Okay. All right. Well, I'll just show you
21  another document, and we can go from there. So I'm
22  going to show you what's titled Exhibit 51, which is
23  Bates label SAN00001433.
24        I have two small children of my own, so I
25  certainly understand that sometimes you never really

1  return -- or you never really left.
2    A. Left, yeah.
3    Q. Yeah.
4        You can let me know when you're ready for this
5  one.
6    A. I see that.
7    Q. Okay. So the first e-mail from April 14th is
8  from Dr. Friederichs to a couple of the senior leader
9  folks, but not you, right?
10    A. Correct.
11    Q. And then it is forwarded from Ms. Dobberstein
12  onto you and Mr. Erickson on April 14th of 2022.
13        Do you see that?
14    A. I do.
15    Q. And this was, I don't know exactly how you
16  described it, but, you know, before you were supposed
17  to come back, but you were still working. So -- is --
18  is that fair?
19    A. Yes.
20    Q. Okay.
21    A. On specific things, I did -- I did work.
22    Q. Okay. And do you recall then having any
23  involvement in this issue from April of 2022?
24    A. I made no decisions with this issue. I just
25  had awareness and updates as they -- as it -- the

1  process progressed.
2    Q. Okay. And so, again, me trying to pinpoint
3  that a little bit more, you were more just aware rather
4  than, say, actively consulting; is that fair?
5    A. Yes. My consult consisted of we need to ensure
6  that it is fair and equitable and there needs to be an
7  assessment of any safety concerns that brought -- that
8  are brought forward by Dr. Friederichs or anyone else.
9    Q. And do you recall what the ultimate resolution
10  of the issue was?
11    A. I -- I do not know at this point. Honestly,
12  when I left Sanford, there was still some variability
13  happening.
14    Q. Somehow I think we -- and I'm just going to,
15  like I said, continue to jump around.
16        We may have missed this at the very beginning,
17  but did I -- did we miss talking about one of the
18  degrees that you received? Did you have some sort of
19  doctorate degree?
20    A. I do.
21    Q. Okay. When did you receive that?
22    A. 2017 or '18. 2018.
23    Q. And where did you get that degree from?
24    A. Walden University in Minneapolis.
25    Q. And that's the same place you got your masters?

17 (Pages 62 - 65)

1   A.  Correct.
2   Q.  And is that -- what -- what's it called, a
3   doctor of nursing or a PhD of nursing?  Or what's it --
4   sorry.
5   A.  It's a doctorate of nursing practice in
6   leadership and administration.
7   Q.  So are you officially done with your
8   educational journey then, I take it?
9   A.  Who knows.
10   Q.  Yeah.  I understand that completely.
11      So let me just look at my notes here, make sure
12   I didn't miss anything, but we're probably getting
13   close to being done here.  And actually, on this one,
14   we might as well just go off the record for five
15   minutes or so.
16      THE VIDEOGRAPHER:  We're going -- we're
17   going off the record at 3:19 p.m.
18      (A break was taken at 3:19 p.m.)
19      THE VIDEOGRAPHER:  We're going back on the
20   record at 3:25 p.m.
21   BY MR. WHEELER:
22   Q.  All right.  I have a -- list of names here of
23   folks who I understand were departing physicians, and
24   so I'm just going to ask you about each of them and
25   whether you know anything about any letters that may

1   have been sent on their behalf, just to put specific
2   names out there, rather than to try and figure this out
3   in the abstract.
4      So do you have any knowledge of a letter sent
5   on -- or sent regarding Nathan Kobrinsky?
6   A.  I do not.
7   Q.  Saraswathy Manickavasagam?
8   A.  I do not.
9   Q.  I butchered that person's name.
10      Scott Grindel?
11   A.  No.
12   Q.  William Richards?
13   A.  No.
14   Q.  Holly Eischens?
15   A.  No.
16   Q.  Jeff Lipke?
17   A.  No.
18   Q.  Scott Lawrence?
19   A.  No.
20   Q.  Jeffrey Anderson?
21   A.  No.
22   Q.  Andrew Stasko?
23   A.  No.
24   Q.  Neelima Nyayapati -- Nyayapati?
25   A.  No.

1   Q.  Maggie Suby?
2   A.  No.
3   Q.  Nicholas Smith?
4   A.  No.
5   Q.  Ann Safo?
6   A.  No.
7   Q.  Priyanka Tiwari?
8   A.  No.
9   Q.  Nerine Vincent?
10   A.  No.
11   Q.  Kurt Datz?
12   A.  No.
13   Q.  Sarah Fanai?
14   A.  No.
15   Q.  Gautam Phadke?
16   A.  No.
17   Q.  Anthony Odland?
18   A.  No.
19   Q.  Lance Doeden?
20   A.  No.
21   Q.  Scott Fillmore?
22   A.  No.
23   Q.  LeeAnn Wages?
24   A.  No.
25   Q.  All right.  So you -- I think at the beginning

1   of this, you said you're still residing in Fargo; is
2   that right?
3   A.  Correct.
4   Q.  And this -- this lawsuit, if it goes to a
5   trial, could be set for a trial, it's currently in
6   September but could be at any point in time.  Are you
7   planning currently on moving anywhere or are you
8   planning in sticking in Fargo for -- for the time
9   being?
10   A.  I -- I'm leaving Fargo.
11   Q.  You are.  Okay.  Where are you moving to?
12   A.  I wish I knew.  We -- I've -- I've sold my
13   house and I will be moving from Fargo June 1st hinged
14   on my -- where my husband selects a position.
15   Q.  Okay.  I see.  And we don't know a location,
16   what city or state that is yet?
17   A.  No.  It's between --
18   Q.  Okay.
19   A.  -- a handful.
20   Q.  And I assume that's not going to be somewhere
21   else in North Dakota?
22   A.  No, it's not.
23   Q.  Okay.  All right.
24      And -- and just with your husband -- I mean, he
25   was a departing physician from Sanford, right?

18 (Pages 66 - 69)

Page 70

1    A.  Correct.

2    Q.  Did you ever see a copy of the letter that was

3  sent relating to his departure?

4    A.  I did not.

5    Q.  All right.

6        MR. WHEELER:  I do not have any further

7  questions for you.  Mr. Raiter might.

8        MR. RAITER:  I do not.  We will read and

9  sign.

10        MR. WHEELER:  Okay.  Thank you very much

11  for your time this afternoon.

12        THE WITNESS:  Thank you.

13        THE VIDEOGRAPHER:  We're going off the

14  record at 3:29 p.m.

15

16    (The deposition was concluded at 3:29 p.m.)

17

18

19

20

21

22

23

24

25

---

Page 71

1

        REPORTER'S CERTIFICATE

2

3  STATE OF MINNESOTA    )
                         ) ss.

4  COUNTY OF CLAY        )

5      I hereby certify that I reported the remote
    videotaped deposition of Brittany Sachdeva on Monday,

6  February 20, 2023, and that the witness was by me
    first duly sworn to tell the whole truth;

7

        That the testimony was transcribed by me and is

8  a true record of the testimony of the witness;

9        That the cost of the original has been charged
    to the party who noticed the deposition, and that all

10  parties who ordered copies have been charged at the
    same rate for such copies;

11

        That I am not a relative or employee or

12  attorney or counsel of any of the parties, or a
    relative or employee of such attorney or counsel;

13

        That I am not financially interested in the

14  action and have no contract with the parties,
    attorneys, or persons with an interest in the action

15  that affects or has a substantial tendency to affect
    my impartiality;

16

        That the right to read and sign the deposition

17  by the witness was preserved.

18

        WITNESS MY HAND AND SEAL THIS 7th day of March,

19  2023.

20

21

22

23  _____
    Chrissa A. Belew, RDR, CRR, CRC

24  Notary Public, Clay County, Minnesota
    My commission expires January 31, 2027

25

---

Page 72

1                Veritext Legal Solutions
                 1100 Superior Ave

2                  Suite 1820
                Cleveland, Ohio 44114

3              Phone: 216-523-1313

4

    March 8, 2023

5

    To: Mr. Raiter

6

    Case Name: Friederichs, M.D., Matthew G. v. Sanford Health

7

    Veritext Reference Number: 5755417

8

    Witness:  Brittany Sachdeva      Deposition Date:  2/20/2023

9

10  Dear Sir/Madam:

11

    Enclosed please find a deposition transcript.  Please have the witness

12  review the transcript and note any changes or corrections on the

13  included errata sheet, indicating the page, line number, change, and

14  the reason for the change.  Have the witness' signature notarized and

15  forward the completed page(s) back to us at the Production address

16  shown

17  above, or email to production-midwest@veritext.com.

18

    If the errata is not returned within thirty days of your receipt of

19  this letter, the reading and signing will be deemed waived.

20

21  Sincerely,

22  Production Department

23

24

25  NO NOTARY REQUIRED IN CA

---

Page 73

1        DEPOSITION REVIEW
        CERTIFICATION OF WITNESS

2

    ASSIGNMENT REFERENCE NO: 5755417

3    CASE NAME: Friederichs, M.D., Matthew G. v. Sanford Health
    DATE OF DEPOSITION: 2/20/2023

4    WITNESS' NAME: Brittany Sachdeva

5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of

6  my testimony or it has been read to me.

