## UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA

Matthew Friederichs, M.D.,                    Case No. 3:22-cv-0008-PDW-ARS

                    Plaintiff,

vs.

Sanford Health,

                    Defendant.

### Sanford Health's Memorandum in Support of
### Motion for Judgment as a Matter of Law

### Introduction

When ruling on the parties' motions for summary judgment, the Court found that "Dr. Friederichs ha[d] brought forth little evidence of confusion" and advised the parties that they "should be aware the Eighth Circuit recently suggested that monetary relief under the Lanham Act, including disgorgement of profits, is only appropriate in exceptional cases." (Dkt. 123 at pp. 10, 17) (cleaned up)(citing *Wing Enterprises, Inc. v. Tricam Indus., Inc.*, 511 F. Supp. 3d 957, 978 (D. Minn. 2021)).

The testimony and evidence presented by Dr. Friederichs at trial did not better support his claims. In a Lanham Act false endorsement case where he was required to show confusion among an appreciable number of patients, Dr. Friederichs rested without testimony from a single person who was actually confused by the Jan. 5 and Feb. 4 letters or who mistakenly thought that Dr. Friederichs had endorsed Sanford. He also failed to show

that Sanford's patient communications caused him any damage. Dr. Friederichs's conclusory testimony that he suffered damage is insufficient under binding Eighth Circuit precedent.

Dr. Friederichs also rested without presenting any evidence or testimony showing that Sanford employed a misrepresentation and did so with the intent that others rely on it in connection with the advertisement of its services – both critical elements of his claim under North Dakota's unlawful sales or advertising practice statute. More importantly, he failed to show that Sanford acquired any money as a result of a statutorily unlawful advertising practice, which is another fatal failure with respect to his statutory claim.

Finally, he failed to show that Sanford paid him less than he was owed under his employment contract. Instead, he proved that Sanford paid him more than was required. Dr. Friederichs had the burden of establishing what he was owed under the contract, what he was paid, and how the former was less than the latter. Dr. Friederichs did not make any of these showings.

A ruling that Dr. Friederichs's claims fail as a matter of law is appropriate.

**Legal Standard**

Judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ." Fed. R. Civ. P. 50(a)(1). "When ruling on a motion for judgment as a matter of law, the district court must accord the nonmoving party the benefit of all reasonable inferences, but may not give that party the benefit of unreasonable inferences or resort to speculation." *Jaros v. LodgeNet Entm't Corp.*, 171 F. Supp. 2d 992, 999 (D.S.D. 2001), aff'd, 294 F.3d 960 (8th Cir. 2002). The "question is not whether there is literally no evidence supporting the nonmoving party but whether there

is evidence upon which the jury could properly find for that party." *Owner-Operator Indep. Drivers Assoc., Inc. v. USIS Commercial Servs., Inc.*, 537 F.3d 1184, 1191 (10th Cir. 2008) (internal quotation omitted). Rule 50 "allows the trial court to remove cases or issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result." *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000) (internal quotation omitted).

### Evidence and Testimony Presented

Dr. Friederichs failed to present any evidence sufficient for a jury to find for him on any of his claims or determine any damages award with the slightest certainty. His lawsuit should be ruled on as a matter of law.

### A. August 27th Testimony of Dr. Friederichs on Direct Examination

On August 27th, Dr. Friederichs testified to the following on direct examination:

- His patients no longer come through the hospital pipeline, they come through "self-referrals" where his previous or current patients refer him new patients.

- Once he operates on a patient's knee or shoulder they are "married for life" and they see him "until they are dead."

- His patients know how to reach him whenever they need him and "have his phone number."

In summary, Dr. Friederichs unequivocally testified that: (1) his patients have a high degree of care in selecting their surgeons and would select him; (2) would be able to find him despite the Jan. 5 letter (even without the Feb. 4 letter); and (3) would continue to use him for their knee and shoulder problems for life. Dr. Friederichs's testimony directly rebuts the confusion elements of his claims as well as his allegations that he suffered actual damage caused by Sanford's actions.

### B. August 28th Testimony of Dr. Friederichs on Direct Examination

On August 28th, Dr. Friederichs testified to the following on direct examination:

- The purpose of a departing physician letter is to alert patients who had seen the physician that the physician was leaving Sanford.

- Around the time that he perceived that his schedule was being "drained" patients immediately began calling him to ask what was going on.

- He understood that his contract paid him based on his production in the same time period the prior fiscal year.

- He again claimed that most of his patients were "self-referral."

- Susan Solheim texted him after receiving the Jan. 5 because she wanted to follow him to his new practice.

- When asked how he was harmed, he generally claimed that once the Jan. 5 letter was sent the "bleeding started" and needed to be stopped as soon as possible. He also stated that patients were told he was "disappearing."

   o During this line of questioning about damage he suffered, Dr. Friederichs did not: (1) provide estimated damages; (2) claim that he had received less money as a result of the letters; (3) explain how OrthoDakota suffered from the letters when it did not open until the middle of March and both letters were sent while he was still an employee at Sanford; or (4) identify a patient that did not see him because of the letters.

- A good number of patients followed him to OrthoDakota because of the relationships that he had built over his years as their orthopedic surgeon.

Numerous times, Dr. Friederichs broadly claimed that he was damaged, that the Jan. 5 letter was fraudulent, and that it was too late for the damage to be undone. Dr. Friederichs never identified a patient who did not see him because of the letter and instead chose to go see another physician for their orthopedic needs. And he did not provide any other specifics about his claimed damage. Dr. Friederichs never substantiated that claim. Again, Dr. Friederichs rebutted the confusion elements of his claims as well as his allegations that he suffered actual damage caused by Sanford's actions.

### C. Recordings That Were Played on August 28th During Dr. Friederichs's Testimony

- Dr. Friederichs stated that patients contacted him the day his schedule changed.

- Mike Erickson stated that Sanford wanted him to be able to get his current patients done so that they would not have to come to Sanford after Dr. Friederichs was no longer a surgeon there.

