IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | |
|---|---|
| Matthew G. Friederichs, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>Sanford Health,<br><br>Defendant. | Case No. 3:22-cv-00008-PDW-ARS<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW** |

Defendant Sanford Health ("Sanford") moves for judgment as a matter of law. Sanford's motion fails to meet the exacting standard for such relief. As it did on summary judgment, Sanford attempts to rewrite Plaintiff Dr. Friederichs' ("Dr. Friederichs") claims and ignores critical facts and evidence that has been admitted in this trial, and which may be considered by the jury to support a finding in favor of Dr. Friederichs. For the reasons outlined below, Dr. Friederichs has presented sufficient evidence related to his claims to submit them to the jury. Accordingly, Sanford's Motion for Judgment as a Matter of Law should be denied in all respects.

## APPLICABLE STANDARD

When "a party has been fully heard on an issue" and the Court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," the Court may:

(A) resolve the issue against the party; and

(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a). "Judgment as a matter of law is only appropriate when there is insufficient evidence to permit a reasonable jury to find in favor of the non-moving party." Rosen

1

v. Wentworth, 13 F. Supp. 3d 944, 948 (D. Minn. 2014) (citing Gardner v. Buerger, 82 F.3d 248, 251 (8th Cir. 1996)). In analyzing a motion for judgment as a matter of law, the Court must: (1) resolve direct factual conflicts in favor of Dr. Friederichs, as the nonmovant; (2) assume as true all facts supporting Dr. Friederichs which the evidence tends to prove; (3) give Dr. Friederichs the benefit of all reasonable inferences; and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn. See Roberson v. AFC Enterprises, Inc., 602 F.3d 931, 933 (8th Cir. 2010). In other words, the Court should not grant the motion unless the evidence is susceptible of no reasonable inference sustaining the position of Dr. Friederichs. Children's Broad Corp. v. Walt Disney Co., 357 F.3d 860, 863 (8th Cir. 2004). "The evidence must point unswervingly to only one reasonable conclusion." Penford Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 662 F.3d 497, 503 (8th Cir. 2011). "This demanding standard reflects our concern that, if misused, judgment as a matter of law can invade the jury's rightful province." Id.

Sanford's attempt to use Rule 50 as a vehicle to avoid submitting Dr. Friederichs' claims to the jury fails and its motion must be denied.

## ARGUMENT

### I. A Reasonable Jury Could Find that the January Letter Likely Caused Confusion.

To prevail on his false endorsement claim, Dr. Friedrichs mush show that Sanford "(1) in commerce, (2) made a false or misleading representation of fact (3) in connection with goods or services (4) that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services." Moreland v. Kladeck, Inc., 2022 WL 1501122, at *2 (D. Minn. May 12, 2022) (quoting Burck v. Mars, Inc., 571 F. Supp. 2d 446, 455 (S.D.N.Y. 2008)).

In its motion, Sanford argues there is no evidence of actual confusion. But, as this Court recognized at summary judgment, "Dr. Friederichs' burden is to show the January Letter was only 'likely' to cause this confusion." (ECF No. 123 at 6.) Courts determine whether there is a likelihood of confusion based on the following six factors: "(1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to 'pass off' its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its cost, and conditions of purchase." Johnson v. J.P. Parking, Inc., No. 422CV00146, 2024 WL 676770, at *12 (S. D. Iowa Feb. 20, 2024). As this Court noted at summary judgment, "the most relevant factors are the strength of the mark, the infringer's intent, and incidents of actual confusion." (ECF No. 123 at 8.)

In a false endorsement case, the strength of a mark "refers to the level of recognition that [a] plaintiff has among the consumers to who the advertisements are directed." Jackson v. Odenat, 9 F. Supp. 3d 342, 356 (S.D.N.Y. 2014). The January Letter makes clear that Sanford used Dr. Friederichs name in a communication sent to over 2,000 of his patients that he had seen in the preceding eighteen months. The testimony at trial sufficiently supports that Dr. Friederichs is recognizable among the patients who were sent the January Letter. He is their physician.

