**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | |
|---|---|
| Matthew G. Friederichs, M.D., | Case No. 3:22-cv-00008-PDW-ARS |
| Plaintiff, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND TREBLING OF DAMAGES** |
| Sanford Health, | |
| Defendant. | |

Defendant Sanford Health ("Sanford") sent a fraudulent letter to 2,334 of the patients of Plaintiff Matthew Friederichs, M.D. ("Dr. Friederichs"). Sanford stole Dr. Friederichs' identity to mislead his patients into finding a new physician at Sanford, rather than following Dr. Friederichs to his new clinic. This conduct invaded the doctor-patient relationship to retain Dr. Friederichs' patients and the corresponding revenues. Sanford's conduct was appalling.

The jury agreed. The jury found Sanford liable under the Unlawful Sales and Advertising Practices Act ("USAPA") and the Lanham Act. Recognizing the particular reprehensibility of Sanford's misconduct, the jury also found Sanford liable for exemplary damages in the amount of $240,000. The Court then entered judgment in the amount of $289,800.

Dr. Friederichs now moves for an award of attorneys' fees under the USAPA and the Lanham Act. Under the USAPA, an award is mandatory if the Court finds that Sanford "knowingly committed" the conduct at issue. Under the Lanham Act, an award is permissive in "exceptional cases." Dr. Friederichs also moves for the trebling of damages under both statutes.

As was demonstrated at trial, Sanford knowingly committed the conduct, and this is an exceptional case. Sanford's written policy required a letter to be sent to a departing physician's patients "on behalf of" the departing physician. These letters endorsed and asked patients to find

replacement Sanford physicians. This policy applied even when a physician left to join a competing system, and did not require the physician to review or authorize the letter.

In November 2021, Dr. Friederichs told Sanford that he was leaving. Sanford knew Dr. Friederichs was leaving to start a competing clinic in Fargo. In preparing the departing physician letter to be sent "on behalf of" Dr. Friederichs, the director of Sanford's orthopedic clinic (Emily Mangin) emailed the executive director (Michael Erickson) and the chair of the department (Bruce Piatt). Ms. Mangin flagged that Dr. Friederichs "might not like" how the letter—again, drafted as if it came from Dr. Friederichs—was drafted. Knowing Dr. Friederichs would never approve such a blanket endorsement or urge his own patients to find a new physician, Sanford's leadership did not send the letter to Dr. Friederichs for approval, or otherwise discuss it with Dr. Friederichs. Instead, they mailed the letter. Sanford wanted to retain as many of Dr. Friederichs' patients as it could. It did not want these patients to follow Dr. Friederichs.

Though Sanford's witnesses testified that they made a mistake, the above documentary evidence proved otherwise. Indeed, in the immediate aftermath of the letter, Sanford showed no remorse and minimized the issue. Sanford did not respond to a pre-suit demand from Dr. Friederichs' counsel that immediate action be taken and waited a month to send a second letter. Dr. Piatt went so far as to lie to Dr. Friederichs and disavowed any involvement in the letter.

The jury has already decided that Sanford's conduct was not just illegal, but reprehensible. In addition to finding that Sanford violated the Lanham Act and the USAPA, the jury found exemplary damages were appropriate. As a result, it must be the case that Sanford "knowingly committed" the conduct, and that this case is an "exceptional case."

Therefore, Dr. Friederichs respectfully requests that the Court grant his motion for attorneys' fees and treble damages in full.

4275247.v3

## BACKGROUND

Dr. Friederichs worked as an orthopedic physician for Sanford in Fargo. (ECF No. 123 ("SJ Order") at 1.) In November 2021, Dr. Friederichs gave 90 days' notice of his intent to resign his position at Sanford. (SJ Order at 2.) Dr. Friederichs intended to start his own practice in Fargo and desired to continue seeing his patients. (SJ Order at 2; Friederichs Trial Testimony.)

Sanford had a policy by which it sent letters to the patients of departing physicians. (Ex. P046 (the "Policy").) This Policy was intended to "ensure consistent communication and **retain their patients**" and "**ensure patient retention**." (Policy at SAN0277.) The Policy specifically addressed the circumstance of a physician "tak[ing] a position with another health care system." (Policy at SAN0281-282.) In this circumstance, the Policy required the letter to be sent "on behalf of the physician," written in the first person with the physician's name in the signature block. The form letter contained endorsements of other physicians at Sanford and encouraged the recipients to contact Sanford to find a new physician. Nowhere did the Policy require that the departing physician authorize the letter being sent out on his or her behalf.

On December 22, 2021, a marketing employee named Scott Seiler sent a draft departing physician letter for Dr. Friederichs to Emily Mangin and Michael Erickson. (Ex. P032.) Ms. Mangin was the director of the orthopedic and sports medicine group in Fargo, and reported to Mr. Erickson, the executive director. (Mangin Trial Testimony; Erickson Trial Testimony.)