7      I have made no changes to the testimony
    as transcribed by the court reporter.

8

    _____

9  Date          Brittany Sachdeva

10      Sworn to and subscribed before me, a
    Notary Public in and for the State and County,

11  the referenced witness did personally appear
    and acknowledge that:

12

    They have read the transcript;

13    They signed the foregoing Sworn
        Statement; and

14    Their execution of this Statement is of
        their free act and deed.

15

    I have affixed my name and official seal

16

    this _____ day of_____, 20____.

17

    _____

18    Notary Public

19    _____

    Commission Expiration Date

20

21

22

23

24

25

19 (Pages 70 - 73)

Page 74

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 5755417
3   CASE NAME: Friederichs, M.D., Matthew G. v. Sanford Health
    DATE OF DEPOSITION: 2/20/2023
4   WITNESS' NAME: Brittany Sachdeva
5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7      I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9      I request that these changes be entered
    as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date            Brittany Sachdeva
14
       Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18       in the appended Errata Sheet;
       They signed the foregoing Sworn
19       Statement; and
       Their execution of this Statement is of
20       their free act and deed.
21  I have affixed my name and official seal
22  this _____ day of_____, 20____.
23  _____
    Notary Public
24
25  Commission Expiration Date

Page 75

1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 5755417
3   PAGE/LINE(S) /      CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____    _____
20  Date            Brittany Sachdeva
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
    Notary Public
24
    _____
25  Commission Expiration Date

20 (Pages 74 - 75)

**[00008 - actively]**

| 0 |
|---|
| **00008** 1:7 5:9 |

| 1 |
|---|

**1** 41:6
**1/21/2022** 4:9
**1/23/2022** 4:9
**11** 36:21
**1100** 72:1
**11th** 37:12
**12** 10:1,1
**14th** 64:7,12
**16** 40:15 44:21
  47:22
**17951** 71:22
**18** 65:22
**1820** 72:2
**18th** 60:21
  61:14
**1:34** 1:17 2:3
  5:3
**1st** 69:13

| 2 |
|---|

**2** 41:7 47:21
**2/18/2022** 4:14
**2/20/2023** 72:8
  73:3 74:3
**20** 1:16 2:2 5:3
  6:22 44:17
  71:6 73:16
  74:22 75:22
**2008** 9:13
**2009** 11:18
**2011** 9:25
  12:13

**2012** 10:1
**2017** 13:24
  65:22
**2018** 65:22
**2019** 15:2,25
  23:2
**2021** 26:15
  28:22
**2022** 24:11
  28:24 32:21
  36:21 37:13
  55:1 56:19
  60:21 64:12,23
**2023** 1:16 2:2
  5:3 44:17 71:6
  71:19 72:4
**2027** 71:24
**216-523-1313**
  72:3
**21st** 56:19
**220** 2:15
**2200** 2:15
**23** 25:20
**25th** 24:8
**278** 41:6
**2800** 3:6
**2:32** 44:13,14
**2:46** 44:18

| 3 |
|---|

**30** 3:7
**31** 36:10 49:19
  49:22 71:24
**37** 56:11
**3:19** 66:17,18

**3:22** 1:7 5:9
**3:25** 66:20
**3:29** 70:14,16

| 4 |
|---|

**4** 48:11
**4/14/2022** 4:16
**44114** 72:2
**49** 4:9 58:24

| 5 |
|---|

**5** 48:15
**50** 4:14 60:11
**51** 4:16 63:22
**55101** 3:8
**55402-4504**
  2:16
**5755417** 72:7
  73:2 74:2 75:2
**58** 4:9
**5th** 32:21

| 6 |
|---|

**6** 4:4 32:3,21
  39:12,15 48:19
**60** 4:14
**605** 36:24
**612-339-6321**
  2:17
**63** 4:16
**651-312-6500**
  3:9

| 7 |
|---|

**7th** 71:18

| 8 |
|---|
| **8** 72:4 |

| 9 |
|---|
| **90** 62:12 |

| a |
|---|

**aamodt** 59:15
  59:15
**ability** 12:13
**able** 36:11
  37:20
**above** 72:17
**absolute** 7:12
**abstract** 31:15
  67:3
**abundantly**
  50:21
**abut** 16:14
**access** 37:18
  38:1
**accordance**
  73:5 74:5
**accreditation**
  12:19 14:11,16
**accredited**
  12:25
**acknowledge**
  73:11 74:16
**acquisition**
  53:20
**act** 73:14 74:20
**action** 71:14,14
**actively** 29:17
  65:4

**actual** 41:12
  47:8
**actually** 23:1
  37:17 49:12
  51:11 66:13
**ad** 53:7,11
**additional**
  62:18
**address** 72:15
**administration**
  66:6
**administrative**
  13:15,18,19
  15:14 28:11
**advance** 25:25
  26:3
**affect** 71:15
**affects** 71:15
**affixed** 73:15
  74:21
**afternoon** 5:17
  6:4 70:11
**ago** 6:18,23 7:3
  8:8,9 37:10
**ahead** 25:2
  34:20 35:18
  46:2 51:8
  55:22
**allowed** 34:25
  35:7
**ambulatory**
  14:5,9,23
**amendments**
  60:8

**amount** 15:10
**anderson** 67:20
**andrew** 67:22
**ann** 68:5
**annual** 22:21
**answer** 14:22
  55:22
**answering** 7:14
  7:16
**answers** 7:9,18
  7:19 10:2
**anthony** 68:17
**antonio** 24:21
  24:23 25:16
**anybody** 16:5
  26:23 38:22
  51:16,18 58:15
  61:19
**anymore** 13:4
**apologize** 23:2
  25:25 26:3
  56:22 58:18
**apparently**
  48:19
**appear** 73:11
  74:15
**appearances**
  2:10,22 3:1
**appeared** 50:10
**appended**
  74:11,18
**appointments**
  29:5
**apprised** 30:6

**approach**
  33:14,14
**approached**
  33:15
**appropriate**
  42:19,22 43:8
**appropriately**
  28:10
**approved**
  50:10
**approximately**
  32:24 62:10
**april** 64:7,12
  64:23
**area** 30:13
**ars** 1:7 5:9
**article** 56:17
**ashley** 19:3
**aside** 41:10
  58:10
**asked** 17:14
  33:17 62:4
  63:15
**asking** 7:8
  23:10 26:10
  31:23 34:5
  52:11
**assessment**
  65:7
**assignment**
  73:2 74:2 75:2
**associate's**
  10:14
**associates** 9:15
  9:16

**assume** 7:1
  14:21 18:2,15
  20:24 23:18
  62:2,11 69:20
**assumed** 20:12
**assuming** 18:22
**assumption**
  62:14
**attached** 74:7
**attended** 22:20
**attending**
  10:25 39:2
  53:2,4
**attorney** 39:6
  57:22 58:11
  71:12,12
**attorneys** 71:14
**audible** 7:18
**authorize**
  74:11
**ave** 72:1
**aware** 26:8
  29:16 30:4,9
  45:18,20,23
  46:18 49:3,9
  55:1,5,8,13
  61:12 65:3
**awareness**
  42:17 60:5
  62:19 63:8
  64:25
**awkward** 58:22

| **b** | | | |
|---|---|---|---|

**bachelor's** 9:14
9:22 10:8
**bachelors**
10:10
**back** 6:16,19
8:7,20 9:21
17:14 30:10
37:20 39:12
44:17 45:17
48:11 50:17,18
54:25 63:18
64:17 66:19
72:15
**bad** 16:11
17:14 25:18
**ballpark** 23:3,6
**bar** 38:16
**based** 16:18
18:21 20:11
25:12 44:2
49:15 62:12
**basis** 22:5,21
25:5 35:23
53:7,11 58:8
**bates** 36:20
58:24 60:12
63:23
**bear** 31:19
58:22
**beginning** 7:4
9:6 65:16
68:25
**behalf** 2:12 3:3
5:18,20 48:3,7

48:22 55:3
60:17 67:1
**believe** 6:15
11:5 24:12,18
29:25 35:15
36:19 62:25
**bell** 37:6
**bemidji** 22:2
**benefits** 28:9
**best** 6:7,9 7:12
12:13 13:12
30:12 45:4
54:8
**better** 10:6
13:13,15 16:11
36:15 41:15
53:21
**beyond** 38:22
52:4 53:3
54:16 55:12
**big** 12:1
**bismarck** 22:1
**bit** 12:22 16:14
20:3,25 24:4
28:1,5,20
29:15 31:18
33:12 36:13,18
41:15 52:24
65:3
**block** 47:10
49:6 62:19,21
62:23 63:2
**body** 13:2
**boilerplate**
39:24 41:8