- Dr. Friederichs stated that his "phone is ringing off the hook" in reference to patients contacting him around the time that he resigned.

- Dr. Friederichs admitted that it was likely that, at first, he would have a decrease in the patients he was able to see at OrthoDakota.

### D. August 28th Testimony of Dr. Friederichs on Cross Examination

On August 28th, Dr. Friederichs testified to the following on cross examination:

- His practice at OrthoDakota is not failing.

- His practice at OrthoDakota has done better over time.

- He never lost his operating privileges at Sanford or had any limitations placed on them.

- His employment contract permitted Sanford to completely cut him off from seeing any patients, but Sanford did not do that.

- He had not been undercompensated.

- His patients were allowed to decide where they wanted to receive medical treatment.

- His patients could find him via the internet if they wanted to see him at OrthoDakota.

- Some drop off in patients was expected when he initially started OrthoDakota.

- His patients stay with him for their lifetime and have his personal cell phone number.

- He had no data on the percentage of patients that he could expect to follow him to OrthoDakota.

- He recognized that many patients would make their decisions based on where their primary care physician was or where they were covered by insurance.

- 327 out of the first 877 patients he saw at OrthoDakota had seen the Jan. 5 letter.

5

### E. August 28th Testimony of Mary Vetter

On August 28th, Mary Vetter testified to the following:

- She saw Dr. Friederichs at Sanford following the Jan. 5 letter and prior to him leaving Sanford.

- Dr. Friederichs told her during an office visit at Sanford that he was leaving to start his own practice.

- She now sees Dr. Friederichs at OrthoDakota and never saw a different orthopedic surgeon following the Jan. 5 letter.

### F. August 28th Testimony of Susan Solheim

On August 28th, Susan Solheim testified to the following:

- When she received the Jan. 5 letter, she understood it to mean that Dr. Friederichs was leaving Sanford, not that he was retiring.

- She texted Dr. Friederichs shortly after receiving the Jan. 5 letter.

- In the same text chain, she asked if she and her husband could follow Dr. Friederichs to his new practice at OrthoDakota.

- Dr. Friederichs invited her to follow him to OrthoDakota.

- She now sees Dr. Friederichs at OrthoDakota and never saw a different orthopedic surgeon following the Jan. 5 letter.

### G. August 28th Testimony of Gary Euren

On August 28th, Gary Euren testified to the following:

- When he received the Jan. 5 letter, he understood it to mean that Dr. Friederichs was leaving Sanford, not that he was retiring.

- In fact, it was obvious from the letter that Dr. Friederichs was leaving Sanford.

- The Jan. 5 letter gave him the option to see another physician at Sanford "if he wanted."

- His shoulder that he originally saw Dr. Friederichs for did not initially require surgery.

- His shoulder got worse. He then called Dr. Friederichs to see if he was in network and, therefore, would be able to do the surgery.

6

- He learned about OrthoDakota, which was not difficult to find.

- The Jan. 5 letter "was not confusing at the time."

- He did not see any other physician regarding his shoulder and continues to see Dr. Friederichs to this day.

### H. August 28th and August 29th Testimony of Mike Erickson

On August 28th and August 29th, Mike Erickson testified to the following:

- The Jan. 5 letter was due to an internal failure and was unintentional.

- The Jan. 5 letter was not approved because everyone involved on Sanford's side assumed that someone had shown the letter to Dr. Friederichs.

### I. August 29th Testimony of Chris Schooneveld

On August 29th, Chris Schooneveld testified to the following:

- His damage calculations are based on assumptions he was told to make.

- He had no opinions that patients were confused or misled by Sanford's patient communications

### J. August 29th Testimony of Darla Dobberstein

On August 29th, Darla Dobberstein testified to the following:

- She had not trained Mike Erickson on departing physician letters, which lends credibility to the fact that this was an innocent mistake.

### K. August 29th Testimony of Scott Seiler

On August 29th, Scott Seiler testified to the following:

- He selected a form and drafted the Jan. 5 letter.

- The Feb. 4 letter was sent to every single patient that the Jan. 5 letter was sent to and was sent in the same manner.

Importantly, there was no evidence elicited from Scott Seiler showing that he selected the form letter based on an instruction to harm Dr. Friederichs. He selected the standard departing physician form letter. Sanford just failed to show the letter to Dr. Friederichs.

7

### L. August 29th Testimony of Connie Burington

On August 29th, Connie Burington testified to the following:

- She determined Dr. Friederichs's pay for his 90-day notice period multiple ways and chose the result that was the highest.

- She ran calculations using both an eight-month period and a twelve-month period.

- The MeritCare fiscal year was the same as the Sanford physician compensation year (July 1 to June 30)

- If she had precisely followed the contract, Dr. Friederichs would have been paid approximately $5,000 less than he was actually paid.

### M. August 30th Testimony of Emily Mangin

On August 30th, Emily Mangin testified to the following:

- Any new patients who called in to see Dr. Friederichs were given his contact information once Dr. Friederichs provided it to Sanford, which occurred on January 19, 2022.

- No patients were removed from Dr. Friederichs's schedule.

### N. August 30th Testimony of Dr. James Volk

On August 30th, Dr. James Volk testified to the following:

- Departing physician letters are common within the industry.

- It is standard practice that departing physician letters do not contain the departing physician's new contact information.

### O. August 30th Testimony of Brittany Sachdeva

On August 30th, Brittany Sachdeva testified to the following:

- The Jan. 5 letter was a form letter and was a mistake, not intentional.

- The Jan. 5 letter was an error specific to Dr. Friederichs and Dr. Erpelding.

- Upon learning about the problem, Mike Erickson immediately texted her that he had "f**d up" regarding these letters.

### P. August 30th Testimony of Douglas Nowak

On August 30th, Douglas Nowak testified to the following:

- His spreadsheet data shows when a patient made an appointment, the date of the appointment, and who the appointment was with.

If this data is carefully considered. It will show that the patients Dr. Friederichs complains of could not have been influenced by the Jan. 5 letter based on the timing of their appointment creations in relation to that letter and its correction.