The next factor focuses on the infringer's intent. Notably, this is not about bad faith. Johnson, 2024 WL 676770, at *14. Here, the testimony revealed that Sanford clearly intended to use Dr. Friederichs' name and believed the patients would associate the January Letter's signatory with their doctor. Sanford was trying to retain these patients by sending the January Letter.

The last factor focuses on evidence of actual confusion. As an initial matter, because the January Letter is "literally false as a factual matter," there does not need to be any evidence of

actual confusion. Dryer v. National Football League, 814 F.3d 938, 944 (8th Cir. 2016) (quoting United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998); see also United Indus., 140 F.3d at 1180 ("If a plaintiff proves that a challenged claim is literally false, a court may grant relief without considering whether the buying public was actually misled; actual consumer confusion need not be proved."); Masters v. UHS of Del., Inc., 631 F.3d 464, 472-74 (8th Cir. 2011) ("The relevant statutory provisions do not expressly require proof of actual confusion.... [R]equiring actual confusion would undermine the equitable nature of the Lanham Act's remedial scheme....").

Even if the Court is inclined not to adopt this line of case law, there was also testimony demonstrating actual confusion. Actual confusion is the false belief that "a product was authorized or approved by a particular person." Allen v. Nat'l Video, Inc., 610 F. Supp. 612, 626 (S.D.N.Y. 1985). Three of Dr. Friederichs' patients testified that they received the January Letter, which stated that Dr. Friederichs "trusts" the remaining "highly trained and skilled" Orthopedic Surgeons and "advanced practice providers to continue providing you with expert care for your orthopedic needs." Each witness testified that that they interpreted the January Letter as Dr. Friederichs endorsing Sanford's services. Between this testimony and the evidence on the other factors—including the face of the January Letter—there is sufficient evidence to show the January Letter likely caused confusion and in fact did cause confusion to support a finding of liability on Dr. Friederichs' Lanham Act claim.

## II.     Dr. Friedrichs Presented Sufficient Evidence to Support the Remedy of Disgorgement.

Sanford argues that there is no evidence that the 7 patients identified by Dr. Friederichs' expert chose to keep their medical care at Sanford because they were confused or misled by the January Letter. But Sanford improperly flips the burden on its head for a remedy of disgorgement.

The Lanham Act "makes an award of the infringing party's profits subject only to the principles of equity." Masters, 631 F.3d at 473 (8th Cir. 2011). As the Court noted at summary judgment, "[d]isgorgement of profits is a remedy available subject to the principles of equity and does not require a showing of actual damages." (ECF No. 123 at 11); see also Wing Enterprises, 511 F. Supp. at 974 ("The burden is similarly low when a plaintiff seeks the equitable remedy of disgorgement of profits. That is because, rather than aiming to compensate the plaintiff for specific, identifiable losses, this remedy exists to deter would-be infringers and to safeguard against unjust enrichment.") (internal quotations omitted). Because Dr. Friederichs demonstrated the likelihood of harm necessary to establish an underlying Lanham Act violation, Dr. Friederichs need "only establish [Sanford's] sales during the relevant time period, and then burden shifts to [Sanford] to prove that any of those sales were not due to the allegedly unfair competitive practices." Watkins Inc. v. McCormick & Co., Inc., 574 F. Supp. 2d 644, 655 (D. Minn. 2021); see also Aviva Sports, Inc. v. Fingerhut Direct Marketing, Inc., 829 F. Supp. 2d 802, 809 (D. Minn. Nov. 8, 2011) ("To recover profits, 'the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.'") (quoting 15 U.S.C. § 1117(a)). That is, all Dr. Friederichs has to provide is evidence of the sales of the challenged services to meet the "injury-and-causation threshold to seek disgorgement of profits." Wing Enterprises, Inc. v. Tricam Indus., Inc., 511 F. Supp. 3d 957, 976 (D. Minn. 2021). It is the infringer's burden to "isolate the profits which are attributable to the" Lanham Act violation. Aviva, 829 F. Supp. 2d at 818. Indeed, the Court may also consider issues of unjust enrichment and deterrence when determining if disgorgement is an appropriate equitable remedy. Safeway Transit LLC v. Discount Party Bus, Inc., 954 F.3d 1171, 1178-81 (8th Cir. 2020); Watkins, 574 F. Supp. 3d at 656 ("Disgorgement imposes a lower burden than money damages and injunctive relief because it serves a different