The letter announced "[i]t has been my honor and pleasure to serve patients," and that "it's with mixed emotions" that "Dr. Friederichs" was announcing his resignation. (Ex. P032 at 2.) "Dr. Friederichs" endorsed the other orthopedic physicians at Sanford as "highly skilled surgeon[s]" who are all "highly trained and skilled" and "trust[ed]" by "Dr. Friederichs" to "continue providing you with expert care for your orthopedic needs." "Dr. Friederichs" stated that it would be a "seamless transition" and provided Sanford's contact information to find a new

4275247.v3

physician. It concluded that "I greatly value our relationship and thank you for entrusting me to care for you over the years. It's been truly rewarding and humbling to have you as my patient. Best wishes for your future health." It was then signed "Sincerely, Matthew Friederichs, MD."

Ms. Mangin forwarded this draft letter to Dr. Piatt, the chair of the department. (Ex. P033.) Ms. Mangin asked Dr. Piatt to review the letter and indicated that "I know with [Dr. Friederichs] leaving to private practices [he] **may not like how these letters are worded**. Appreciate any feedback." (Ex. P033 (emphasis added).) The obvious inference is that Dr. Friederichs had not seen the letter, nor would he see the letter before it was mailed.

Mr. Erickson responded that "I think we can send these out." (Ex. P034.) Dr. Piatt responded that "[i]f that is the standard letter that looks fine to me." (Ex. P036.) Both Mr. Erickson and Dr. Piatt testified that while they reviewed the draft, they did not discuss it with Dr. Friederichs. Mr. Erickson testified that he assumed somebody else would do so, though it is not clear who, as Ms. Mangin's email clearly indicated she had not. Mr. Erickson also blamed the lack of any training he received regarding departing physician letters, as if either he or any of the other educated, long-tenured employees at issue needed training to know that a doctor should authorize a letter sent on his behalf to his patients.

Dr. Piatt testified that, despite admittedly reviewing the letter, he apparently did not realize that the letter was written in the first person "on behalf of" Dr. Friederichs. This is despite the one-page letter using "my," "me," or "I" seven times, and concluding "Sincerely, Matthew Friederichs, MD." This is further despite Ms. Mangin flagging that Dr. Friederichs had not reviewed the letter; that he "may not like" how it was worded. As discussed further below, the jury rejected Dr. Piatt's and Mr. Erickson's excuses and testimony, finding them not credible.

Given the approval of Dr. Piatt and Mr. Erickson, Mr. Seiler proceeded with mailing. In an email requesting a list of "Dr. Matthew Friederichs' patients," Mr. Seiler stated that he

"need[ed] to mail a letter out to his patients about rescheduling with existing providers." (Ex. P037.) Then, on January 5, 2022, the departing physician letter for Dr. Friederichs was mailed to 2,334 of his patients. (Ex. P001 ("January Letter").). Both Mr. Seiler and his boss, Darren Huber, testified that they had done nothing wrong in connection with the January Letter. Mr. Seiler also struggled to admit that a purpose of the letter was to retain or reschedule patients, despite the plain language of the Policy and his own words in Exhibit P037. Indeed, various Sanford employees testified that the purpose of the letter was to "provide options" to patients about their healthcare. Witnesses generally resisted making the unqualified admission that a purpose was for Sanford to retain patients. Witnesses also generally resisted questions about whether Sanford derived revenues from patient appointments. Mr. Erickson even deflected by testifying about Sanford's history as a "faith-based organization" and the religious history of Sanford's logo.

On January 12, 2022, Dr. Friederichs sent a demand letter to Sanford's general counsel. (Ex. P056.) Sanford did not respond. As a result, on January 18, 2022, Dr. Friederichs commenced this litigation, asserting claims under the USAPA and the Lanham Act. (ECF No. 1.) Dr. Friederichs then filed a motion seeking a temporary restraining order relating to the January Letter. (ECF Nos. 3-7.) Sanford opposed the motion. (ECF Nos. 13-14.) The motion was set for a hearing to occur on February 4, 2022, and the parties agreed to a resolution to the motion the night before, which required Sanford to mail a second letter to patients. (ECF Nos. 23-24.)

A short time later, Dr. Friederichs and Dr. Piatt had a conversation about the January Letter. (Ex. P131.) Dr. Piatt downplayed the significance of the letter, criticized and expressed "disappointment" with Dr. Friederichs' response to the letter, and disavowed any involvement with the letter. Dr. Piatt stated he had "no idea" how the letter happened and that it was "hurtful" that Dr. Friederichs thought that Dr. Piatt was "in on it." Dr. Piatt stated that he could not "feel bad" for it happening to Dr. Friederichs and that if anything happened, it "hasn't been me."

4275247.v3

The case then proceeded to discovery. As discussed in more detail *infra* Section II(A)(1), a considerable amount of work occurred over the three years of this litigation. This culminated in a two-week jury trial during which Dr. Friederichs presented his claims for false endorsement under the Lanham Act, violation of the USAPA, and exemplary damages. On the Lanham Act claim, the jury found that Sanford engaged in false endorsement and that Dr. Friederichs sustained damage in the amount of $24,250. (ECF No. 182.) On the USAPA claim, the jury found: (1) Sanford used or employed a deceptive act or practice, fraud, false pretense, false promise, or misrepresentation; (2) Sanford intended for others to rely on that act; and (3) Dr. Friederichs sustained damage in the amount of $24,250. (ECF No. 182.) On the exemplary damages claim, the jury found that Dr. Friederichs was entitled to recover exemplary damages in the amount of $240,000. (ECF No. 184.) On October 7, 2024, the Court entered judgment in the amount of $289,800. (ECF No. 186.)