**bottom** 32:12
47:13,24 48:12
48:16 56:15
59:4 60:16
**bouncing** 15:9
**boy** 12:10
**brandon** 2:13
5:17
**break** 43:21
44:11,14,20
66:18
**bridge** 10:12
11:20
**briefly** 14:13
**britt** 44:16
**brittany** 1:15
2:1 4:3,12 5:5
5:24 6:6 44:16
71:5 72:8 73:4
73:9 74:4,13
75:20
**broader** 20:23
**brought** 65:7,8
**bryan** 16:1
**bunch** 60:17
**burud** 19:2
61:7
**business** 8:16
8:19
**butchered** 67:9
**bwheeler** 2:18

| **c** | | | |
|---|---|---|---|

**ca** 72:25
**calendar** 37:14
37:19

**call** 20:15
33:17 34:5,11
35:11,20 37:4
41:11 45:1
46:6 50:25
54:23 62:7
**called** 22:11
44:22 50:7,18
66:2
**captioner** 2:5
**care** 12:21 13:4
13:8 21:7 25:9
**career** 6:22
40:7
**case** 1:7 5:8
24:13 39:10
48:6 72:6 73:3
74:3
**categories**
54:16
**caution** 52:7
**cc'd** 30:8
**cell** 37:1 38:7
**center** 10:21
11:4,10
**central** 5:3 44:4
**centrally** 44:6,7
**ceo** 15:20 17:3
17:25
**certainly** 19:23
55:1 60:22
62:2 63:25
**certainty** 35:21
**certificate** 71:1
74:11

[certification - correct]                                                    Page 4

**certification**
73:1 74:1
**certified**  2:4,5
**certify**  71:5
**chain**  58:15,16
59:22 61:1
**change**  57:7
72:13,14 74:8
75:3
**changes**  37:15
42:16 52:17,22
72:12 73:7
74:7,9
**changing**  42:13
**charge**  51:2
**charged**  71:9
71:10
**check**  38:2
**chief**  14:19
15:1,4,20 17:4
17:4,6,21,21,22
17:23 20:17,22
21:1,3 43:10
**children**  63:24
**christa**  1:23 2:3
5:13 71:23
**city**  11:9 69:16
**civil**  73:5 74:5
**clarify**  35:5
**clay**  71:4,23
**clear**  20:16
50:21 55:11
**cleared**  28:10
**cleveland**  72:2

**client**  58:11
**clinic**  17:6,23
22:12 29:7
30:12 31:7
51:4
**clinical**  21:5,5
30:21
**clinics**  12:25
19:6 30:18
42:7
**close**  33:2
66:13
**closely**  16:16
**closer**  20:10
**closest**  16:25
**clunkier**  58:19
**collaborate**
22:5
**college**  9:6
**come**  8:2 45:4
64:17
**coming**  52:12
63:18
**commencing**
1:17 2:2
**commission**
13:1 71:24
73:19 74:25
75:25
**communicate**
22:23
**communicated**
43:13
**communicati...**
59:17

**comp**  42:4
50:19
**compensation**
40:9 41:2
53:18 54:12
**complaints**
46:15
**completed**
72:15
**completely**
66:10
**complex**  12:2
15:18
**compliance**
34:22 51:14,16
**concern**  62:19
**concerns**  62:24
62:24 65:7
**concluded**
70:16
**concurrent**
33:19
**conducted**  5:10
**confident**  30:7
**confirm**  63:3
**connect**  39:3
**connection**
40:22,23,24
41:16
**consisted**  65:5
**consult**  27:9
29:24 36:4
65:5
**consulted**
29:18

**consulting**  25:6
25:10 29:17
65:4
**context**  32:15
54:6
**continue**  65:15
**continued**  2:22
3:1
**contract**  71:14
**conversation**
33:13,21 50:3
50:13 52:10
59:25
**conversations**
52:5,8 54:25
56:4 58:11,14
59:22 61:19,23
62:3
**conveyed**  52:9
**coo**  15:13 16:15
19:20 20:18
21:12
**coordinating**
43:16
**copies**  71:10,10
**copy**  35:1,25
70:2
**corporate**  14:8
44:4 57:4
**correct**  6:9
11:12,15,22
12:7 13:5,17
14:8 15:16
17:9,12 18:18
19:19,24 20:2

[correct - deposition]                                                    Page 5

21:14 24:6,17
24:25 25:11
27:22 28:4
29:13 31:3
32:9 33:10
34:15 35:3
36:1 37:23
39:7 41:9,9
47:15 48:10,14
52:20 54:10,14
59:13,19 61:5
62:9 64:10
66:1 69:3 70:1
**corrections**
72:12 74:17
**correctly**  6:8
**correspondent...**
30:8
**cost**  71:9
**counsel**  5:15
39:1 52:1
57:24 71:12,12
**counsel's**  52:11
**counted**  19:11
**counterpart**
21:19,22
**counterperson**
21:22
**counterpoint**
21:22
**county**  71:4,23
73:10 74:15
**couple**  7:3
43:21 45:21
50:4 59:5

60:22 64:8
**course**  24:15
31:14 38:1
59:4
**court**  1:1 5:7
5:13,21 7:10
73:7
**coverage**  60:4
**crc**  1:23 71:23
**create**  20:8
**crr**  1:23 71:23
**currently**  24:5
25:4 69:5,7
**cut**  27:16
**cv**  1:7 5:9

**d**

**d**  4:1
**daily**  35:22
**dakota**  1:2 5:8
9:7,10 10:23
22:1,2 69:21
**darla**  4:17 19:2
61:7
**darren**  4:11
56:16,22 57:3
58:7
**darren's**  58:4
**data**  53:14
**date**  26:10 33:2
34:4 37:20
61:14 62:11
72:8 73:3,9,19
74:3,13,25
75:20,25

**dated**  36:21
**dates**  6:21
12:11 26:14
28:25 36:7
**datz**  68:11
**day**  24:7 29:7
29:11 33:1
34:7,10 35:14
35:15,23 60:3
62:12 71:18
73:16 74:22
75:22
**days**  50:4 72:18
**deal**  23:23
62:18
**dealing**  62:15
**deals**  48:19
**dear**  72:10
**december**  29:4
**decent**  15:10
**decided**  29:23
30:21
**decision**  26:4,4
26:6 29:8,10
29:12,17,18,19
29:21 63:13
**decisions**  29:16
64:24
**deed**  73:14
74:20
**deemed**  72:19
**defendant**  1:11
3:3
**define**  19:7

**degree**  9:14,16
9:22,25 10:8,9
10:15 11:7
12:20 65:19,23
**degrees**  65:18
**delay**  8:1
**dep**  36:10
**depart**  39:25
**departing**
40:10 41:17
42:9 45:5
47:18 48:7
49:5,5,7,13
52:18 55:3
66:23 69:25
**department**
29:24 30:20
31:8 43:24
44:3 72:22
**departments**
19:6 30:19
**departure**
28:12 30:2
70:3
**departures**
20:6 45:4
**depend**  23:24
**deposition**  1:14
2:1 5:5,10 6:10
6:13 32:2
36:10 40:15
44:16 56:11
70:16 71:5,9
71:16 72:8,11
73:1,3 74:1,3

**depositions** 7:1
7:6 8:8,21
**describe** 12:22
13:14 30:11,12
44:25 54:12
**described**
34:12 46:24
64:16
**differences**
45:21
**different** 18:24
23:20 30:8
36:8 40:12
41:1 45:21,22
45:24 50:21
53:19 54:2
60:18
**differentiate**
46:10
**differently**
51:12
**difficult** 31:12
**direct** 13:4
17:24 18:3
**direction** 16:13
18:9,14 52:12
**directly** 15:19
18:13,16 22:17
27:23,24,25
28:13,17 31:10
62:18
**director** 14:4
14:12,16,17,23
19:2,17 20:9
27:3,4,4,5,9,10

27:13 48:3,23
49:11,11 56:24
**directors** 19:5
19:7,8 20:6
22:22,23 26:24
31:11 35:22
43:2,3 57:1
**disclose** 52:10
**discussed** 35:11
36:3 54:6 58:1
**discussing** 30:4
**discussion** 29:6
51:23,24
**discussions**
23:11 29:2
30:5 42:10
51:16,20,23
52:8,14 55:16
**district** 1:1,2
5:7,8
**division** 1:3 5:8
**dobberstein**
4:17 19:3 61:7
64:11
**doctor** 26:17,21
66:3
**doctorate**
65:19 66:5
**document**
28:21 32:6
36:8 40:13,19
44:25 45:1
63:21
**documents**
31:17,21 37:25

**doeden** 68:19
**doing** 13:4,14
17:8 26:20,25
**doug** 17:6 61:7
**dr** 19:15,16
22:15,16 23:4
23:11 24:1,2
26:7 27:14
28:16,22 29:5
29:25 32:7,12
33:5,7,18
34:25 38:7
39:19 41:20
46:11,12,14,19
46:22 49:2
50:14,15 51:17
52:6 56:6,7
59:6 60:18
61:24 62:7,16
64:8 65:8
**draft** 59:6
**drafting** 45:9
**duly** 5:25 71:6
**dumb** 10:4
**duties** 12:23

### e

**e** 4:1,10,14,16
4:18 30:8
37:18 38:1
56:14,15,15
57:18 58:13,15
58:16 59:3,4,5
59:21,22 60:3
60:8,15,16,16
60:22 61:1,13