### Q. Testimony of Remaining Witnesses

On Tuesday, September 3rd, Dr. Friederichs will call two additional witnesses – Dr. Bruce Piatt and Darren Huber. Sanford does not anticipate that their testimony will fix the deficiencies in Plaintiff's evidence. It is anticipated that both will testify that the Jan. 5 letter was an innocent mistake and was the form letter that has been used for previous resigning surgeons.

## Argument

Following the Court's ruling on the summary judgment motions, Plaintiff has three claims remaining in this lawsuit: (1) Lanham Act false endorsement; (2) violation of North Dakota's unlawful sales and advertising statute; and (3) breach of contract. The Court should issue judgment as a matter of law against Dr. Friederichs on his claims.

### A.   This is Not an Exceptional Case and Remedies Like Disgorgement and Damages are Not Appropriate.

Monetary relief under the Lanham Act, including disgorgement of profits, is only appropriate in "exceptional" cases. *Martinizing Int'l, LLC v. BC Cleaners, LLC*, 855 F.3d 847, 852 (8th Cir. 2017). "Because the Lanham Act is grounded in equity and bars punitive remedies, 'relief in a Lanham Act case should be limited to an injunction if that is sufficient to do equity.'" *Id.* (quoting *Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc.*, 41 F.3d 1242, 1247 (8th Cir. 1994) (citations omitted)).

Dr. Friederichs failed to establish that this is an "exceptional" case that would allow him to seek disgorgement or damages. The evidence does not support a finding that the corrective letter and stipulated order that has been in place for two and a half years should be supplemented with other Lanham Act remedies. *Wing Enterprises, Inc. v. Tricam Indus., Inc.*, 511 F. Supp. 3d 957, 978 (D. Minn. 2021). Dr. Friederichs presented evidence relating to disgorgement, which the Court will only award under the principles of equity, which include: (1) unjust enrichment, (2) damages, or (3) deterrence of a willful infringer. *Masters v. UHS of Delaware, Inc.*, 631 F.3d 464, 475 (8th Cir. 2011). If allowed, the profits to be disgorged must be those "attributable" to the infringement. *See Safeway Transit LLC v. Disc. Party Bus, Inc.*, 954 F.3d 1171, 1181 (8th Cir. 2020).

Dr. Friederichs did not establish that Sanford was unjustly enriched or that he sustained any damage attributable to a Lanham Act violation. He also failed to show that Sanford was a willful infringer in need of deterrence. Sanford made a mistake, agreed to correct the mistake, and agreed to only communicate about Dr. Friederichs via an agreed statement. Even after trial testimony and evidence, Dr. Friederichs could not prove that this is an exceptional case justifying consideration of disgorgement or other damages by the jury. Sanford should be granted judgment as a matter of law on the Lanham Act claim.

**B.     Lanham Act False Endorsement.**

To prove his Lanham Act false endorsement claim, Dr. Friederichs had the burden to show by a preponderance of the evidence that (1) Sanford made a false or misleading misrepresentation of fact; (2) that the misrepresentation was made in commerce; (3) that the misrepresentation was made in connection with the goods and services Sanford provides; and (4) that the misrepresentation was likely to cause consumers of Sanford's products to be

confused as to the origin, sponsorship, or approval of Sanford's goods or services. *See* 15 U.S.C. § 1125(a)(1).

Even if the Court finds that there is sufficient evidence for the jury to find for Dr. Friederichs on the basic elements of his claim, he is not entitled to anything other than an injunction. As the parties stipulated to a corrective letter and a going forward communication agreement in February 2022, an injunction is unnecessary. To obtain any other remedy under the Lanham Act, Dr. Friederichs had to show that this is an "exceptional" case. He failed to make that showing and also failed to provide any evidence of causation or damages.

### 1.    No Evidence of Misrepresentation of Fact.

Dr. Friederichs failed to present evidence that the Jan. 5 letter contained objective misrepresentations of fact. He instead pointed to portions of the letter that required subjective analysis of Dr. Friederichs's views about his departure. There is no dispute that the letter contained objectively true information like the fact Dr. Friederichs was leaving Sanford, that Sanford would assist patients with future care needs, that Sanford would answer questions and would transfer medical records if needed.

Dr. Friederichs focused on arguments that the subjective suggestion of the letter was that he did not want to see the patients any longer and that he believed every orthopedic surgeon at Sanford was highly trained to perform the type of surgeries he performed. Dr. Friederichs presented testimony from three of the 2,334 patients who were sent the two letters at issue.[1] None of these patients testified that they believed Dr. Friederichs did not

---

[1] These patients total 0.129% of the patients who were sent these letters (3/2,334 = .001289).

want to see them again or that they thought Dr. Friederichs was suggesting that they see a different orthopedic physician.

The Eighth Circuit's opinion in *Dryer v. National Football League* is instructive on this issue. In *Dryer*, multiple former players sued the NFL claiming that films produced by an NFL-affiliate violated the Lanham Act. *Dryer v. Nat'l Football League*, 814 F.3d 938, 940 (8th Cir. 2016). The complained of films consisted of compilations of game footage and interviews with the plaintiffs. *Id.* at 941. The plaintiffs argued that the films falsely implied that they still endorsed the NFL. *Id.* at 944-945. The plaintiffs presented evidence that a significant number of survey participants concluded that the depicted players endorsed the NFL. *Id.* at 944. However, the Court found that the plaintiffs had failed to provide any evidence that the films contained misleading or false statements regarding their current endorsement of the NFL. *Id.* at 945. Accordingly, the Eighth Circuit affirmed the trial court's granting of summary judgment in favor of the NFL. *Id.* ("Some viewers of this content may have 'misunderstood' the extent to which the appellants continue to associate with or endorse the league, but this misunderstanding alone is insufficient to overcome summary judgment.") In doing so, the *Dryer* court noted that:

> Evidence that some consumers "misunderstood" a statement, however, is insufficient to overcome summary judgment where the statement is not objectively "misleading [or] false." *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 393–94 (8th Cir.2004) (holding that survey results showing that half of consumers misinterpreted a statement failed to give rise to a genuine issue of material fact where the plain meaning of the statement was not objectively misleading).