purpose. Disgorgement, an equitable remedy, targets the wrongdoer and seeks to deter improper conduct and prevent unjust enrichment."). The Safeway Court specifically noted that "a court may award a defendant's profits solely upon a finding that the defendant fraudulently used the plaintiff's mark," which is in part "to protect the public at large." Safeway, 954 F.3d at 1180-81.

Here, Dr. Friederichs met this burden at trial by showing the amount of revenue that Sanford derived from the challenged orthopedic services—that is, orthopedic services provided by a physician other than Dr. Friederichs to recipients of the January Letter. To highlight a few patients from **Exhibit P138**, each of these patients: (1) saw Dr. Friederichs prior to the January Letter; (2) made and attended an appointment after the January Letter but before the February Letter; and (3) generated profits for Sanford as a result.

A. ▮▮▮▮▮

| Check-In Date | Attending Provider | Diagnosis | Charges | Payment |
|---|---|---|---|---|
| 10/20/2021 | FRIEDERICHS, MATTHEW | Complete rotatr-cuff tear/ruptr of r shoulder, not trauma | 293 | 262 |
| 11/17/2021 | BAILEY, DAVID | Laceration without foreign body of left hand, init encntr | 535 | 428 |
| 11/30/2021 | BAILEY, DAVID | Lacerat extn musc/fasc/tend l lit fngr at wrs/hnd lv, subs | 122 | 110 |
| 1/31/2022 | NELSEN, MATTHEW J | Complete rotatr-cuff tear/ruptr of r shoulder, not trauma | 143 | 128 |
| 2/8/2022 | NELSEN, MATTHEW J | Unsp rotatr-cuff tear/ruptr of right shoulder, not trauma | 3,126 | 2,364 |
| 3/4/2022 | NELSEN, MATTHEW J | Complete rotatr-cuff tear/ruptr of r shoulder, not trauma | 35,621 | 14,437 |
| 4/22/2022 | SEKUNDIAK, TODD D | Pain in right hip | 233 | 207 |
| 6/20/2022 | NELSEN, MATTHEW J | Other specified postprocedural states | 143 | 128 |
| 8/22/2022 | NELSEN, MATTHEW J | Other specified postprocedural states | 149 | 134 |

▮▮▮▮▮ green appointments generated $916 in profits for Sanford. (Ex. D282A.)

B. ▮▮▮▮▮ :

| Check-In Date | Attending Provider | ICD-9/10-CM Diagnosis2 | Charges | Payment |
|---|---|---|---|---|
| 5/21/2014 | FRIEDERICHS, MATTHEW | JOINT PAIN-L/LEG | 232 | 188 |
| 2/2/2015 | FRIEDERICHS, MATTHEW | JOINT PAIN-L/LEG | 156 | 126 |
| 4/2/2015 | FRIEDERICHS, MATTHEW | DERANG POST MED MENISCUS | 1,503 | 960 |
| 4/2/2015 | FRIEDERICHS, MATTHEW | TEAR MED MENISC KNEE-CUR | 7,362 | 6,184 |
| 12/20/2021 | FRIEDERICHS, MATTHEW | Other specified injuries of left lower leg, init encntr | 443 | 399 |
| 1/17/2022 | FRIEDERICHS, MATTHEW | Effusion, left knee | 3,224 | 2,793 |
| 1/19/2022 | FRIEDERICHS, MATTHEW | Prph tear of medial meniscus, current injury, l knee, subs | 233 | 210 |
| 1/27/2022 | NOONAN, BENJAMIN | Prph tear of medial meniscus, current injury, l knee, subs | 330 | 297 |

▮▮▮▮▮ green appointment generated $138 in profits for Sanford. (Ex. D282A.)