## ARGUMENT

Dr. Friederichs now moves the Court for recovery of his attorneys' fees and trebling of damages under the USAPA and the Lanham Act. The Court should award Dr. Friederichs his attorneys' fees in the total amount of $492,734.79 and should further treble damages.

### I. **The Court Should Award Attorneys' Fees.**

#### A. **Attorneys' Fees under the USAPA.**

Under the USAPA, "[i]f the court finds the defendant knowingly committed the conduct, the court… **must** order that the person commencing the action recover… actual reasonable attorney's fees incurred in the action." N.D.C.C. § 51-15-09 (emphasis added). The USAPA "is remedial in nature and must be liberally construed to effectuate its purpose." Staal v. Scherping Enterprises, Inc., 466 F. Supp. 3d 1030, 1034 (D.N.D. 2020); see also Woodmont Co. v. LaSalle Shopping Ctr., LLC, 2021 WL 9666526, at *2 (D.N.D. Apr. 12, 2021). The "clear intent" of the

USAPA's provision of a private cause of action is to "give individuals an opportunity to pursue, on their own, consumer fraud claims." A & R Fugleberg Farms, Inc. v. Triangle Ag, LLC, 2010 WL 1418870, at *6 (D.N.D. Apr. 7, 2010). Section 51-15-09 accomplishes this intent by: (1) "provid[ing] an incentive for private individuals to bring legal action against sellers guilty of fraud and deception"; (2) "provid[ing] a remedy for the injured"; (3) "deter[ring] future seller misconduct"; and (4) "encourag[ing] attorneys to accept cases of consumer fraud." Id. at *5.

Here, Sanford "knowingly committed" the conduct, and therefore the Court "must" award attorneys' fees. The jury has already concluded as much. Sanford asked the jury to find no liability based on a narrative that the January Letter was just a "mistake." The jury necessarily rejected this narrative and all of Sanford's excuses, finding Dr. Piatt and Mr. Erickson to be not credible. The jury found that the January Letter was a "deceptive act or practice, fraud, false pretense, or misrepresentation," and further found that Sanford "intended that others rely" on it. (ECF No. 176 at F-7; ECF No. 182 at Question 6.) The jury also found Sanford liable for exemplary damages. (ECF No. 184.) This required the jury to find by "clear and convincing evidence" that Sanford acted with "oppression, fraud, or actual malice." (ECF No. 185 at F-22.) The Court defined "oppression" as "subjecting a person to cruel and unjust hardship in **conscious disregard** of that person's rights." (ECF No. 185 at F-23 (emphasis added).) The Court defined "fraud" to include "the assertion as a fact of that which is not true by **one who has no reasonable ground for believing it to be true.**" (ECF No. 185 at F-24 (emphasis added).) The Court defined "actual malice" as the "actual state or condition of the mind" or "motive" that was "**improper and unjustifiable**." (ECF No. 185 at F-25 (emphasis added).) Given the jury's findings, it must be that Sanford "knowingly committed" the conduct in violation of the USAPA.

Indeed, it is easy to see how the jury concluded that the January Letter was not a "mistake," but intentional misconduct. Sanford itself acted intentionally. Sanford as an entity had

4275247.v3

a written corporate policy that required the January Letter be sent "on behalf of" Dr. Friederichs, and did not require Dr. Friederichs to authorize it. Mr. Seiler and Mr. Huber testified they followed the Policy, and that there was no mistake. The Policy further made clear that the purpose was to "retain" the patients of the departing physician and "ensure patient retention."

Intent is further proven through the acts and knowledge of the individual employees. Ms. Mangin recognized that the draft letter was inappropriate and flagged the issue for Dr. Piatt and Mr. Erickson. Dr. Piatt and Mr. Erickson reviewed the draft letter and authorized it to be sent, without discussing it with Dr. Friederichs or requiring his approval. While Dr. Piatt and Mr. Erickson later claimed a "mistake" at trial, that claim is not credible on the face of the one-page January Letter. The jury necessarily rejected the excuses as not credible when reaching their findings. And Mr. Erickson's and Dr. Piatt's immediate actions in the aftermath contradict their "mistake" narrative. Mr. Erickson never told Dr. Friederichs that there had been a mistake, never personally apologized, and never even reached out to Dr. Friederichs until directed to do so by counsel at the eleventh hour. Dr. Piatt lied to Dr. Friederichs and falsely disavowed any involvement with the January Letter. And Sanford otherwise refused to take the issue seriously. Sanford's general counsel never responded to the demand letter, and it took Sanford nearly a month to send out a second letter. This is not the conduct of a party who made an honest mistake.