61:17,20 63:12
64:7
**earlier** 8:21
17:14 24:22
30:16 50:14
59:4 61:4
**early** 63:18
**easiest** 31:16
39:14
**east** 3:7
**eastern** 1:3 5:8
**educational**
42:11 66:8
**effort** 20:8
**eight** 20:5
**eischens** 67:14
**either** 47:11
**else's** 26:4
**email** 72:17
**emergency**
11:24
**emily** 4:15
27:15,18 43:19
57:25
**employee** 63:2
71:11,12
**employment**
8:10
**enclosed** 72:11
**ended** 34:4
**ends** 26:1 27:7
**ensure** 16:17
65:5
**enter** 22:10

| | | | f |
|---|---|---|---|
| **entered** 74:9 | 75:1 | **executives** 19:5 | **f** 50:5 |
| **enterprise** | **error** 55:25 | **exhibit** 4:9,14 | **f'd** 37:4 49:23 |
| 22:10 42:15 | 56:1,6 | 4:16 32:3,21 | **facilitating** |
| 53:7 | **esq** 2:13 3:4 | 36:10 39:12,15 | 43:15 |
| **entire** 73:5 74:5 | **essentially** | 40:15 44:21 | **facility** 12:4 |
| **entirety** 61:2 | 17:17 27:6 | 47:22 49:19,22 | **fair** 45:6 64:18 |
| **equitable** 65:6 | **estimate** 53:12 | 50:17 56:11 | 65:4,6 |
| **equity** 20:9 | **evening** 34:3 | 58:24 60:11 | **fall** 54:16 |
| **equivalent** | **eventually** 62:7 | 63:22 | **falls** 10:21 |
| 17:24 20:21 | **exact** 22:4 | **exhibits** 4:8 | 11:25 12:2,5 |
| 21:19 | **exactly** 31:1 | 56:10 | 12:25 14:3,7 |
| **er** 12:9 | 33:11 64:15 | **expanding** | 18:3,11,19 |
| **erickson** 4:13 | **examination** | 55:12 | 21:24 22:1 |
| 19:2,3,16 | 4:4 6:2 | **expect** 47:12 | 44:2,8 45:17 |
| 20:12 27:20,24 | **examined** 5:25 | **expectation** | 45:23,24 57:15 |
| 27:25 29:3 | **example** 40:3 | 49:15 | **familiar** 39:13 |
| 32:17 33:13 | **examples** 47:17 | **expectations** | **family** 8:16 |
| 35:14 37:17 | **exchange** 4:10 | 49:10 | **fanai** 68:13 |
| 38:11,22 42:22 | **execute** 42:19 | **expected** 47:3 | **far** 63:16 |
| 49:23 50:5,13 | 43:17 | **experience** | **fargo** 3:6 13:20 |
| 51:13 54:25 | **executed** 46:8 | 54:18 | 14:2,18,19 |
| 55:16 56:5 | 74:10 | **expiration** | 15:5,14,21 |
| 57:2,19 60:17 | **execution** | 73:19 74:25 | 16:8,9,15,17 |
| 61:13 64:12 | 46:24,25 52:18 | 75:25 | 18:19,21 19:12 |
| **erickson's** | 73:14 74:19 | **expires** 71:24 | 22:14 24:18 |
| 36:18 55:24 | **executive** 14:4 | **explain** 43:8 | 25:15 30:11,12 |
| **ericksons** 42:20 | 14:12,17,23 | 50:14 | 30:14,15,18 |
| 43:18 48:8 | 19:1,7,8,17 | **explained** 50:8 | 31:6 45:22,24 |
| **erpelding** | 20:6,9 22:22 | **external** 58:8 | 46:25 53:1,3,4 |
| 50:11 55:6 | 26:24 27:3,4 | 60:4 | 56:25 69:1,8 |
| 56:7 | 27:10 31:11 | **extremely** | 69:10,13 |
| **erpelding's** | 35:22 43:3 | 27:11 63:10 | **february** 1:16 |
| 37:5 49:24 | 48:3 49:11 | | 2:2 5:3 25:15 |
| **errata** 72:13,18 | 56:24 57:1 | | 28:24 44:17 |
| 74:7,10,18 | | | |

60:21 61:14
62:12 71:6
**felhaber** 2:14
**felhaber.com**
2:18
**figure** 8:4 9:3
18:23 29:14
34:23 67:2
**filed** 5:7
**fillmore** 68:21
**financial** 17:5
17:22
**financially**
71:13
**find** 38:10,12
72:11
**fine** 21:15
**finish** 7:15
**firm** 26:13
**first** 10:16 11:7
11:23 14:18
15:24 18:15
33:13,14 40:16
43:14 45:13
47:18,23 48:12
48:16,20,21
50:12 64:7
71:6
**five** 6:18,18,23
7:2 8:9 16:25
17:1,9 66:14
**focus** 53:1,3
**folks** 18:25
19:5 43:23
44:5 56:16

59:5,11,22
60:18 64:9
66:23
**follow** 39:3
43:12
**followed** 50:3
**following** 15:11
34:7 35:19
43:5
**follows** 5:25
**foregoing**
73:13 74:18
**forgive** 22:25
**form** 55:21
**forward** 36:5
65:8 72:15
**forwarded** 4:18
64:11
**four** 14:9 22:3
**fourth** 6:15
**frame** 15:23
16:6 26:12
28:20 29:1
**frankly** 43:5
**freddy** 34:18
38:17,19 39:1
39:2 50:10
55:5
**freddy's** 37:4
49:23
**free** 73:14
74:20
**frequent** 22:5
58:7

**frequently** 53:4
57:12 58:6
61:18
**friday** 62:23
63:2
**friederichs** 1:5
4:19 5:6 19:15
19:16 22:15,16
23:4 26:7
27:14 28:16,22
29:5 32:7,12
33:7,18 34:25
38:7,17 39:19
41:20 46:11,12
46:14,22 49:2
51:17 52:6
56:6 59:6
60:18 61:24
62:7,16 64:8
65:8 72:6 73:3
74:3
**friederichson**
23:11 33:5
**front** 42:18,21
43:7
**full** 10:16,17,18
**fully** 21:9
**function** 44:4
**functions** 28:11
**further** 6:19
8:20 70:6
**fyi** 42:11

| g |
| --- |
| **g** 1:5 5:6 72:6 |

73:3 74:3
**garcia** 42:6
51:1
**garcia's** 51:3,4
**gautam** 68:15
**gen** 46:3
**general** 8:17
46:3,4
**generally** 34:13
46:25
**getting** 11:6
12:24 42:18,21
42:23 43:7,19
66:12
**gist** 31:2
**give** 7:3 23:3
37:20 41:18
**given** 20:14
43:2 53:9
**giving** 7:15
**glancing** 61:1
**go** 7:5 8:3 9:4,6
9:21 10:10
16:13 17:14
25:2 28:23
33:13 34:20
35:18 36:18
37:20 44:11
46:2 51:8
55:22 63:21
66:14
**goes** 69:4

**[going - interested]** Page 9

**going** 5:2 6:7
6:16,19 7:8
8:20 10:15,17
11:19 15:11
18:14 21:16
24:3 30:5
31:20 32:1
34:25 36:7
39:12 41:21
43:12 44:9,12
44:17 45:17
46:9 50:18
56:9 58:23
60:11,25 63:22
65:14 66:16,17
66:19,24 69:20
70:13
**good** 5:17 6:4
**gotten** 12:10
**graduate** 9:9
**griffin** 17:6
23:22 24:2
57:17 61:7
**grindel** 67:10
**group** 22:3,24
53:6 54:19
55:13
**groups** 42:15
54:2 55:14
**guess** 6:20 14:2
15:25 16:8,22
17:15 18:15,25
26:20 32:6,10
34:1 44:21,23
44:24 50:6,20

52:25 55:4,18
61:22,24
**guidance** 36:5
**guideline** 45:2
46:3,5,7,16
49:16
**guidelines**
51:10

**h**

**hand** 71:18
**handful** 16:24
69:19
**handles** 51:9
**handwritten**
47:8
**happen** 43:16
**happened**
33:12
**happening**
29:16 55:8,13
63:12 65:13
**happiness**
53:21
**happy** 54:21
**hardest** 63:15
**head** 7:19
**health** 1:10 5:7
5:20 8:10
11:14 25:9
72:6 73:3 74:3
**hear** 24:9 32:8
**held** 14:3 15:6
21:12 51:5
53:7

**helpful** 18:1
37:13
**helps** 37:15
**herman** 17:4
**hierarchy**
17:16
**high** 23:15
**highlighted**
41:6
**hildahl** 3:16
5:11
**hinged** 69:13
**hoc** 53:7,11
**holly** 67:14
**honestly** 26:13
65:11
**hopefully** 61:16
**hospital** 12:1
25:10 35:8
**hospitals** 12:3
**hour** 22:13
44:10
**house** 69:13
**huber** 4:11
56:16,23 57:12
59:5
**huber's** 59:18
**huhs** 7:20
**hundred** 35:20
43:6
**husband** 69:14
69:24
**hybrid** 11:1,2