*Id.* at 945.

Here, Dr. Friederichs provided no evidence that his supposed false endorsement contained any objective falsities. The things he focused on all required knowledge of his

subjective views. None of his witnesses testified that they interpreted the Jan. 5 letter to be an endorsement of Sanford. The letter contains boilerplate language that is not objectively false and Dr. Friederichs did not present any evidence to the contrary. The Court should rule as a matter of law against Dr. Friederichs on his Lanham Act claim.

### 2. Likelihood of Confusion

The Court has indicated that it will evaluate likelihood of confusion using four non-exclusive factors:

(1) the strength of Dr. Friederichs' name. This refers to the level of recognition or recognizability that Dr. Friederichs has among the consumers to whom the letter dated January 5, 2022, was directed;

(2) the degree to which Dr. Friederichs' and Sanford's Health's products or services compete with each other;

(3) whether Sanford Health intended to use Dr. Friederichs' name. This is not about whether Sanford Health acted in bad faith, but whether Sanford Health believed that patients would associate the letter dated January 5, 2022, with Dr. Friederichs; and

(4) whether Sanford Health's use of the letter dated January 5, 2022, has led to instances of actual confusion among purchasers or potential purchasers about the sponsorship or approval of Sanford Health's product or services.

When considering likelihood of confusion, "the ultimate question is whether the use in its totality would likely confuse consumers." *Jackson v. Odenat*, 9 F. Supp. 3d 342, 356 (S.D.N.Y. 2014). "Actual confusion in the marketplace is often considered the best evidence of likelihood of confusion." *Safeway Transit LLC, v. Discount Party Bus, Inc.*, 954 F.3d 1171, 1179 (8th Cir. 2020) (quoting *John Allan Co. v. Craig Allen Co.*, 540 F.3d 1133, 1140 (10th Cir. 2008) (internal quotation omitted)). Actual confusion is the false belief that "a product was authorized or approved by a particular person." *Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612, 627-28 (S.D.N.Y. 1985). But even evidence that some consumers "misunderstood" a statement is insufficient to support Dr. Friederichs's false endorsement claim where the

13

statement is not objectively "misleading [or] false." *Am. Italian Pasta Co.,* 371 F.3d at 393–94 (survey results showing that half of consumers misinterpreted a statement failed to give rise to a genuine issue of material fact where the plain meaning of the statement was not objectively misleading).

As the Court noted, "Dr. Friederichs has brought forth little evidence of confusion" and none of the letter recipients, including Dr. Friederichs's three patient witnesses, have "interpreted the January Letter as an endorsement of Sanford." (Dkt. 123 at p. 9). During his case in chief, Dr. Friederichs did not fix this problem. He was required to put forth evidence of confusion among an appreciable number of patients if the jury was to evaluate his false endorsement claim. *See e.g., Duluth News-Trib. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996) ("[E]ven several isolated incidents of actual confusion . . . are insufficient to establish a genuine issue of material fact as to the likelihood of confusion."); *Dryer*, 814 F.3d at 944 (cleaned up); *Am. Italian Pasta Co.*, 371 F.3d at 393–94.

Dr. Friederichs presented testimony from three patients who did not testify that they believed Dr. Friederichs endorsed transferring their care to another provider. Dr. Friederichs did not provide any survey or similar evidence to support his claims. Nor has there been any documentary evidence that patients were confused about Sanford's patient communications. For example, Dr. Friederichs did not present any emails or communications from patients suggesting they were confused. He similarly did not present any internal Sanford communications that suggested patients were confused or misled.

In addition to failing to present evidence of actual confusion—the most important factor in the likelihood of confusion analysis—Dr. Friederichs failed to present evidence supporting any of the other factors and, in fact, presented evidence negating those factors.

For example, Dr. Friederichs testified that patients take great care in their selection of surgeons and were not influenced into selecting a different surgeon based on the January 5 letter. The three patients Dr. Friederichs sought testimony from each testified that they have not seen a doctor for their orthopedic needs other than him since they received the January 5 letter. They each made it clear that all they needed to do was place a phone call or send a text message to Dr. Friederichs to confirm that he would see them in the future.

The evidence also established that the February 4, 2022 letter was sent to the same patients and corrected the January 5 letter. Dr. Friederichs did not provide any evidence that the clarification was ineffective. Additionally, Sanford has provided Dr. Friederichs's contact information to patients who call or ask about him. And given the high degree of care patients generally use to select their orthopedic surgeon, simple internet searches will lead patients to OrthoDakota if they are looking for Dr. Friederichs. With respect to the most important Lanham Act factor, actual confusion, Dr. Friederichs has provided zero evidence. The Court should rule as a matter of law in favor of Sanford on Dr. Friederichs's Lanham Act claim.

Dr. Friederichs also failed to establish that Sanford intended to confuse or mislead patients. All testimony and evidence established that this was a communication breakdown caused by an absence of clear delineation of who was responsible for showing the letter to Dr. Friederichs.

### 3.    Lanham Act Remedies

Even if the court finds that Dr. Friederichs submitted sufficient evidence to submit a technical violation of the Lanham Act to the jury, monetary relief, disgorgement of profits, and attorneys' fees are only available under the Lanham act if the case is "exceptional." *Wing*

*Enterprises*, 511 F. Supp. 3d at 978; *Martinizing Int'l, LLC v. BC Cleaners, LLC*, 855 F.3d 847, 852 (8th Cir. 2017) ("[O]n this record we conclude Martinizing failed to prove that BC Cleaners' conduct makes this the kind of exceptional case that would entitle Martinizing to damages, an accounting of infringer profits, or attorneys' fees, in addition to the injunctive relief we have upheld.").