C. ▮▮▮▮▮

| | |
|---|---|
| 9/11/2020 | FRIEDERICHS, MATTHEW |
| 1/13/2022 | HVIDSTON, ANDREW |
| 1/13/2022 | HVIDSTON, ANDREW |
| 2/2/2022 | HVIDSTON, ANDREW |

6

4260374.v1

| | | |
|---|---:|---:|
| Impingement syndrome of right shoulder | 285 | 108 |
| Pain in right shoulder | 192 | 121 |
| Impingement syndrome of right shoulder | 233 | 66 |
| Incomplete rotatr-cuff tear/ruptr of r shoulder, not trauma | 3,586 | 235 |

███████ green appointments generated $115 in profits for Sanford. (Ex. D282A.)

D. ███████:

| Check-In Date | Attending Provider | ICD-9/10-CM Diagnosis2 | Charges | Payment |
|---|---|---|---:|---:|
| 6/1/2020 | FRIEDERICHS, MATTHEW | Complex tear of medial mensc, current injury, l knee, init | 276 | 229 |
| 6/23/2020 | FRIEDERICHS, MATTHEW | Derangement of unsp lat mensc due to old tear/inj, left knee | 1,623 | 1,257 |
| 6/23/2020 | FRIEDERICHS, MATTHEW | Other specified disorders of cartilage, lower leg | 8,163 | 5,241 |
| 1/17/2022 | DAHL, KEVIN | Oth tear of medial meniscus, current injury, r knee, init | 443 | 352 |
| 2/21/2022 | DAHL, KEVIN | Oth tear of medial meniscus, current injury, r knee, init | 233 | 191 |
| 3/1/2022 | DAHL, KEVIN | Derang of post horn of medial mensc d/t old tear/inj, r knee | 1,894 | 1,157 |
| 3/9/2022 | DAHL, KEVIN | Derang of post horn of medial mensc d/t old tear/inj, r knee | 9,771 | 5,589 |
| 7/5/2022 | DAHL, KEVIN | Bilateral primary osteoarthritis of knee | 622 | 365 |
| 4/3/2023 | DAHL, KEVIN | Bilateral primary osteoarthritis of knee | 343 | 251 |
| 5/16/2023 | DAHL, KEVIN | Bilateral primary osteoarthritis of knee | 242 | 200 |
| 6/6/2023 | DAHL, KEVIN | Unilateral primary osteoarthritis, left knee | 30,666 | 26,264 |
| 6/12/2023 | DAHL, KEVIN | Aftercare following joint replacement surgery | 684 | 500 |

███████ green appointment generated $138 in profits for Sanford. (Ex. D282A.)

### III. A Reasonable Jury Could Find that Dr. Friedrichs Suffered Actual Damages

Sanford also argues that there is no evidence that the January Letter was the proximate cause of Dr. Friedrichs' damages. Unlike the standard for disgorgement, when a plaintiff is seeking money damages he "must prove both actual damages and a causal link between [the] defendant's violations and those damages." Wing Enterprises, 511 F. Supp. 3d at 973. To recover damages for violation of the Lanham Act, "plaintiff must prove it has been damaged by actual consumer confusion or deception resulting from the violation." Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 525 (10th Cir. 1987). "Actual consumer confusion may be shown by direct evidence, a diversion of sales or direct testimony from the public, or by circumstantial evidence such as consumer surveys." Id. Notably, a "defendant whose wrongful conduct has caused the difficulty in assessing damages cannot complain that the damages are somewhat speculative." Id. at 526. Accordingly, "[e]vidence of the amount of damages may be circumstantial and inexact." Id.; see also Pound v. Airosol Co., Inc., 368 F. Supp. 2d 1210, 1216 (D. Kan. 2005) ("[P]laintiff is not