Given the evidence and the verdict, the result is clear. Sanford "knowingly committed the conduct" under the USAPA. Thus, the Court "**must**" award Dr. Friederichs' attorneys' fees.

### B.  Attorneys' Fees under the Lanham Act.

In addition to the USAPA, the Court may also award attorneys' fees under the Lanham Act to the prevailing party in an "exceptional case." 15 U.S.C. § 1117(a). "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the

unreasonable manner in which the case was litigated." Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014). Relevant factors include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." Safeway Transit LLC v. Discount Party Bus, Inc., 954 F.3d 1171, 1182 (8th Cir. 2020). A case may be "exceptional" if the defendant "acted willfully and deliberately." Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church, 634 F.3d 1005, 1013 (8th Cir. 2011); Loegering Mfg., Inc. v. Grouser Prod., Inc., 330 F. Supp. 2d 1057, 1072 (D. N.D. 2004).

Here, there is ample evidence of this case being "exceptional." As discussed in the USAPA section, Sanford's conduct with the January Letter was deliberate and willful. The January Letter was also objectively unreasonable and dishonest on its face. To put it simply, every honest person knows that you cannot send a letter under somebody else's name without their permission. And here, it happened in the context of the doctor-patient relationship. Sanford impersonated a doctor to deceive his patients into finding a new physician at Sanford. This is so exceptional that there does not appear to be any precedent in the case law.

Further, rather than admit the obvious, Sanford fought tooth and nail over the last three years. Sanford incredibly claimed at trial that this was an "honest mistake" and that it simply desired to ensure the "continuity of care" and act in the patients' "best interests." The jury saw right through the false narrative and determined that Sanford's conduct was so reprehensible that it warranted exemplary damages of $240,000. This makes the case exceptional.

Courts routinely find as "exceptional" and award attorneys' fees in Lanham Act cases involving such undisputed, willful misconduct. Among other things, Sanford "stepped into" Dr. Friederichs' shoes. Moon Seed LLC v. Weidner, 604 F. Supp. 3d 780, 796 (S.D. Iowa 2022). Sanford "obviously" infringed on Dr. Friederichs' name. Hydreon Corp. v. JC Brothers, Inc.,

2016 WL 6826158, at *9-10 (D. Minn. Nov. 18, 2016). Sanford "willfully and deliberately" used Dr. Friederichs' name and attempted to avoid document productions. <u>Warner Bros. v. Dave Grossman Creations</u>, 2015 WL 5786087, at *2 (E.D. Mo. Sept. 30, 2015). Sanford willfully used Dr. Friederichs' name and ignored a cease and desist letter. <u>Devon Park</u>, 634 F.3d at 1014. Sanford "intentionally set out to deceive or confuse the public through the publication of false statements." <u>Porous Media Corp. v. Pall Corp.</u>, 110 F.3d 1329, 1341 (8th Cir. 1997).

Regarding compensation and deterrence, Dr. Friederichs single-handedly changed Sanford's practice of sending fraudulent letters, obtained a judgment of $289,800, and achieved public vindication. But, as discussed further below, this did not come easy. Nor did it come cheap. Dr. Friederichs' demand letter was sent on January 12, 2022. (Ex. P056.) The jury's verdict came 32 months later. Given Sanford's fierce resistance over these 32 months, Dr. Friederichs incurred and paid, and continues to incur and pay, substantial attorneys' fees. (Wheeler Fees Decl. ¶ 9.) Dr. Friederichs fought a massive healthcare conglomerate and won. Dr. Friederichs had the courage to do what was right, but dug deep into his own pocket to do so. Given the exceptional misconduct of the January Letter, the Court should not make Dr. Friederichs bear this substantial cost. It should be borne by Sanford, the undisputed wrongdoer, who can clearly afford it. <u>See</u> https://research.sanfordhealth.org/-/media/research/files/grants-administration/sdcl-required-disclosure-a.pdf ($5 billion in revenues).

Therefore, the Court should also award attorneys' fees under the Lanham Act.

## II. <u>The Amount of Attorneys' Fees is Reasonable.</u>

If the Court awards attorneys' fees, it must next determine the amount of the award. Under both state and federal law, courts apply a "lodestar" analysis of "the number of reasonably expended hours times a reasonable hourly rate." <u>Big Pines, LLC v. Baker</u>, 2021 ND 70, ¶ 18,

958 N.W.2d 480, 486. Though the lodestar figure is the "presumptively reasonable amount," North Dakota courts may also consider the following factors in evaluating the amount to award:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer…; and
> (8) whether the fee is fixed or contingent.

Id. Under either analysis, Dr. Friederichs' requested attorneys' fees are reasonable.

**A. Lodestar Method.**

Dr. Friederichs seeks an award of **$492,734.79** for fees billed and/or incurred through October 20, 2024. (Wheeler Fees Decl. ¶ 8 & Ex. A.) This consists of 1,202.90 hours of attorney time. The value of this time is $497,064.50; however, Felhaber provided courtesy discounts at various times that totaled $21,581.21. (Wheeler Fees Decl. ¶ 6 & Ex. B at 6, 11, 61, 121, 126.) For the 1,202.9 in attorney hours, Dr. Friederichs seeks $475,483.29. Dr. Friederichs also seeks paralegal time of 61.6 hours in the total cost of $17,251.50. (Wheeler Fees Decl. ¶ 8 & Ex. A.)