**i**

**i.e.** 42:20
**idea** 33:1
**identify** 5:15
**immediate** 50:2
**impact** 28:9
**impartiality**
71:15
**important** 7:11
7:25
**included** 72:13
**includes** 61:2
**incorporated**
74:12
**independence**
30:20
**indicating**
72:13
**individuals**
47:6
**information**
35:9 43:13
52:8
**informed** 52:14
**initial** 34:3
**initially** 10:20
**initiates** 27:5
**inpatient** 12:4
**instructions**
7:4
**interaction**
23:15
**interest** 71:14
**interested**
71:13

**internal**  36:4
    39:1 52:1
    57:22
**involved**  27:12
    27:14 28:6,14
    28:17 29:8
    31:9 34:22
    46:18 52:1,8
    52:21
**involvement**
    45:9 63:8
    64:23
**iphone**  38:14
    38:15
**issue**  23:19,23
    23:24 24:1
    33:18 34:13
    50:14 54:3
    55:18 61:20
    62:22 63:8
    64:23,24 65:10
**issues**  8:2 46:19
    62:15,19

**j**

**j**  2:13
**james**  4:11 61:6
**january**  25:20
    32:21 36:21
    37:12 54:25
    56:19 71:24
**jeff**  67:16
**jeffrey**  67:20
**jim**  17:5
**job**  8:25 12:23
    21:6

**jobs**  26:2
**john**  46:19
**join**  11:16
**joined**  11:13,18
**joint**  12:25
**journey**  66:8
**jump**  65:15
**jumping**  24:4
**june**  69:13

**k**

**kansas**  11:9
**kathryn**  19:3
**kept**  30:6
**kind**  7:3 17:13
    31:15 49:4
    54:18,20
**kinds**  50:21
**king**  3:5 5:19
**knew**  22:16
    69:12
**know**  6:9 8:3,3
    10:2,6 13:1,11
    14:21 15:12
    19:6,14 20:8
    20:14 22:15,19
    26:1,10,14
    27:11,13,19
    30:17 31:1,9
    31:22 32:3
    33:11 34:4
    35:8 37:15
    40:3,10,17
    41:5 42:8,15
    42:16 44:21,24
    47:16 50:8,9

    51:15 52:3,4
    53:1,9,22,22
    56:12 57:14
    58:12,25 59:23
    60:6,13 63:1
    63:11 64:4,15
    64:16 65:11
    66:25 69:15
**knowledge**
    43:4 45:15
    58:17 67:4
**knows**  28:9
    66:9
**kobrinsky**  67:5
**kraig**  3:16 5:11
**kristin**  17:4
**kristy**  57:17
**kurt**  68:11

**l**

**label**  60:12
    63:23
**lag**  8:1
**lance**  68:19
**language**  41:8
    50:6
**large**  15:17
**largely**  21:6
    22:22 42:14
**larson**  2:14 3:5
    5:19 17:3
**larsonking.com**
    3:10
**lateral**  20:19
**lawrence**  16:4
    17:2 61:6

    67:18
**lawsuit**  8:9
    19:15 33:9
    56:17 59:7,23
    60:18 69:4
**lawyer**  52:3
**leader**  64:8
**leadership**
    16:17,20 17:17
    17:18,19 20:9
    23:20 29:24
    43:14 51:18,21
    61:3 66:6
**leading**  51:2
**leave**  25:21,23
    26:3,5 27:7
    61:15 63:10,14
**leaves**  62:8
**leaving**  28:8
    31:1 69:10
**leeann**  68:23
**left**  25:23 33:19
    64:1,2 65:12
**legal**  5:12
    34:22 36:4
    51:14,15 52:1
    52:9,12,12,14
    72:1 75:1
**letter**  32:7,11
    32:13,16 33:6
    33:20 34:2,14
    34:17 35:25
    39:19,20 40:3
    40:11 41:6,7
    41:16,21,22

42:1,11,23
46:12,14,23
47:2,13,17,21
48:2,15,19
49:3 50:15
51:17 52:6
54:5 61:25
62:6,17 67:4
70:2 72:19
**letters** 37:5
39:22,25 40:6
40:22 41:12,12
46:20 47:1
49:5,13,24
52:18 55:2
66:25
**level** 18:11
23:15 27:19
**lewis** 60:17
**life** 58:19
**likely** 30:8
37:20
**likewise** 7:14
**limited** 63:9
**line** 20:10
72:13 74:7
75:3
**lines** 7:22 19:8
19:9,11 22:21
**link** 56:17
**lipke** 67:16
**list** 21:9 34:19
35:2 66:22
**listed** 74:7,17

**listing** 74:7
**litigation** 32:13
**little** 12:22
16:14 20:3,25
22:18 24:4
28:1,5,20
29:15 31:17
33:12 36:11,13
38:16 41:15
52:24 58:18
65:3
**llp** 3:5
**local** 44:5
**location** 40:2
69:15
**locations** 14:9
18:20
**long** 6:25 11:3
12:8 14:25
30:1
**look** 31:22
36:19 44:21
47:16 66:11
**looking** 37:13
42:12 47:22
49:21 54:1
57:18 59:21
60:23
**looks** 32:11
45:3 48:22
**loose** 27:7
**low** 23:14
**lpn** 11:7
**luis** 42:6 51:1,3
51:4

**m**

**m** 3:4
**m.d.** 1:5 5:6
72:6 73:3 74:3
**madam** 72:10
**made** 29:10,19
29:20 64:24
73:7
**maggie** 68:1
**mail** 4:10,14,16
4:18 30:8
56:14,15,15
57:18 58:13,15
58:16 59:4,5
59:22 60:3,8
60:16,16,22
61:1,13,20
63:12 64:7
**mails** 37:18
38:1 59:3,21
60:15 61:17
**majority** 27:8
**make** 7:4,16,22
8:4 27:6 28:25
29:11 31:15
36:6 39:14
57:9 60:7
66:11
**makes** 44:10
**making** 28:7,8
28:9 29:8,17
29:19 30:24
52:22 63:13
**man** 9:13

**manageable**
18:22
**managed** 44:5
44:7
**mangin** 4:15
27:15,18,20
29:3 57:25
**manickavasa...**
67:7
**march** 63:19
71:18 72:4
**marked** 4:8
32:2 36:10
40:15 56:11
**market** 12:25
14:20 15:5,14
15:21 16:9,15
16:17 30:14,15
30:18 31:7
44:1,5 45:22
45:23,24,24
46:8 56:25
**marketing**
43:23,23 44:7
44:23 56:24
58:4 59:17
**markets** 14:9
21:19,21 43:14
45:22
**master's** 9:25
10:9
**masters** 10:22
11:20 65:25
**maternity**
61:15 63:10,14

**math**  22:25
**matter**  5:6 8:16
**matthew**  1:5
4:19 5:6 72:6
73:3 74:3
**mean**  6:22
12:18 18:10
23:3 26:24
28:20 49:10
53:10 61:18,23
69:24
**means**  7:10
**meant**  41:7
43:9
**media**  5:4
44:15 58:8
59:6,23 60:4
**medical**  10:20
11:4,9 17:6,21
48:23
**medicine**  19:18
55:13
**meeting**  22:9
34:6 35:14,24
36:3 39:2
51:13
**meetings**  22:8
30:3,7 41:3
42:4,5 50:20
50:22,25 52:2
52:25 53:5,19
**members**  16:16
16:19
**memorized**
63:6

**mentioned**
30:24 61:9
**message**  36:21
36:22 37:3,9
49:22 50:3
55:25
**messages**  36:17
38:3,6,6,8,21
49:21
**met**  22:13 23:4
37:17
**michael**  4:12
**middle**  7:13
**midwest**  72:17
75:1
**mike**  19:2,16
20:12 27:20,25
29:25 30:6
32:17 34:4
38:11 42:20,22
43:17,18 48:8
50:7 55:24
**mike's**  55:24
**mind**  29:1 62:4
**mine**  60:7
**minimum**
53:15
**minneapolis**
2:16 9:8 10:24
65:24
**minnesota**  2:6
2:16 3:8 22:2
71:3,23
**minutes**  66:15

**mispronounc...**
56:23
**missed**  65:16
**missing**  14:10
**moment**  6:25
8:8 31:19,25
34:12 37:10
**monday**  2:2
71:5
**monthly**  22:8
**months**  28:23
**move**  20:16,19
36:5
**moved**  13:20
14:2 25:1
**moving**  20:16
25:2 69:7,11
69:13
**multiple**  7:11
12:2 18:19
51:23

**n**

**n**  4:1
**name**  5:11 6:5
27:17 29:4
32:12 39:10,19
41:18,24 47:9
47:12,24 48:12
48:16 49:6
56:23 59:14
67:9 72:6 73:3
73:4,15 74:3,4
74:21
**names**  16:21
18:24 41:13

59:16 61:2,8
66:22 67:2
**nathan**  59:15
67:5
**nature**  8:17
**near**  28:24 58:7
**necessarily**
51:2
**need**  7:18,21
10:8 14:14
34:21,22 39:3
41:24 65:5
**needs**  22:23
65:6
**neelima**  67:24
**neil**  57:20
**neither**  17:11
**nerine**  68:9
**nermoe**  16:1
**never**  14:21
62:4 63:25
64:1
**new**  7:13 30:2
59:15
**newpoint**  25:5
25:7
**nicholas**  68:3
**nine**  40:15
**norberg**  46:19
50:14
**norberg's**
50:15
**norby**  19:3
**north**  1:2 5:8
22:1 69:21