"'[E]xceptional,' as Congress used the word in . . . the Lanham Act, is most reasonably read to mean what the word is generally understood to indicate—uncommon, not run-of-the-mill." *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Rest.*, 771 F.2d 521, 526 (D.C. Cir. 1985). District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554, 134 S.Ct. 1749 (2014) (interpreting similar language in the patent statutes). A district court may consider a nonexclusive list of factors, including frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence. *Id.* at 554 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).

The evidence has shown that Sanford did not knowingly intend to mislead patients to harm Dr. Friederichs. Additionally, Sanford promptly agreed to issue the corrective letter and agreed to a going forward plan regarding future communications about Dr. Friederichs, making the preferred remedy under the Lanham act – an injunction – moot. *See Minn. Pet Breeders, Inc. v. Schell & Kampeter, Inc.*, 41 F.3d 1242, 1247 (8th Cir. 1994) (citing 15 U.S.C. § 1117(a)). Sanford also changed its policies and practices to be sure a mistake like this does not happen again. Dr. Friederichs has not presented evidence that: (1) Sanford took a

frivolous position with respect to the Jan. 5 letter; (2) Sanford had a bad motive in sending the Jan. 5 letter; (3) Sanford was objectively unreasonable in the factual or legal components of this case; or (4) there is a need to advance consideration and deterrence.

The evidence presented during Dr. Friederichs's portion of the case shows that Sanford: (1) made an honest mistake in not showing the letter to Dr. Friederichs; (2) took ownership of that mistake; (3) tried to meet with Dr. Friederichs; (4) and quickly agreed to a correction while Dr. Friederichs was still a Sanford employee and six weeks before his new practice opened. This is not an exceptional case. This is a run-of-the-mill case that should have ended following the agreement to send the corrective letter.

Based on his failure to show that this is an exceptional case, the Court should find as a matter of law that Dr. Friederichs is not entitled to monetary damages including attorneys' fees, disgorgement of profits, or actual damages. Even if the Court finds that this is an exceptional case and such damages are available, Dr. Friederichs failed to show that a violation of the Lanham Act caused Sanford to receive revenue or that he was damaged because of a Lanham Act violation.

**4.      No Evidence of Damages, Revenues, or Proximate Cause**

Dr. Friederichs asserts that he is entitled to disgorge Sanford's profits and receive actual damages. He was required to present evidence of profits Sanford received and that those profits were caused by a violation of the Lanham Act. He was also required to present evidence that a Lanham Act violation proximately caused him damage. He did not present evidence on either of these points and the jury could do nothing but speculate about why a limited number of patients chose to keep their care at Sanford.

17

"[B]efore a case under [the Lanham Act] can proceed to a jury, the district court must ensure that the record adequately supports all items of damages claimed and establishes a causal link between the damages and the defendant's conduct, lest the award become speculative or violate section 35(a)'s prohibition against punishment." *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 757 (8th Cir. 2003) (cleaned up) (citing *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1336 (8th Cir.1997)). Damages cannot be awarded unless there is " 'substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages.' " *Id.* (quoting *Broan Mfg. Co., Inc. v. Associated Distributors, Inc.*, 923 F.2d 1232, 1236 (6th Cir. 1991)).

Dr. Friederichs failed to provide evidence that a Lanham Act violation caused him damage and, if he had, a factual basis for the jury to make a fair and reasonable assessment of his damages. *See id.* at 761 (affirming district court's grant of summary judgment because plaintiffs had presented no evidence demonstrating the amount of damages caused by the defendant tobacco companies' admitted conspiracy such that the jury would have to "arbitrarily" set a damage amount); *Johnson v. Monsanto Co.*, 303 N.W.2d 86, 95 (N.D. 1981) ("The trier of fact must be furnished data sufficient to determine damages without resort to mere speculation or conjecture."); *Sadek v. Weber*, 948 N.W.2d 820, 828 (N.D. 2020) ("Due to the lack of available evidence to suggest how, when, or even where Andrew Sadek died, a conclusion that his death was proximately caused by Defendants' acts or omissions would be based on speculation.").

No witness in the case testified that a Lanham Act violation caused money damage. Dr. Friederichs talked generically about "damage" but never identified a single patient who selected a different orthopedic surgeon because they thought he did not want to treat them.

He did not testify or provide documents that showed how much he claims to have lost. There is no document admitted into evidence that ties alleged confusion about the January 5 letter to a decision to see a different surgeon. Nor was there any expert testimony that attempted to link the claimed Lanham Act violation to damage of any sort.

Dr. Friederichs conceded on cross-examination that patients may have elected to see a different surgeon for any number of reasons, including health insurance, scheduling availability, a desire to keep their care at Sanford, or idiosyncratic things like simply not liking Dr. Friederichs. The jury was not provided any evidence from which it could determine why some patients did not follow Dr. Friederichs, even though a substantial number of patients sought him out at his new practice.

There is literally no evidence—much less a preponderance—to establish that Dr. Friederichs incurred past or future damage because or as a result of a Lanham Act violation. The jury could only speculate whether Dr. Friederichs sustained damage because Sanford mailed the January 5 letter without his approval. The Court should rule as a matter of law that Dr. Friederichs is not entitled to damages under the Lanham Act.

*Disgorgement of Profits*

"[T]he Lanham Act contemplates that a disgorgement or accounting of profits may be appropriate to remedy unfair infringement." *Masters v. UHS of Del., Inc.*, 631 F.3d 464, 471 (8th Cir. 2011) (citing 15 U.S.C. § 1117(a)). However, disgorgement "is not automatic upon a finding of" false advertising. *Fifty-Six Hope Road Music, Ltd.* v. A.V.E.L.A., Inc., 778 F.3d 1059, 1073 (9th Cir. 2015) (citation omitted). "[T]he Lanham Act does not permit the award of monetary relief as a penalty." *Minn. Pet Breeders, Inc.*, 41 F.3d at 1247 (citing 15 U.S.C. § 1117(a)). "[B]ecause the Act is grounded in equity and bars punitive remedies, an accounting

will be denied in a trademark infringement action where an injunction will satisfy the equities of the case." *Id.* (internal quotation omitted). Thus, "an injunction is the preferred Lanham Act remedy." *Id.*; *see also Martinizing Int'l LLC*, 855 F.3d at 852 (holding that following an injunction, only an "exceptional case" allows an award of actual damages, disgorgement, or attorneys' fees); *Kars 4 Kids, Inc. v. America Can!*, 8 F.4th 209, 223 (3rd Cir. 2021).