7

required to prove actual damages to prevail on his Lanham Act claim, but may instead approximate his damages based on circumstantial or inexact information."); Allergan USA Inc. v. Imprimis Pharmaceuticals, Inc., 2019 WL 4546897, at *4 (C.D. Cal. Aug. 2, 2019) ("In reviewing a jury's award of actual damages under the Lanham Act, we accept 'crude' measures of damages based upon reasonable inferences so long as those inferences are neither 'inexorable … [nor] fanciful.").

In Pound, the plaintiff competed with defendant in the sale of pesticides and argued that defendant made false representations about its own products and plaintiff's products. Id. at 1215. The plaintiff alleged that because of these false or misleading representations, it has been injured, and continues to be injured, and because it competes with defendant, any and all sales of defendant's products directly result in lost customers and sales to plaintiff. Id. at 1216. The plaintiff's damage theory was based on this "one-to-one sales loss assumption." Id. The court determined plaintiff's evidence created an issue of material fact[1] under the Lanham Act:

> The court acknowledges that plaintiff's estimation of damages seems to be quite speculative; it fails to consider relevant market factors such as price difference between the products, availability of plaintiff's product, other reptile pest products on the market, or alternative reptile pest control methods. However, when viewed in the light most favorable to the plaintiff, plaintiff's admittedly weak estimation of damages nevertheless creates a genuine issue of material fact as to whether plaintiff suffered any damages, or the extent of any damages suffered.

Id.

In Brunswick Corp., the plaintiff manufactured spin-cast fishing reels, including the Zebco Model 33. Id. at 516. A longtime employee of plaintiff left to form a new business and began manufacturing and selling the SR 210 reel, which closely resembled the Zebco Model 33. Id. The plaintiff sued defendant for violation of the Lanham Act because it claimed the SR 210 had been

---

[1] "This [Rule 50(a)] standard is identical to that the court must employ when ruling on motions for summary judgment under rule 56." Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1278, 1280 (D. N.M. 2005)

deliberately copied from the Zebco Model 33 reel. Id. Following trial, the court found a violation of the Lanham Act but did not award any damages ruling "it failed to establish clear proof of damages," which "implies that Brunswick presented insufficient proof of actual damages." Id. at 525. The plaintiff had based its claim for damages on the theory that it lost one sale of a Model 33 as a result of each Spinit SR 210 reel sold. Id. at 526. On appeal, the court reversed and found there was a sufficient basis to award damages. Id. Specifically, the court noted that in addition to the testimony regarding the one-to-one sales loss assumption, the plaintiff had submitted evidence about how all of its spin-cast products dropped off by five percent, the sales of spin-cast reels generally decreased by six percent due to the recession, and the sales for the Zebco 33 dropped sixteen percent. Id. The defendant, on the other hand, introduced evidence that other causes may have contributed to the decrease in the plaintiff's sales, including the introduction of other new reels on the market. Id. Despite the fact there may have been an alternative cause for lost sales, the appellate court held "in light of the trial court's finding of actual confusion and direct competition between the reels, we are not persuaded that other reels were the sole cause of the substantial reduction in the sale of the Zebco 33. Thus, the evidence does not indicate that Brunswick failed to show it suffered any actual damages." Id.

Dr. Friedrichs has produced evidence that he has been damaged by the January Letter. Exhibits P125, P138, and 286B show both future damages (total knee/shoulder surgeries yet to come, but are highly likely to come) as well as past damages (total knee/shoulder surgeries and appointments that have already occurred). As the undisputed evidence at trial shows, Dr. Friederichs would receive an average of $1,850 after variable expenses for total knee/shoulder surgeries. To pick a few examples, each of the following patients (1) saw Dr. Friederichs prior to the January Letter; (2) made and/or had an initial appointment with a new physician after the

9

January Letter but prior to the February Letter; and (3) had one knee/shoulder replaced but not the other. Further, three of these five had their first knee/shoulder replaced after the January Letter.