The 1,202.90 hours of attorney time carried an average bill rate of $395.28 an hour, and the 61.6 hours of paralegal time carried an average bill rate of $280.06 an hour. (Wheeler Fees Decl. ¶ 13.) The hours and average rates and total award of $492,734.79 are reasonable for such a fiercely contested litigation over the course of nearly three years. It has involved a motion for a temporary restraining order, productions of thousands of pages of documents, 18 depositions, multiple expert witness reports, summary judgment motions, pretrial motions, a two week jury trial, and now post-trial motions. With all of this, attorneys' fees of $492,734.79 is reasonable.

1.   <u>The Hours Worked and Total Costs are Reasonable.</u>

To assist the Court's analysis, Dr. Friederichs has categorized all the claimed attorneys' fees into eleven different stages of the litigation. (<u>See</u> Wheeler Fees Decl. ¶ 4-8 & Ex. A.) Exhibit A reflects all the requested time that has been incurred. This has all been billed except for October 2024 time. Subject to courtesy discounts, Dr. Friederichs has fully paid for all these fees, except for August (in part) and September 2024, which were recently billed. (<u>Id.</u> ¶ 6, 9.)

*Initial Assessment, Demand, Pleadings, and Temporary Restraining Order.* The case started with the need for extensive work. Due to the January Letter being sent to 2,334 unsuspecting patients, Dr. Friederichs had no choice but to take immediate action. Within approximately five weeks, counsel: (1) researched potential claims; (2) drafted a demand letter to Sanford (ECF No. 6-2); (3) researched and drafted a complaint (ECF No. 1); (4) researched and drafted a motion for a temporary restraining order (ECF Nos. 3-7, 17-22); (5) negotiated a resolution to the motion (ECF Nos. 23-24) the night before the hearing (which required full preparation); and (6) addressed possible breaches of the negotiated resolution. (Wheeler Fees Decl. ¶ 8(a) & Ex. A at 1-5.) Due to the amount of work required, Felhaber provided two courtesy discounts of $6,000 and $5,000 to Dr. Friederichs for January and February 2022. (<u>Id.</u> ¶ 6.) For all this work, 169.60 hours at the total cost of $60,647.50 is reasonable.

*Motion for Exemplary Damages.* Dr. Friederichs next filed a motion to assert a claim for exemplary damages. (ECF Nos. 45-46, 49.) Dr. Friederichs sought Sanford's stipulation to this pleading issue, but Sanford declined. Dr. Friederichs then filed the motion, which was ultimately successful. (ECF No. 57.) The attorney time was 25.90 hours at a cost of $9,453.50. These limited hours and costs are reasonable. (Wheeler Fees Decl. ¶ 8(b) & Ex. A at 6.)

*Written Discovery, Document Productions, and Fact Development.* For more than a year, the parties engaged in written discovery and document productions. This included: (1) multiple

12

sets of discovery requests; (2) multiple responses to written discovery; (3) a motion to compel; (4) other discovery disputes (resolved without a motion to compel); (5) the defensive processing and review of thousands of potentially responsive documents, resulting in the production of nearly 2,000 pages of documents; (6) subpoenas to obtain data from personal devices of Sanford employees; (7) the processing and review of Sanford's document production totaling nearly 2,000 pages; (8) the analysis of complicated data sets produced by Sanford; and (9) efforts to contact potential witnesses. Of course, Dr. Friederichs had to analyze and understand all the information, documents, and data to determine how to litigate this case. (Wheeler Fees Decl. ¶ 8(c) & Ex. A at 7-25.) Omitting entries previously requested pursuant to the motion to compel (ECF No. 73), the attorney time was 194.4 hours at a cost of $74,516, and the paralegal time was 43.20 hours at a cost of $11,731.50. (Id.) Given the extensive written discovery, discovery disputes, document productions, and fact development, this time and costs were reasonable.

*Fact Depositions.* Dr. Friederichs took 12 fact depositions. Sanford took two fact depositions. Including the time to prepare for and take or defend the depositions, the attorney time was 68.8 hours at a cost of $25,494.14 depositions at an average attorneys' fee of $1,821 per deposition is reasonable, particularly given that 11 of the 12 individuals ultimately testified at trial. (Wheeler Fees Decl. ¶ 8(d) & Ex. A at 26-28.)

*Settlement Efforts.* The parties engaged in significant settlement discussions on two occasions. The parties attended a settlement conference before Magistrate Judge Senechal on May 12, 2023 (ECF No. 83). Additionally, in August 2024, the parties engaged in direct settlement negotiations. Dr. Friederichs' incurred 35.2 hours of attorney time at the cost of $14,035.50 relating to the efforts to settle the case. (Wheeler Fees Decl. ¶ 8(e) & Ex. A at 26-28.) These amounts reflect the serious efforts made by Dr. Friederichs to settle the case.