**notarized**
72:14
**notary**   2:5
71:23 72:25
73:10,18 74:15
74:23 75:23
**note**   72:12
**notes**   17:7
66:11
**notice**   26:9,16
28:22 62:13,16
**noticed**   71:9
**notified**   28:7
30:25 43:19
**november**
26:14 28:21,22
**nuanced**   27:11
30:22
**nuances**   46:8
**number**   5:4,8
18:16,23 32:3
36:10,24 41:6
44:15 47:21
48:11,15 56:16
72:7,13
**numbers**   74:7
**nurse**   9:18,20
17:10,11
**nursing**   9:17
9:25 10:9,22
14:5,19,19,23
15:1,1 17:4,22
20:17,17 21:1
21:1,3,5 22:12
66:3,3,5

**nyayapati**
67:24,24

**o**

**objection**   55:21
**objections**   7:8
**obtain**   9:21
**obviously**
15:17 19:14
25:25 26:1
46:11
**occurred**   55:5
56:6
**occurring**   29:6
**october**   13:24
15:2,25 23:2
24:8
**odland**   68:17
**offboarding**
27:6,14 28:2,6
28:14,17 30:24
31:4
**office**   51:9
**officer**   14:19
15:1,5 17:4,5,6
17:21,22,22,23
20:17,22 21:1
21:3 43:10
**official**   73:15
74:21
**officially**   63:17
66:7
**oh**   6:21 9:13
24:9,11 34:20
35:18 36:15
46:2 51:8 57:5

**ohio**   72:2
**okay**   6:24 8:15
8:20 10:13,25
11:3,13,23
12:6,12 13:6
13:11,20 15:9
16:7 17:1,13
17:20 18:1,14
19:9,14 21:8
21:15,16,18
22:7 23:8 24:3
24:12,21,24
25:4,9,12 26:7
26:16 28:16
29:14 30:9
31:4,14,24
32:6,10,15,20
33:7,11,16,21
34:1,8 35:4,13
35:24 36:2,12
36:16 37:1,3
37:12,24 38:10
38:12,16,20
39:8,18 40:19
40:21 41:1,5
41:10,20 42:3
42:10 43:1,5
43:20 45:3,8
45:20 46:2,13
46:22 47:12,16
48:1,6,11 49:1
49:15,18 50:2
50:17,24 52:24
53:19 54:5,8
54:11,24 55:7

56:9,14 57:7,9
57:11,16,23
58:18,21 59:3
59:14,18,20
60:10,25 61:11
61:16 62:2,21
63:4,20 64:7
64:20,22 65:2
65:21 69:11,15
69:18,23 70:10
**onboard**   42:8
**once**   29:19
53:13,14
**ongoing**   51:24
63:11
**online**   10:25
**operating**   15:4
17:23 20:22
43:10
**operations**   15:4
15:13 16:15,18
19:25 22:10,10
40:2 42:15
44:7
**opportunity**
25:14
**ops**   19:20 20:18
21:11,16,18
22:4,11,13
31:5 43:11,15
53:7
**option**   47:21
48:15
**ordered**   71:10

**organization**
11:14 15:18
40:1
**organizational**
20:20
**origin** 55:17
**original** 71:9
**orthopedic**
29:24 55:12
**orthopedics**
19:16,17 20:13
48:8 55:19
**outside** 36:4
59:20
**overarching**
42:7
**overseeing**
26:24
**oversight** 21:7
**own** 26:4 63:24

**p**

**p.m.** 1:17 2:3
5:3 36:22
44:13,14,18
66:17,18,20
70:14,16
**page** 2:22 4:3,8
36:7,19,19,20
39:14 40:16
41:6,7 49:21
72:13,15 74:7
75:3
**pages** 40:15
**part** 17:19 25:5
50:2 52:10

74:9
**participate**
63:13
**particular** 19:6
26:19 30:18
**particularly**
7:24
**parties** 42:19
42:22 43:8
71:10,12,14
**party** 71:9
**passing** 35:22
**past** 49:13
**pat** 60:16
**patient** 12:20
13:4,8 37:5
47:24 49:24
53:20,20,24
**patients** 28:7
29:7,11 30:2
30:25 33:20
35:2 53:16
**paul** 3:8 19:2
61:7
**pause** 17:8
**pauses** 58:22
**pdw** 1:7 5:9
**peer** 16:8
**peers** 57:2,3
**pending** 35:8
**people** 7:11
16:25 18:6,16
22:3 23:20
26:25 34:19
43:17 44:6

**percent** 35:20
43:6
**perfect** 8:6
**period** 29:22
30:19 35:19
43:1
**person** 11:1
23:5 33:24,24
34:6 40:6
47:18,23 48:12
48:16,21,21
50:4 57:20
61:1
**person's** 67:9
**personal** 8:17
37:1
**personally**
73:11 74:15
**persons** 71:14
**phadke** 68:15
**phd** 66:3
**phoenix** 25:13
25:15
**phone** 34:2,9
34:11 35:11,20
36:18 37:1
38:3,8 72:3
**phrase** 28:2
53:21
**phrases** 44:22
**phrasing** 57:10
**physically** 44:6
**physician**
17:11 22:24
23:19,23 24:1

26:21 27:6
28:9 29:23
30:25 33:19
40:1,8,9,24
41:1,2,2,11,12
41:12,17,19
42:3,4 45:3
46:15 47:18
48:7,16 49:5,7
50:19,19,22,24
51:9 52:25
53:6,18 54:9
54:12,12,17,18
55:3 69:25
**physician's**
47:2,24 48:12
52:18 55:4
**physicians**
17:10 23:14,21
23:22 39:25
40:10 42:9
45:5 46:25
49:13 53:16
55:9 56:1 63:5
66:23
**physicians's**
49:6
**pinpoint** 65:2
**pissed** 37:5
49:24
**place** 3:6 65:25
**plaintiff** 1:6
2:12 5:18
**planning** 22:20
69:7,8

**[please - quote]**

**please** 5:15,22
6:4 10:6 72:11
72:11
**point** 9:22
10:19 11:13
13:3,8,20
20:12 24:2
34:21,24 49:2
51:25 55:1
61:15 62:12
63:11 65:11
69:6
**policies** 21:6
**policy** 30:17
41:10 42:10,23
42:25 43:2,12
44:23 45:14
**portfolio** 20:11
**position** 11:23
12:15,16 14:3
14:8,18 15:3,6
15:15 18:12
19:21 20:23
21:12 31:5
69:14
**positions** 13:7
14:1,10 16:8
16:21 45:12
**possibility** 8:1
**possible** 7:5
**potentially**
23:9
**practice** 42:13
42:17 46:20
49:4,4 52:17

55:18 66:5
**practices** 30:21
**preceded** 11:6
**precisely** 29:15
**present** 3:16
52:3 53:10
**presentations**
40:8 43:16
**presenting** 53:6
54:2
**preserved**
71:17
**president** 15:4
15:20 17:3,5
17:23,25 42:7
51:4
**pretend** 10:2
**pretty** 23:16,16
37:21
**previously** 32:2
36:9 40:14
56:11
**primarily** 17:8
27:20
**print** 60:5
**prior** 7:6 8:8
20:5,5 30:1
32:13 41:21
46:21 49:2
55:10 56:6
59:12
**privilege** 58:11
**priyanka** 68:7
**pro** 45:15

**probably** 10:1
13:25 15:9
16:10 19:24
20:24 66:12
**procedure** 45:1
45:5,14,15,18
45:25 46:6,7
46:16 73:5
74:5
**procedures**
43:11
**proceed** 5:22
**process** 25:1
27:5,8 28:2
31:10 40:10,25
42:19 52:21
56:1,6 65:1
**produced**
36:17
**production**
72:15,17,22
**professional**
2:4 9:5 37:19
**program** 10:12
**progressed**
65:1
**promotion**
14:22 20:18
**prompted** 33:4
58:13 61:12
**pronounce** 6:7
29:3
**protected**
58:11

**protocols** 21:6
**provided** 21:7
52:9
**provider** 28:8
54:22
**providers**
54:21
**public** 2:5
71:23 73:10,18
74:15,23 75:23
**pull** 36:12
**put** 26:8,11
39:12 50:17
61:22 67:1
**puts** 28:22

**q**

**quality** 12:14
12:16,19 14:11
16:18 21:4
**question** 7:13
7:14,15 10:5,7
16:11,11 17:14
21:10 56:4
62:5 63:15
**questions** 6:25
7:7,9 10:3,4
21:10 31:14,23
43:21 70:7
**quickly** 37:22
**quit** 30:2
**quite** 41:24
**quote** 60:6