Additionally, disgorgement of profits is only appropriate if it is equitable, and the defendant profited from a Lanham Act violation. *See, e.g., Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 875–76 (5th Cir. 2019). A plaintiff must "present evidence that the defendant benefitted from the alleged false advertising." *Logan v. Burgers Ozark Cty. Cured Hams Inc.*, 263 F.3d 447, 465 (5th Cir. 2001); *Globefill Inc. v. Elements Spirits, Inc.*, 756 F. App'x 764, 765 (9th Cir. 2019) (disgorgement under the Lanham Act is only allowed for profits that are earned by the defendant and "attributable to" false advertising). Without such evidence, a Lanham Act plaintiff cannot recover a defendant's profits even if disgorgement would otherwise be equitable. *Retractable Techs.*, 919 F.3d at 876; *see also ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C. Cir. 1990) ("[T]he court must ensure that the record adequately supports all items of damages . . . lest the award become speculative or violate [the Lanham Act's] prohibition against punishment."); *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1042 (9th Cir. 1986) ("The amount to be awarded is the financial benefit [the defendant] received because of the advertising.").

In *Safeway Transit LLC, v. Discount Party Bus, Inc.*, 954 F.3d 1171, 1179 (8th Cir. 2020), the Eighth Circuit affirmed the district court's rejection of a disgorgement claim even after the district court found infringement under the Lanham Act. The district court rejected the disgorgement claim because the plaintiff had not proven what revenue the defendant

received because of the infringement. *Id.*, at 1179-1180. The Eighth Circuit affirmed, noting: "The trademark holder has the burden to prove the defendant infringer's gross revenue from the infringement." *Id.*, at 1180 (quoting *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015)).

Absent from Dr. Friederichs's case in chief is evidence that Sanford received any revenue *because* patients were misled by the January 5 letter. Dr. Friederichs's expert was instructed to *assume* that certain patients will not see him in the future because of the January 5 letter.[2] None of the three patients who testified in the case said that they saw an orthopedic physician other than Dr. Friederichs because they were confused by the letter. No evidence was presented showing causation, which is fatal to Dr. Friederichs's request for disgorgement. The Court should rule, as a matter of law, that Dr. Friederichs is not entitled to disgorge Sanford's profits, as small as they may be.

*Actual Damages*

Claims brought under the Lanham Act must be supported by evidence that the wrongful act was the proximate cause of injury. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014) (a Lanham Act plaintiff "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising"). This limitation is necessary because Congress did not intend "to allow all factually injured plaintiffs" under the statute "to recover," and thus the Lanham Act must "not get such an expansive reading" as to include "any person who believes that he or she is likely to be damaged" despite the language of the statute. *Id.* at 129. Damages under the Lanham Act "may not be awarded on the basis of speculation or conjecture." *Porous Media*

---

[2] Mr. Van Schooneveld had not disclosed and was not allowed to provide opinions about claimed past damage.

*Corp. v. Pall Corp.*, 173 F.3d 1109, 1122 (8th Cir. 1999); *see also McClaran v. Plastic Industries, Inc.*, 97 F.3d 347, 361 (9th Cir. 1996). "[T]o recover money damages under the [Lanham Act], a plaintiff must prove both actual damages and a causal link between defendant's violation and those damages." *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1042 (8th Cir. 1999) (quotations omitted). A plaintiff may not recover under the Lanham Act if he or she fails to prove that the defendant's actions caused the claimed harm. *Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 515 (8th Cir. 1996) (quotations and citations omitted); *see also Wing Enterprises, Inc.*, 511 F. Supp. 3d at 973-74 (D. Minn. 2021) ("A plaintiff's burden is at its highest when it seeks monetary damages.").

Per the Court's anticipated instructions, in considering actual damages under Dr. Friederichs's Lanham Act claim, the jury may consider (1) injury to Dr. Friederichs' reputation; (2) injury to Dr. Friederichs' goodwill; (3) lost profits that Dr. Friederichs would have earned but for Sanford Health's false endorsement; and (4) the cost of corrective advertising reasonably required to correct any public confusion caused by the false endorsement. *See* Court's Proposed Jury Instruction F-14. The jury must also consider whether any of these injuries were proximately caused by the Lanham Act violation. *Id.* Nonetheless, Dr. Friederichs failed to provide evidence of any of the four factors of actual damage under the Lanham Act.

Dr. Friederichs offered no evidence that his reputation was harmed by Sanford's letters. The three patients who testified did not say they viewed him differently and Dr. Friederichs himself did not testify about any claimed reputational damage. Nor was there any expert testimony or documentary evidence to support a claim that his reputation was harmed. With respect to claimed reputational damages, the evidence must show "some

injury and must establish sufficient data from which the jury could estimate the amount." *Pemberton v. OvaTech, Inc.*, 669 F.2d 533, 541 (8th Cir. 1982) (ordering remitter of jury's award because plaintiffs could not show more than nominal damages regarding damage to their reputation); *see also G & H Soybean Oil, Inc. v. Diamond Crystal Specialty Foods, Inc.*, 796 F. Supp. 1214, 1217 (S.D. Iowa 1992) ("business reputation and goodwill are tied closely with the production of profits"). As in *Pemberton*, zero evidence has been presented of damage to Dr. Friederichs's reputation or the value thereof. The jury would have to completely speculate about whether there has been damage to Dr. Friederichs's reputation.

The same is true for goodwill. Dr. Friederichs did not submit any evidence that he had goodwill, what it was worth, or how it was allegedly damaged in this case. With respect to goodwill, the Supreme Court has noted the difficulty in defining goodwill, but has nonetheless cited the following definition favorably:

> "the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessity, or even from ancient partialities or prejudices."

*Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555 (1993) (quoting *Metropolitan Bank v. St. Louis Dispatch Co.*, 149 U.S. 436 (1893). In North Dakota, "[t]he goodwill of a business is the expectation of continued public patronage, but it does not include a right to use the name of any person from whom it was acquired." N.D.C.C. § 47-07-10.

"Factors to be considered in determining the loss of goodwill are the following: the length of time the business has been in existence; its average profits; its success; and the likelihood of its continuing business under the same name." *Agric. Services Ass'n, Inc. v. Ferry-*

*Morse Seed Co., Inc.*, 551 F.2d 1057, 1070 (6th Cir. 1977). "It follows, then, that a relatively new business would have little if any established goodwill . . . ." *Stallworth Timber Co. v. Triad Bldg. Supply*, 968 F. Supp. 279, 284 (D.V.I. 1997) (citing *Id.*) "A company does not have any corporate goodwill when all of the goodwill is attributable solely to the personal ability of an employee." *Bross Trucking, Inc. v. C.I.R.*, 107 T.C.M. (CCH) 1528 (T.C. 2014).

Here, Dr. Friederichs did not present any evidence of goodwill at all. Rather, the evidence shows that Dr. Friederichs had not yet established any goodwill at his new practice:

- Dr. Friederichs had not started OrthoDakota by the time both letters were sent.

- Dr. Friederichs had no average profits through OrthoDakota at the time both letters were sent.

- OrthoDakota, when started, would only have had goodwill attributable to the personal ability of two surgeons; there was no ongoing goodwill developed from lengthy operation of the business.

- Dr. Friederichs did not have any capital, stock, funds, or property employed in OrthoDakota that could be valued.

- Dr. Friederichs had no habitual customers at OrthoDakota at the time the letters were sent.

" 'Goodwill' is the difference between the purchase price paid for a business and the fair value of the net assets acquired." *Hughes v. Huron Consulting Group, Inc.*, 733 F. Supp. 2d 943, 946 n.3 (N.D. Ill. 2010). In other words, goodwill represents the value a business acquires via its ongoing operations that is in excess of its book value and consistent with a business with regular patronage. Even if an individual could have goodwill, which Sanford disputes, Dr. Friederichs did not have any goodwill at the time that the letters were sent. A jury would again be left to speculate on this element of damages because no evidence establishing Dr. Friederichs's goodwill has been presented. *Roundhouse v. Owens-Illinois, Inc.*, 604 F.2d 990, 995 (6th Cir. 1979) ("Since the plaintiffs could not prove the profitability of their business, or

assign any kind of a goodwill value to it, it would have been sheer speculation on the jury's part to try to establish a figure for lost goodwill.").

With respect to the final two elements of actual damages, Dr. Friederichs has not presented any evidence of lost profits he suffered because of the letters or of corrective advertising he had to do because of the letters. That he presented evidence of what his damages would be if the jury *assumed* that certain patients would have gone to him in the future is insufficient. There is simply no evidence of either element for the jury to consider.

In *Blue Dane Simmental Corp.*, the plaintiff filed a Lanham Act false advertising lawsuit based on an allegedly false registration of 19 cattle as full-blooded "Simmental" breed where the cattle were partly Angus. *Blue Dane Simmental Corp.*, 178 F.3d at 1039. The Eighth Circuit affirmed the trial court's grant of a motion for judgment as a matter of law following a nine-day jury trial where the plaintiff had failed to present evidence that any consumers purchased artificial insemination services from the defendants "because of a mistaken belief in the genetic makeup of these animals based upon the advertisements." *Id.* at 1043. Accordingly, the jury did not have a legally sufficient evidentiary basis to find that the advertisement was false or misleading. *Id.* The Eighth Circuit further found that, even if a Lanham Act violation was assumed, the plaintiffs had failed to provide the jury with a legally sufficient evidentiary basis to find that they were damaged. *Id.* Specifically, the only evidence of actual damages caused by the advertisements was "plaintiffs' testimony that they believed that their sales had dropped . . . ." *Id.* at 1043.

The evidentiary structure of Dr. Friederichs's case is materially similar to that in *Blue Dane Simmental Corp.*. Dr. Friederichs has not presented any evidence of a consumer that used Sanford because of the allegedly false advertisement. And even if a Lanham Act

violation was presumed by the Court, the only evidence that Dr. Friederichs was damaged is Dr. Friederichs's vague and unsubstantiated testimony. He simply and generally claimed that he was damaged. This is insufficient under the Lanham Act and binding Eighth Circuit precedent. Accordingly, the Court should rule as a matter of law that Dr. Friederichs's Lanham Act fails because of an absence of actual damage.

*Lost Future Profits*

Dr. Friederichs asserted that he is entitled to lost future profits based on the notion that any person who received a total knee or shoulder replacement would need the opposite knee or shoulder replaced in the future and such people would have chosen him to perform the second surgery but for the January 5 letter. Putting aside the obvious causation problem with this argument, Dr. Friederichs never established—to a reasonable degree of medical certainty—that these patients would need a second total knee or shoulder replacement.

North Dakota "has long required that expert medical opinions be expressed in terms of reasonable medical certainty, not mere possibilities." *Klimple v. Bahl*, 727 N.W.2d 256, 261 (N.D. 2007). Dr. Friederichs did not state that opinions he offered about the 31 lost profit patients and their future medical care were provided to a reasonable degree of medical certainty. He was not asked and did not provide opinions about future care needs using the requisite medical certainty. It is standard practice to ask an expert—especially a medical expert—to express their opinions to a specified degree of certainty.