A. ▮▮▮▮▮

    a. Saw Dr. Friederichs ten times from June 2020 through November 2021

    b. Made appointment with Dr. Berglund on January 17, 2022

    c. Had total knee replacement with Dr. Nelsen August 2, 2022

    d. Had 17 other appointments after January 5, 2022

B. ▮▮▮▮▮

    a. Saw Dr. Friederichs 16 times between November 19, 2018 and March 1, 2021

    b. Made appointment with Dr. Dahl on February 1, 2022

    c. Had previous total knee replacement (pre-Jan. 5)

    d. Had 8 appointments between Dr. Dahl and Dr. Orson after January 5, 2022.

C. ▮▮▮▮▮

    a. Saw Dr. Friederichs on September 11, 2022

    b. Made appointment with Dr. Hvidston on January 10, 2022

    c. Had previous total knee replacement (pre-Jan. 5)

    d. Had 3 appointments with Dr. Hvidston, all after January 5, 2022

D. ▮▮▮▮▮

    a. Saw Dr. Friederichs 8 times between October 2020 and May 2021

    b. Made appointment with Dr. Hvidston on January 14, 2022

    c. Had total shoulder replacement with Dr. Hvidston on October 17, 2022

    d. Had 9 other appointments with Dr. Hvidston, all after January 5, 2022.

E. ▮▮▮▮▮

      a. Saw Dr. Friederichs three times in 2020

      b. Made appointment with Dr. Dahl on January 14, 2022

      c. Had total knee replacement with Dr. Dahl on June 6, 2023

      d. Had 8 appointments with Dr. Dahl, all after January 5, 2022.

This is only 5 of the 31 patients in Exhibit P125. For all 31 patients, Chris Van Schooneveld calculated future damages solely relating to a second knee/shoulder replacement. Discounted to present value with a steep discount rate, he valued those 31 patients at $26,909. (Ex. P120.)

Additionally, for each of the 14 of these 31 patients who had their first knee/shoulder replacement after January 5, 2022, a reasonable inference from the evidence is that there are additional damages in the amount of $1,850 per surgery. That is, these patients received the January Letter and did exactly what it suggested they do—find another physician at Sanford. That caused damages to Dr. Friederichs.

The fact that Sanford argues there may have been other reasons why Dr. Friederichs' patients chose to reschedule their appointments after receiving the January Letter does not mean there is insufficient evidence for the jury to determine the amount of damages. Nor is the February Letter dispositive. It is but one piece out of many pieces of evidence that the jury may consider in interpreting patient appointment data. The Court may not weigh this evidence on Sanford's motion. The Court must give all reasonable inferences in favor of Dr. Friederichs.

## CONCLUSION

For the reasons set forth herein, Dr. Friederichs respectfully requests that the Court deny Sanford's Motion for Judgment as a Matter of Law in its entirety and permit all of Dr. Friederichs' claims to be submitted to and decided by the jury.

| | |
|---|---|
| Dated: September 3, 2023 | **FELHABER LARSON** |
| | By:   */s/Brandon J. Wheeler* |
| |       David L. Hashmall, MN #138162 |
| |       Daniel R. Kelly, MN #247674 |
| |       Brandon J. Wheeler, MN #396336 |
| |       220 South Sixth Street, Suite 2200 |
| |       Minneapolis, MN 55402-4504 |
| |       Telephone: (612) 339-6321 |
| |       Facsimile: (612) 338-0535 |
| |       dhashmall@felhaber.com |
| |       dkelly@felhaber.com |
| |       bwheeler@felhaber.com |
| | **ATTORNEYS FOR PLAINTIFF** |

4260374.v1