*Expert Reports and Discovery.* Given the complicated data sets produced by Sanford, Dr. Friederichs retained an expert witness to help analyze the data, develop damages and disgorgement theories, and prepare expert reports. The work of these expert witnesses, and the necessity for this work is discussed in more detail in Dr. Friederichs' motion for costs. For attorneys' fees spent in developing these theories, preparing expert reports, doing depositions, and supplementing expert reports, the attorney time was 98.1 hours at a cost of $38,521. Felhaber also provided a courtesy discount of $2,132.45 for March 2023, which brings this total to $36,388.55. (Wheeler Fees Decl. ¶ 8(f) & Ex. A at 32-38.)

*Summary Judgment.* The parties filed cross-motions for summary judgment. Dr. Friederichs primarily moved for summary judgment on liability on his Lanham Act claim.[1] Sanford moved on all claims and all damages and remedies. Dr. Friederichs incurred attorney time of 132.7 hours at a cost of $52,222 in connection with these motions. These motions were incredibly important. Had Dr. Friederichs affirmatively succeeded on liability at summary judgment, it would have streamlined the trial. Further, Dr. Friederichs' motion benefitted his opposition to Sanford's motion on the same issues of liability and otherwise provided valuable work product for trial. And defeating Sanford's motion was critically important, given that Sanford sought to dismiss the entire case. (Wheeler Fees Decl. ¶ 8(g) & Ex. A at 39-43.) As such, the time and amounts are reasonable. ResCap Liquidating Tr. v. Primary Residential Mortg., Inc., 59 F.4th 905, 922 (8th Cir. 2023) ("[D]efendants who drive up the expense of litigation must pay the full costs, even if legal fees seem excessive in retrospect.").

*Pretrial.* The parties engaged in a great deal of work in connection with pretrial filings and trial preparation, including: (1) attending pretrial conferences with the Court; (2) researching

---

[1] Dr. Friederichs also moved on his breach of contract claim but has omitted from his request entries relating to that portion of the motion. (Wheeler Fees Decl. ¶ 8(g).)

and drafting offensive motions in limine; (3) researching and drafting oppositions to Sanford's motions in limine; (4) researching and drafting an opposition to Sanford's bifurcation motion; (5) researching and drafting proposed jury instructions; (6) researching and drafting proposed special verdict forms; (7) determining the witnesses, witness order, and related subpoena issues; (8) determining the exhibits to be used at trial; (9) analyzing potential 30(b)(6) designations and counter-designating Sanford's designations; (10) reviewing and developing objections to Sanford's exhibits; (11) reviewing and developing arguments in response to Sanford's objections to Dr. Friederichs' exhibits; (12) researching and drafting the trial memorandum; (13) drafting voir dire questions for the Court; (14) analyzing the Court's orders on pretrial motions and adjusting exhibits and testimony accordingly; (15) opposing Sanford's motion to quash; (16) researching potential jurors; and (17) developing overall trial strategy. Together, the attorney time was 201.8 hours at a cost of $87,011, and the paralegal time was 18.4 hours at a cost of $5,520, for a total cost of $92,531. (Wheeler Fees Decl. ¶ 8(h) & Ex. A at 44-55.) These amounts are reasonable given the incredible amount of work that went into accomplishing the many tasks necessary for preparing for trial.

*Sanford's Rule 50 Motion*. At trial, Sanford filed a Rule 50 motion. Dr. Friederichs anticipated some, but not all, of the issues raised by Sanford, and prepared a written brief. Because Mr. Wheeler and Mr. Kelly were occupied with trial, much of this work was performed by others. The total attorney hours were 30.7, and the total cost was $14,467. Opposing this motion was critically important, given that Sanford sought to dismiss the entire case. (Wheeler Fees Decl. ¶ 8(i) & Ex. A at 57-58) Given the importance, these amounts are reasonable.

*Trial.* This case culminated in a two-week jury trial, involving the following trial tasks: (1) preparing witness outlines; (2) preparing witnesses for their testimony; (3) developing overall trial strategy; (4) preparing opening and closing statements for both phases of the case; (5)

analyzing jury instructions; and (6) attending trial. This resulted in attorney time of 180.6 hours at a cost of $84,107.50. However, Felhaber provided courtesy discounts for August 2024 ($6,423.83) and September 2024 ($2,024.93), to bring the total to $75,658.74. Further, Felhaber capped Mr. Kelly's time per trial day at 8 hours, even though he performed significantly more work than 8 hours some trial days. Further, Felhaber wrote off all its travel time, travel expenses, lodging, and meals. Felhaber also capped its rates. (Wheeler Fees Decl. ¶ 8(j) & Ex. A at 59-61.) Given the significant amount of work that was necessary to result in successful jury verdicts, and further given Felhaber's discounts, caps, write-offs, and non-increases, this time is reasonable.