**r**

**raised** 46:19
61:20 62:24
**raiter** 3:4 5:19
5:19 7:9 52:7
55:21 70:7,8
72:5
**ramp** 29:22
30:19
**rate** 71:10
**rather** 10:16
65:3 67:2
**reaching** 33:5
**read** 34:9,13
70:8 71:16
73:5,6,12 74:5
74:6,17
**reading** 72:19
**ready** 31:23
32:4,5 40:17
40:18 56:12,13
59:1 60:13,14
64:4
**real** 58:19
**really** 7:20 13:4
22:15 27:23,24
63:25 64:1
**realtime** 2:4,5
**reason** 8:2
15:10 72:14
74:8 75:3
**recall** 7:6 23:6
29:6,21 32:20
32:24 33:3,7
33:11 34:16,20

35:11,12,13
36:2 37:21
39:23 40:5,21
41:11,14,16,24
41:25 45:13
46:15,23,24
50:5,16 54:5,8
55:15 58:13
59:20,24,25
61:14 62:10,11
62:15,21 64:22
65:9
**receipt** 72:18
**receive** 60:9
65:21
**received** 9:14
9:25 24:13
63:11 65:18
**receiving** 50:7
**recent** 6:16,23
17:3
**recollection**
37:16 60:2
**record** 5:3,16
6:5 8:3 44:11
44:13,18 66:14
66:17,20 70:14
71:8 74:9
**recorded** 5:4
7:10
**recruit** 42:8
**recruitment**
40:8 41:2 42:4
50:19 54:13

**reeser** 1:23 2:3
5:14 71:23
**reference** 39:1
72:7 73:2 74:2
**referenced**
73:11 74:15
**referred** 61:4
**referring** 41:3
47:8,9
**refresh** 37:15
**regarding** 29:4
38:7 39:2
53:20 67:5
**registered** 2:3
9:18,20
**regular** 58:8
**regulating** 13:1
**regulatory** 13:2
14:17
**related** 8:16
28:11 50:24
**relating** 8:1,25
46:19 62:16,17
70:3
**relationship**
23:14
**relative** 71:11
71:12
**relatively** 57:11
63:9
**release** 35:9
**released** 60:5
**relied** 22:22
31:10

**remember** 29:2
30:1 34:18
51:11 61:19
**remembrance**
26:13
**remote** 1:14 2:1
71:5
**remotely** 5:10
58:19
**reorganization**
20:1,4,15
**report** 18:3
57:5
**reported** 1:23
15:19,25 18:6
18:16 57:14,15
71:5
**reporter** 2:4,4
5:13,21 7:10
73:7
**reporter's** 71:1
**reporting**
17:18,24 27:4
30:13
**reports** 27:3
57:3
**represent**
36:16
**request** 74:9,11
**requested** 38:5
**required** 12:20
72:25
**reshuffling**
20:1,4,15

residents 48:20 48:22
residing 69:1
resignation 26:9 40:25 56:1
resignations 26:17,21
resolution 65:9
respect 16:9 30:24 43:20,22 45:25
response 26:20 26:25 38:3 59:6,10
responses 59:23
responsibility 20:23
responsible 12:24 21:3 43:15,18
restate 18:4 38:4,25
restructured 20:7
resume 12:10
retention 53:20 54:22
retirements 20:7
retiring 42:9
return 8:7 13:8 49:19 63:14,17 64:1

returned 72:18
returning 26:7
review 53:14 72:12 73:1 74:1
reviewed 47:3
reviewing 61:17,17
revising 42:12
revisions 42:16 60:7
richards 67:12
right 7:7,18,24 8:15 9:3 11:13 11:14,19 12:8 13:21,25 14:25 15:3,15 16:2,7 17:9,16 18:17 19:18,23 20:1 21:8,13 22:14 24:5,9,12,13,16 24:16,19 25:3 25:14,21 26:7 27:21 28:14,20 28:25 30:23 31:2 32:1,7 33:9 34:11,14 35:1,14 36:9 36:13,21 37:24 38:20,24 39:5 39:8 40:14 41:22 44:20 45:8 46:9 47:14,21 48:9 48:13 49:1,16

49:18,19 52:16 52:19 54:13 55:1,4,7 56:9 56:17 57:18,25 58:23 59:12 60:15,23 61:4 61:11,22 62:6 62:8,14 63:20 64:9 66:22 68:25 69:2,23 69:25 70:5 71:16
ring 37:6
rn 11:7,24 12:8 12:20
roesler 57:20 57:21 58:12
role 12:14,23 12:24 13:9 19:25 25:19,22 25:24 27:5 42:18 43:10 51:3
roles 21:2
room 11:24
roughly 28:23
rpr 1:23 71:23
rules 73:5 74:5
running 49:12

**s**

s 72:15 74:8,8 75:3
sachdev 5:5
sachdeva 1:15 2:2 4:3,12 5:5

5:24 6:6,7,10 44:16 71:5 72:8 73:4,9 74:4,13 75:20
safe 13:13 16:18
safety 21:4 62:24 65:7
safo 68:5
san 24:21,23 25:16
san00000346 60:12
san00001092 58:25
san00001433 63:23
sanford 1:10 5:6,20 8:10,13 8:14,22 11:14 11:17,18,21,23 12:4,15 14:1 15:17 17:24 24:5 25:21,23 26:3 38:1 40:7 43:24 62:8 63:2 65:12 69:25 72:6 73:3 74:3
sarah 68:13
saraswathy 67:7
satisfaction 53:24,25 54:20 54:22

saw 32:16
35:21 38:21
39:18
saying 7:7
34:16,18 49:23
says 32:21 37:3
37:14
schedule 28:10
schedules 63:5
scheduling
29:5
school 10:15,17
11:20
scott 58:2,8
67:10,18 68:21
screen 31:20
seal 71:18
73:15 74:21
search 38:7,16
searches 39:4
seat 20:21 51:5
second 6:20
16:2 30:10
49:20
see 22:25 29:7
29:11 32:20,22
34:1 35:1
36:11,20,22
37:7 39:15,15
41:5,21 42:1
47:19,23 48:4
48:17,24 49:25
52:2 56:20
59:2,8 60:19
61:6 64:6,13

69:15 70:2
seeing 30:2
39:23 40:22
41:11,16 45:14
50:11
seems 61:2
seen 32:13
39:20,24 40:19
40:24 42:16
seiler 58:2,2,5,5
selects 69:14
send 39:25
61:13
sending 49:4
senior 14:4,12
14:22 16:17,19
17:17,18,19
23:20 43:13
51:18,21 61:3
64:8
seniority 16:10
sense 7:16,22
8:4 44:10
sensitive 26:2
sent 33:6,20
34:19 38:11
40:4 48:2
50:11 52:19
55:2 67:1,4,5
70:3
separate 42:5
43:23
september 69:6
served 24:18

service 19:8,9
19:11 20:10
22:21 44:4
57:4
services 14:17
50:23,24 51:9
52:25 53:6
54:9,17
sessions 22:20
set 26:12 27:8,8
28:19 58:10
69:5
setting 41:10
seventh 3:7
several 40:8
51:5
shaking 7:19
sharing 31:20
shawn 3:4 5:19
sheet 72:13
74:7,10,18
75:1
sherm 19:3
short 35:19
shorten 21:16
shorthand 45:4
show 28:21
31:16 33:4
36:8 40:12
44:23 49:20
56:9 58:23
60:10,11 63:20
63:22
showed 32:17
32:18,25 34:7

34:9 35:25
showing 32:1,2
36:9 40:6,14
56:10
shown 72:16
shy 6:8
sic 23:11 33:5
side 7:19,19
13:15
sides 54:9
sign 55:4 70:9
71:16
signature 47:2
47:7,8,9 49:6
71:22 72:14
signed 47:5,14
73:13 74:18
signing 47:1
49:7 72:19
similar 54:20
sincerely 72:21
single 31:12
51:22 61:1
sioux 10:21
11:24 12:2,5
12:25 14:3,7
18:3,11,19
21:24 22:1
44:2,8 45:17
45:23,23 57:15
sir 72:10
site 44:6
sitting 24:15
54:24

**situation**   34:17
    46:10,12,14,23
    48:20 49:3
    50:8 51:17
    62:7
**six**   6:18,23 7:3
    8:9 19:10 20:7
    23:20
**sixth**   2:15
**slash**   11:20
    15:1 16:15
    19:20 20:17
**slight**   8:1
**small**   36:11
    63:24
**smith**   68:3
**smoothly**   7:5
**soft**   12:11
**sold**   69:12
**solutions**   5:12
    72:1 75:1
**somebody**
    49:10 57:15
    58:12
**sorry**   8:13
    11:11 17:7
    18:7,9 21:25
    24:9 25:7
    27:16 28:24
    32:8 35:1 38:4
    42:21 45:14
    48:2 66:4
**sort**   13:8 16:8
    18:2 20:1 25:9
    31:4 33:8

42:12 54:3,6
    56:5 60:4
    65:18
**sorts**   12:23
    27:2 49:12
    53:2,5,19,23
    54:2 58:14
**sound**   10:3
**sounds**   13:3
    34:12 41:20
    63:7
**south**   2:15 9:7
    9:9 10:23 22:1
**speak**   7:11 46:1
**speaking**   37:25
**specialist**   12:19
    14:11 58:4
    59:17
**specific**   6:21
    14:14 26:14
    31:8,10 32:6
    33:1,20 37:20
    39:10 40:1
    41:17,18 55:25
    56:3 60:2,6
    64:21 67:1
**specifically**
    23:1 25:23
    26:8,22 32:11
    33:4
**specifics**   27:12
    29:9 30:1
    31:18
**sports**   19:17
    55:12