Dr. Friederichs did not state, to a reasonable degree of medical certainty, that each of the 31 future lost profit patients would need their opposite joint replaced. Without that, Mr. Van Schooneveld's calculations lack the required expert support to establish that the claimed future medical care will be needed. Accordingly, the Court should rule as a matter of law that

26

Dr. Friederichs may not recover lost future profits. *Klimple*, 727 N.W.2d at 261-63; *Kunnanz v. Edge*, 515 N.W.2d 167, 172 (N.D. 1994); *Nelson v. Trinity Med. Ctr.*, 419 N.W.2d 886, 892 (N.D. 1988); *Smith v. American Family Mut. Ins. Co.*, 294 N.W.2d 751, 763-64 (N.D. 1980); *Dehn v. Otter Tail Power Co.*, 251 N.W.2d 404, 412 (N.D. 1977); *Grenz v. Werre*, 129 N.W.2d 681, 689 (N.D. 1964); *Vaux v. Hamilton*, 103 N.W.2d 291, 295 (N.D. 1960).

### C.    Unlawful Sales or Advertising Practice

North Dakota's Unlawful Sales or Advertising Practices Act (the "Act") prohibits the use of deceptive practices "in connection with the sale or advertisement of any merchandise." N.D.C.C. § 51-15-02. However, a private cause of action does not arise under the Act unless the plaintiff shows that the defendant acquired "moneys"  *See* N.D.C.C. § 51-15-02. Dr. Friederichs had to prove that Sanford intentionally violated the Act and acquired money because of that violation. *Staal v. Scherping Enters., Inc.*, 466 F. Supp. 3d 1030, 1034 (D. N.D. 2020). "Section 51-15-09 is clear that a private cause of action cannot arise unless a person actually 'acquired . . . moneys or property by means of' unlawful conduct." *Woodmont Co. v. LaSalle Shopping Ctr., LLC*, No. 1:17-cv-0073 (PDW), 2020 WL 2857164, at *16 (D. N.D. June 2, 2020) (quoting N.D.C.C. § 51-15-09); *Benz Farm, LLP v. Cavendish Farms, Inc.*, 803 N.W.2d 818, 824 (N.D. 2011)).

As discussed above, Dr. Friederichs failed to present any evidence that a deceptive act by Sanford caused it to acquire money. This failure requires judgment as a matter of law on the claim brought under the Act. There is no private cause of action without such a showing, which Dr. Friederichs failed to make.

Even if Dr. Friederichs created a jury question about whether Sanford obtained money as a result of a violation of the Act, he failed to present sufficient evidence to

proceed on the merits of the claim. To prove an unlawful sales or advertising practice, Dr.

Friederichs must prove, by the greater weight of the evidence:

1. Sanford acted, used, or employed a deceptive act or practice, fraud, false pretense, false promise, or misrepresentation; and

2. Sanford intended that others rely on Sanford's act, use, or employment of a deceptive act or practice, fraud, false pretense, false promise, or misrepresentation in connection with the sale or advertisement of its services. Dr. Friederichs is not required to prove others were in fact misled, deceived, or damaged by Sanford's actions.

N.D.C.C.§ 51-15-02. Dr. Friederichs was required to prove his statutory claim by a

preponderance of the evidence. *State ex rel. Spaeth v. Eddy Furniture Co.*, 386 N.W.2d 901, 903

(N.D. 1986). "The Act provides for a private cause of action for parties who have suffered

actual damages if the court finds the defendant knowingly committed the conduct declared

unlawful under the Act." *Energy Heating, LLC v. Heat On-The-Fly, LLC*, Civil Case No. 4:13-

CV-10, 2015 WL 11156906, at *4 (D. N.D. July 7, 2015).

Dr. Friederichs also had to prove causation and actual damages to recover "any

moneys," including treble damages or attorney's fees. N.D.C.C. § 51-15-09. As with his other

claims, Dr. Friederichs did not provide any evidence to support causation or actual damage

under the Act. The absence of any evidence that a patient would have seen Dr. Friederichs

but for the Jan. 5 letter and his consequential inability to show actual damage is fatal to this

claim. *See Group Health Plan, Inc.*, 344 F.3d at 761; *Johnson*, 303 N.W.2d 86 at 95; *Sadek*, 948

N.W.2d at 828.

Dr. Friederichs did not present any evidence that Sanford intended to mislead

recipients of the January 5 letter. The evidence instead established that a lack of training and

poor communication about responsibilities led to the letter being sent without Dr.

Friederichs's approval. There is no evidence that Sanford intended to send a misleading

patient communication. The Court should rule, as a matter of law, in favor of Sanford on Dr. Friederichs's unlawful sales and advertising practices claim.

### D.     Breach of Contract

A party alleging a breach of contract has the burden of proving (1) the existence of a contract, (2) a breach of the contract, and (3) damages which flow from the breach. *Martin v. Trinity Hosp.*, 2008 ND 176, ¶ 29, 755 N.W.2d 900 (N.D. 2008). Under N.D.C.C. § 32–03–09, "[n]o damages can be recovered for a breach of contract if they are not clearly ascertainable in both their nature and origin."

Dr. Friederichs did not testify about this claim. Nor did his accounting expert. Dr. Friederichs did not establish what he was paid during the notice period or what he claims he should have been paid. He called Sanford employee Connie Burrington, who testified that she calculated, and Sanford paid what it owed Dr. Friederichs under his Employment Agreement. In fact, the evidence elicited from Ms. Burrington showed that Dr. Friederichs was overpaid by more than $5,000. Ms. Burrington explained that the MeritCare fiscal year and Sanford physician compensation year were the same and that she ran calculations using both eight month and annualized RVUs for Dr. Friederichs.

There is simply no evidence in the record from which a jury could find that Sanford breached Dr. Friederichs's Employment Agreement. Accordingly, the Court should rule as a matter of law that Dr. Friederichs may not recover on his breach of contract claim.

Date:  <u>September 3, 2024</u>                              **LARSON • KING, LLP**

<u>*/s/ Shawn M. Raiter*</u>
Shawn M. Raiter (ND 05712)
Angela Beranek Brandt (ND 08130)
Zane P. Aubert
2800 Wells Fargo Place
30 E. Seventh Street
St. Paul, MN  55101
Tel: (651) 312-6500
Fax: (651) 312-6618
sraiter@larsonking.com
abrandt@larsonking.com
zaubert@larsonking.com

**Attorneys for Sanford Health**