*Post-Trial.* Following trial, Dr Friederichs has continued to incur attorneys' fees. So far, this includes: (1) researching and drafting this motion for attorneys' fees; (2) researching and drafting Dr. Friederichs' motion for costs; and (3) anticipating post-trial motions that may be filed by Sanford. Through October 20, 2024, Dr. Friederichs has incurred 65.1 hours of attorney time at a cost of $25,589. Given the significant relief sought by Dr. Friederichs post-trial motions, and given the likely significant relief to be sought by Sanford in its post-trial motions, this time is both necessary and reasonable.[2] (Wheeler Fees Decl. ¶ 8(j) & Ex. A at 62-64.)

For all these reasons, it is reasonable for Dr. Friederichs to request attorney time at 1,202.9 hours, paralegal time at 61.6 hours, and a total cost of **$492,734.79** for fees billed and/or incurred through October 20, 2024.

### 2.  The Attorney and Paralegal Rates are Reasonable.

The lodestar method also requires an analysis of the attorney and paralegal rates. Here, the average rate for attorneys' fees was $395.28 an hour for 1,202.9 hours. (Wheeler Fees Decl. ¶ 13.) The average rate for paralegals' fees was $280.06 an hour for 61.6 hours. These average

---

[2] Dr. Friederichs will also seek additional attorneys' fees incurred in connection with all further litigation, which may include additional work on Dr. Friederichs' post-trial motions, opposing any post-trial motions filed by Sanford, and any appeals.

rates were largely based off the standard rates for Felhaber's attorneys and paralegals. The only rate departures were occasional downwards departures by way of courtesy discounts, write offs, caps, and the non-implementation of rate increases. (Wheeler Fees Decl. ¶¶ 6, 8(j), 11.)

The top three billing attorneys were Mr. Wheeler (72.6 percent), Mr. Hashmall (10.1 percent), and Mr. Kelly (8.5 percent), who account for a total of 91.2 percent of the billed attorney time. (Wheeler Fees Decl. ¶ 10.) Each of these attorneys charged their standard rates, which increased the nearly three years to get to trial. However, each of these attorneys did not implement their standard rate increase on September 1, 2024. Mr. Wheeler's billing rates ranged from $350 to $400 an hour. Mr. Hashmall's billing rates ranged from $535 to $600 an hour. Mr. Kelly's billing rates ranged from $515 to $585 an hour. As set out in their declarations, each of these attorneys is experienced and accomplished, and each of their rates is consistent with the market. (Wheeler Fees Decl. ¶¶ 2-3, 14; Kelly Decl.; Hashmall Decl.)

Further, Sanford did not oppose Felhaber's rates in 2022 when Dr. Friederichs sought to recover attorneys' fees in connection with its motion to compel, and Magistrate Judge Senechal "finds Dr. Friederichs' counsel's hourly rate and the time expended on the motion to compel to be reasonable." (ECF No. 73 at 4.) Indeed, such rates are routinely approved. See Lynne v. Verner, No. 3:23-CV-100, 2023 WL 11225943, at *2 (D.N.D. Dec. 29, 2023) ("Courts in this district have held $200 to $300 hourly rates for associates and $300-$425 hourly rates for partners are not unreasonable; in fact, hourly rates up to $625 for civil litigation have been found reasonable."); Miller v. Cartel, 2022 WL 4182250, at *2-3 (D. N.D. Sept. 13, 2022) (finding hourly rates ranging from $485 to $660 an hour to be reasonable).

**B. Big Pines Factors.**

Dr. Friederichs' requested fees are further reasonable in light of the Big Pines factors.

*First*, regarding "time and labor required," the total amount of work is discussed *supra* Section II(A)(1). This case involved nearly three years of heavily contested litigation, motions, voluminous discovery, depositions, pretrial filings, and complicated factual and legal issues.

*Second*, regarding "customary rates," as discussed *supra* Section II(A)(2), each of Felhaber's attorneys and paralegals charged their standard rates with occasional courtesy discounts and write offs, and are now charging less than their standard rates. (Wheeler Fees Decl. ¶11; Kelly Decl. ¶ 3; Hashmall Decl. ¶3.) As further discussed above, these rates are routinely approved and are customary for this sort of complex, heavily contested litigation.

*Third*, regarding the amounts involved and results obtained, through October 20, 2024, Dr. Friederichs seeks to recover $492,734.79 in attorneys' fees. The Court entered judgment in the amount of $289,800. The attorneys' fees represent approximately 1.7 times the amount of the principal judgment, which is a permissive ratio. Cont'l Res., Inc. v. Fisher, 102 F.4th 918, 930 (8th Cir. 2024) (affirming a 10 to 1 ratio, and noting that "[t]he North Dakota Supreme Court has approved ratios between 5:1 and 6:1"); ResCap Liquidating Tr. v. Primary Residential Mortg., Inc., 59 F.4th 905, 922 (8th Cir. 2023) (attorneys' fees twice as large as the principal damages). Further, non-monetary components are relevant. Through litigation, Dr. Friederichs obtained a second letter to the 2,334 recipients of the January Letter. Additionally, the jury's verdict represents a public repudiation of Sanford and a complete vindication of Dr. Friederichs.