**sraiter**   3:10
**ss**   71:3
**st**   3:8
**staff**   11:24 12:8
    12:14 21:6
**stamped**   36:20
    58:24 60:12
**standard**   23:13
    23:17,25 27:8
    31:13 39:24
    40:10 46:3,7
    60:3,8
**standardization**
    21:4
**standards**   35:8
**standing**   22:7,9
**standpoint**
    23:25 40:2
**start**   7:13,16
    9:5 15:24
    16:23 17:1
    25:19 31:16,23
    60:16
**started**   33:9
    45:14 55:19
    63:18
**stasko**   67:22
**state**   2:6 6:4
    69:16 71:3
    73:10 74:15
**stated**   55:24
**statement**
    73:13,14 74:19
    74:19

**states**   1:1
**steps**   34:23
**sticking**   69:8
**stock**   40:11
**stool**   54:19
**stories**   58:9
**strategic**   22:20
**street**   2:15 3:7
**strictly**   24:1
**strike**   51:11
**structure**   20:21
**subpoena**
    24:13 38:3,5
**subscribed**
    73:10 74:14
    75:21
**subsequent**
    13:7
**substantial**
    71:15
**suby**   68:1
**suite**   2:15 72:2
**superior**   72:1
**supervised**
    18:11
**supplementing**
    42:13
**support**   21:5
    29:19 42:9,18
**supported**   43:7
**supposed**   63:17
    64:16
**sure**   7:2 14:10
    27:7 28:7,8,10
    28:25 30:24

35:10 36:6
37:21 39:12,13
39:14 53:21
57:9 58:10
62:14 63:7
66:11
**survey**  53:14
**surveys**  53:16
**swear**  5:22
**sworn**  5:25
71:6 73:10,13
74:14,18 75:21
**system**  14:5,6
14:16 17:24
30:11 43:11
**syverson**  19:4

**t**

**table**  20:22
**take**  16:3 23:19
24:2 31:22
43:21 44:10
66:8
**taken**  1:16 2:2
5:5 6:11,14
44:14 66:18
**talk**  28:1 33:12
34:5 40:16
42:3 52:2,24
**talked**  14:1
45:20 57:19
59:11
**talking**  8:8
16:22 21:11
24:16 36:7,22
37:9 41:8

42:23 52:4
53:22,23 65:17
**tasked**  26:20
**team**  16:17,20
17:17,18,19
20:9 23:21
26:23,23 40:8
40:9 51:21
58:4 59:18
61:3
**technical**  8:2
**technology**
5:11
**telephone**
33:25
**tell**  13:11 14:13
16:14 18:23
20:3,25 28:5
33:16 49:10
56:5 71:6
**template**  50:9
**tendency**  71:15
**tenure**  11:6
**terms**  20:21
**terrible**  59:15
61:8
**testifies**  5:25
**testimony**  71:7
71:8 73:6,7
74:6,9,12
**text**  36:17,21
36:22 37:3,9
38:2,6,8,21
39:5 49:21,22
50:3,7 55:24

**texted**  33:17
**thank**  30:15
53:25 70:10,12
**theresa**  17:3
**thing**  7:2 8:17
42:12 48:15
54:23
**things**  13:15
27:2 30:23
52:11 53:3,23
54:9,11 64:21
**think**  6:18
17:16 19:10
23:4 28:2 33:8
34:21 35:24
36:12 44:10
46:23 50:18
51:1 52:11
54:11 58:1
59:11,14 65:14
68:25
**third**  36:19,20
49:21 54:18,19
**thirty**  72:18
**three**  8:25 11:6
23:3,9 28:23
48:2
**tied**  27:7
**tiffany**  16:4
17:2 61:6
**tight**  16:18
**time**  5:3 6:15
6:16,20 7:12
8:21 10:4,4,16
10:16,17,18,19

14:12 15:23
16:6 19:20,24
21:9,13 22:14
25:5 26:12
28:19 29:1
34:24 35:19
37:19 39:18
41:25 43:1
45:13,17 53:1
53:3 55:10
62:19,22,23
63:2 69:6,8
70:11
**timelines**  14:14
**times**  6:13 23:4
45:21 53:10
**title**  20:24 57:3
**titled**  58:24
60:11 63:22
**titles**  14:13
18:24 19:1
22:4
**tiwari**  68:7
**today**  5:13
15:10 44:17
**together**  22:5
**told**  50:5
**top**  56:14
**topic**  26:2
**transcribed**
71:7 73:7
**transcript**
72:11,12 73:5
73:12 74:5,11
74:17

**transitioned**
12:14
**trial**  69:5,5
**tried**  20:10
**true**  20:10 71:8
**truman**  11:9,11
**truth**  71:6
**try**  7:4 9:3 20:8
46:10 67:2
**trying**  17:14,15
26:12 29:14
65:2
**tuesday**  37:14
**two**  8:21 17:10
17:10 23:7,9
39:4 42:4
44:16 50:21
54:11,16 56:1
59:3,20 60:15
63:24
**type**  35:9 38:17
**types**  51:10
**typical**  29:23
**typically**  26:16
27:25 28:13
35:21 43:13

**u**

**u.s.**  5:7
**uh**  7:20,21
**uhs**  7:21
**ultimate**  65:9
**umbrella**  42:7
**un**  37:6
**unable**  39:2

**under**  42:6
**understand**
10:5 19:23
21:11 31:16
37:25 46:4
52:16 63:25
66:10,23
**understanding**
55:17
**understood**
10:13 40:12
**uniform**  31:6
**unit**  5:4
**united**  1:1
**university**  9:7,8
9:9 10:23,24
65:24
**unusual**  27:11
**updates**  51:25
63:11 64:25
**upset**  33:6,8
**use**  13:13 38:16
44:22 50:6
**used**  50:9
**using**  5:11
13:12
**usually**  35:22

**v**

**v**  5:6 72:6 73:3
74:3
**va**  10:20 11:3,5
11:6,8
**variability**
65:12

**various**  17:7
**vast**  27:8
**veritext**  5:12,14
72:1,7 75:1
**veritext.com.**
72:17
**version**  39:19
**vice**  15:4 17:5
17:22
**video**  5:4
**videographer**
3:16 5:2,13,21
44:12,15 66:16
66:19 70:13
**videotaped**
1:14 2:1 71:5
**vincent**  68:9
**virtual**  5:11
**volk**  4:11 17:5
23:22 24:1
29:25 52:5
59:11,25 61:6
**vp**  14:19,25
15:13 16:15
19:20,25 20:17
20:18 21:1,11
21:16,18 22:3
22:11,12,12,13
31:5 43:11,15
**vs**  1:8

**w**

**w**  4:17
**wages**  68:23
**wait**  7:15

**waived**  72:19
**walden**  9:8
10:24 65:24
**want**  8:7 20:15
23:18 26:2
28:1 32:10
49:19 51:2,15
52:2,24 53:1
58:10 62:23
**wanted**  57:9
**wanting**  14:21
**way**  18:24
30:12 41:15
42:5
**we've**  44:9
45:20 57:19
58:1 59:11
**wednesday**
53:8
**week**  22:13
**weekly**  22:7,9
**weeks**  60:22
**wells**  3:6
**went**  9:7 20:5,7
32:18 42:1
51:13,14 61:25
**wheeler**  2:13
4:4 5:17,18 6:3
44:9,19 52:15
56:2 66:21
70:6,10
**wide**  43:11
**william**  67:12
**wish**  69:12

**[witness - zoom]**                                    Page 22

| witness 4:3 | x |
|---|---|
| 5:20,22 52:13 | **x** 4:1 |
| 55:23 70:12 | **y** |
| 71:6,8,17,18 | **yeah** 12:17 |
| 72:8,11 73:1,4 | 18:5,7 26:12 |
| 73:11 74:1,4 | 50:7 54:22 |
| 74:15 | 64:2,3 66:10 |
| **witness'** 72:14 | **year** 6:22 9:12 |
| **word** 13:16 | 11:16,16 24:8 |
| 53:25 | 53:9,13,14 |
| **worded** 49:16 | **years** 6:18,23 |
| **words** 13:12,12 | 7:3 8:9 11:6 |
| 13:13 | 23:3 42:16 |
| **work** 7:20 9:2 | 45:16 51:5 |
| 11:3,8 22:5,8 | **yep** 7:17 16:12 |
| 22:17 24:5 | 35:6 47:25 |
| 25:3,4 27:23 | **z** |
| 27:24 57:11 | **zero** 23:10 |
| 58:5 64:21 | **zoom** 2:13 3:4 |
| **worked** 11:5,9 | 7:2,2,25 36:13 |
| 16:16,25 58:7 | |
| **workforce** 21:5 | |
| **working** 10:15 | |
| 10:17,19,20 | |
| 11:21 12:6 | |
| 23:13 25:5 | |
| 64:17 | |
| **world** 48:9 | |
| **written** 47:17 | |
| 47:23 50:10 | |
| **wrong** 6:8 | |
| 19:24 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.