*Fourth*, regarding time limitations, the nature of the January Letter required immediate action, which necessitated additional attorneys to provide time-sensitive services. Further, Sanford filed motions shortly before and during trial. Given that lead counsel was occupied with other pretrial and trial tasks, additional assistance was necessary. (Wheeler Fees Decl. ¶8(i).)

*Fifth*, regarding the nature and length of Dr. Friederichs' relationship with counsel, most materially, Felhaber previously represented Dr. Friederichs in a lawsuit involving a real estate

development. Schaff et al. v. Cornerstone Bank et al., 09-2013-CV-02739 (Cass County). This case was commenced in September 2013 and was resolved in August 2017, right before a jury trial. From this, Dr. Friederichs was acutely aware of the costs and burdens involved with complex civil litigation. He was also aware of the quality of Felhaber's services.

Sixth, regarding the experience and ability of counsel, each of Dr. Friederichs' primary attorneys is sufficiently experienced and able so as to justify the attorneys' fees incurred in connection with this case. (Wheeler Fees Decl. ¶¶ 2-3; Kelly Decl. ¶ 2; Hashmall Decl. ¶ 2.)

Seventh, regarding the billing arrangement, the fee arrangement was entirely hourly. There was never any contingent component. Felhaber billed Dr. Friederichs monthly for its services, and Dr. Friederichs paid Felhaber monthly. Dr. Friederichs has paid all the invoices except for August 2024 (in part), the September 2024 invoice that was just issued, and the October 2024 time that has not yet been invoiced. All the recent time will be paid in due course. An hourly arrangement supports the requested award. Balcor Real Est. Holdings, Inc. v. Walentas-Phoenix Corp., 73 F.3d 150, 153 (7th Cir. 1996) ("the best guarantee of reasonableness is willingness to pay"); Worldwide Home Prod., Inc. v. Bed, Bath & Beyond, Inc., 2015 WL 1573325, at *4 (S.D.N.Y. Apr. 9, 2015) ("The fact that Defendants… have paid the fees in full pursuant to the fee [arrangement] with counsel is indicative of the reasonableness of the fees.").

In sum, given the complexity and intensity of the litigation and the importance of the issues and amounts at stake for the parties, attorneys' fees of $492,734.79 through October 20, 2024, are reasonable, and Dr. Friederichs respectfully requests that the Court award the same.

### III. The Court Should Treble Damages.

Finally, Dr. Friederichs also requests that the Court treble damages under both the USAPA and the Lanham Act. Under the USAPA, "[i]f the court finds the defendant knowingly committed the conduct, the court may order that the person commencing the action recover up to

4275247.v3

three times the actual damages proven…." N.D.C.C. § 51-15-09. There does not appear to be any guidance in the statute or the case law as to when the Court should treble damages. As discussed, however, this Court has recognized four purposes of Section 51-15-09: (1) to provide an incentive for private individuals to bring legal action against sellers guilty of fraud and deception; (2) to provide a remedy for the injured; (3) to deter future seller misconduct; and (4) to encourage attorneys to accept cases of consumer fraud. Triangle Ag, 2010 WL 1418870 at *5.

Under the Lanham Act, "[i]n assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117(a). The statute contains no guidance on when to treble damages, and there likewise appears to be no guidance from the Eighth Circuit. It appears that "willfulness justifies an award of treble damages." Core Distribution, Inc. v. Doe 1, No. 16-CV-04059 (SRN/HB), 2018 WL 6178720, at *8 (D. Minn. Nov. 27, 2018).

As discussed above, Sanford "knowingly committed the conduct" under the USAPA and acted "willfully" for purposes of the Lanham Act. To deter Sanford from such further conduct and to fully remedy Dr. Friederichs, Dr. Friederichs respectfully requests that the Court exercise its discretion and treble damages under both statutes. Dr. Friederichs took on a significant financial burden as an individual in litigation against a massive healthcare conglomerate. This litigation has benefitted the greater public in shining a light on Sanford's misconduct and, hopefully, deterring Sanford from committing such fraud in the future. To encourage plaintiffs to continue to make efforts to eradicate such fraudulent conduct, trebling of damages is warranted.

Therefore, Dr. Friederichs respectfully requests that the Court treble the damages found by the jury under the USAPA from $24,250 to $72,750, and treble the damages found by the jury under the Lanham Act from $24,250 to $72,750.

## CONCLUSION

For the foregoing reasons, Dr. Friederichs respectfully requests that the Court grant his motion in full and award reasonable attorneys' fees and treble damages to Dr. Friederichs.

Dated: October 21, 2024

**FELHABER LARSON**

By:     */s/Brandon J. Wheeler*
        David L. Hashmall, MN #138162
        Daniel R. Kelly, MN #247674
        Brandon J. Wheeler, MN #396336
        220 South Sixth Street, Suite 2200
        Minneapolis, MN 55402-4504
        Telephone: (612) 339-6321
        Facsimile: (612) 338-0535
        dhashmall@felhaber.com
        dkelly@felhaber.com
        bwheeler@felhaber.com

**ATTORNEYS FOR PLAINTIFF**

4275247.v3